**IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| Cajun Services Unlimited, LLC dba Spoked Manufacturing, | § § § | |
| **Plaintiff,** | § § | **CASE NO.** |
| **vs.** | § § | |
| | § | **JURY TRIAL DEMANDED** |
| Benton Energy Service Company dba Besco Tubular and Elite Energy Services, LLC | § § § | |
| **Defendants.** | § § | |

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff, Cajun Services Unlimited, LLC dba Spoked Manufacturing, brings this action against Benton Energy Service Company dba Besco Tubular and Elite Energy Services, LLC (collectively, "Defendants").  Unless otherwise stated herein, Defendants shall collectively refer to all Defendants.  Plaintiff alleges upon personal knowledge as to its own acts and status, and as to all publicly available information and documents, and upon information and belief as to all other matters, as follows:

## <u>INTRODUCTION</u>

1.     This lawsuit arises out of the Defendants' knowing and intentional theft and misappropriation of Spoked's Elevator Roller Insert System ("ERIS")—which Defendants at all times knew to be Spoked's patent pending, proprietary and confidential trade secret information.

2.     During a personal conversation after hours, a Besco employee made a passing mention of a problem in the oil and gas industry to a Spoked employee.  Afterwards, at no urging

of and unbeknownst to Besco, Spoked set out find a solution to this industry-wide problem. Spoked subsequently conceived of and developed the ERIS with no financial, design, or engineering involvement of Defendants.

3.      Only after the ERIS was fully conceived did Spoked inform Besco that it had created a solution to the problem.  At Besco's request, Spoked demonstrated the capabilities of the ERIS—resulting in Besco declaring the tool a "game changer" and seeking to buy the ERIS outright from Spoked.  Spoked immediately and unequivocally informed Besco that it had sought patent protection for the ERIS, and that while the ERIS was not for sale, Spoked was willing to negotiate an exclusive license with Besco.  Further, Besco knew at all times that the ERIS was Spoked's confidential and proprietary trade secret information.

4.      Although Besco feigned interest and requested that Spoked send over its exclusive license proposal, Besco had already determined that it would not negotiate any type of license with Spoked.  Rather, apparently believing that the identification of a problem creates an entitlement to the solution, Besco formulated a plan to steal the ERIS and pass it off as its own.

5.      Defendant Besco ignored Spoked's good faith exclusive license offer, instead opting to rent the ERIS from Spoked.  Under the guise of a need to build additional inventory, Besco encouraged Spoked to seek manufacturing assistance from Defendant Elite, requiring Spoked to divulge its engineering schematics for the ERIS, which Spoked shared pursuant to a Non-Disclosure Agreement with Elite.  While Spoked decided to use another machine shop to build its inventory, Elite's involvement with the ERIS had only just begun.

6.      Spoked and Besco's rental relationship became increasingly strained as it progressed—invoices were paid late, tools were not brought directly back to Spoked after jobs, and Besco began demanding cuts to Spoked's invoices in conflict with the rental terms and

conditions to which Besco agreed.  Finally, after a little over a year of renting the ERIS from Spoked, Besco ceased all rentals and payments, and to date has failed to pay over $600,000 in outstanding invoices.

7.      In July 2016, the reason behind Besco's bizarre approach to a previously positive business relationship became clear.  Spoked was informed by a Besco employee that Besco had been secretly working together with Elite to build its own inventory of ERIS tools.  Rather than returning the ERIS tools after jobs as agreed, Besco delivered the ERIS to Elite, where Elite and Besco disassembled and reverse engineered Spoked's ERIS tools.   Elite then began manufacturing an inventory of knock-off ERIS tools on Besco's behalf.  As soon as Besco's knock-off inventory met its needs, the relationship with Spoked was conveniently wound down. Besco's knock-off ERIS tools currently operate on offshore wells of a major well operator in the Gulf of Mexico, resulting in significant revenue to Besco.

8.      Accordingly, Spoked brings this lawsuit against Defendants Besco and Elite for violations of the federal Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, and Louisiana Uniform Trade Secrets Act, as well as civil conspiracy under Louisiana common law.  Additionally, Spoked brings this lawsuit against Besco for fraud and breach of contract under Louisiana common law.

9.      Spoked seeks declaratory and injunctive relief concerning Defendants' theft and misappropriation of its confidential and proprietary trade secret ERIS tool.  Spoked also seeks monetary damages arising out of the Defendants' unlawful actions alleged herein—including over $600,000 in unpaid invoices and punitive damages for Defendants' intentional and willful conduct.

**PARTIES**

10.     Plaintiff Cajun Services Unlimited, LLC dba Spoked Manufacturing is a Louisiana limited liability company with its principal place of business located at 106 Mac Court, Gray, Louisiana 70539.

11.     Defendant Benton Energy Service Company dba Besco Tubular ("Besco") is a Louisiana Corporation with its principal place of business at 359 Equity Boulevard, Houma, Louisiana 70360.

12.     Defendant Elite Energy Services, L.L.C. ("Elite") is a Louisiana limited liability company with its principal place of business located at 936 Blimp Road, Houma, Louisiana 70363.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction to claims arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, pursuant to 28 U.S.C. § 1331.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

16.     This Court has personal jurisdiction over Defendants because Defendants are residents of the State of Louisiana and because Defendants have continuous and systematic contacts with the Eastern District of Louisiana.  Further, each Defendant has intentionally availed itself of the laws of the Eastern District of Louisiana by conducting a substantial amount of business throughout this District.  Finally, each Defendant has purposefully directed its

activities at this District and this litigation results from injuries that arise out of or relate to those activities.  Accordingly, each Defendant has minimum contacts with this judicial district such that this forum is a fair and reasonable one for adjudication of the dispute.

17.    One or more Defendants regularly conduct business in this District.  Additionally, one or more Defendants own shares or interest in a corporation, partnership, other business entity that is located in or doing business in this District.  Further, one or more Defendants own shares or interest in other assets located in this District, including real property.  Finally, one or more Defendants have contracted to supply services and/or goods in this District and have engaged in a persistent course of conduct in and derived substantial revenue from this District.

18.    Venue is proper in this District under at least 28 U.S.C. § 1391 because one or more of the Defendants is an entity that resides or transacts business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and/or a substantial part of property that is the subject of the action is situated in this judicial district.

## **FACTUAL BACKGROND**

19.    In or around September 2014, Spoked's web developer was meeting with Spoked at their office to discuss Spoked's website.  After business hours, the web developer's husband, Jamie Lovell, a manager of Besco, visited Spoked's facility.  During a conversation with Heath Triche ("Heath"), the Operations Manager of Spoked, Mr. Lovell mentioned an existing problem present in certain oil and gas wells.  Specifically, Mr. Lovell mentioned to Heath that "someone could make a lot of money if they developed a solution to allow tubulars to spin inside of an elevator."  No solutions to the problem were discussed and no request was made by Mr. Lovell for Spoked to create a solution.

20.     Nonetheless, Heath and his brother Shane Triche ("Shane"), the General Manager of Spoked, were intrigued by the problem.  In the days following Mr. Lovell's comment, Heath and Shane began brainstorming and discussing potential solutions.  Falling upon their years of mechanical and industrial knowledge, these discussions soon materialized into what the brothers believed could be a possible solution.

21.     Over the next five months, Spoked invested approximately 1,500 hours of engineering time and $60,000 to prototype and test their solution.  As a result, Spoked was able to create a tool that many experts in the field had tried to accomplish over many years but failed.  Spoked called this new tool the Elevator Roller Insert System ("ERIS").

22.     Neither Mr. Lovell nor Besco were in any way involved in Spoked's development efforts.  In fact, neither Mr. Lovell nor Besco were even aware that such development was occurring until Spoked approached Mr. Lovell on or around January 16, 2015 to inform him that Spoked had created a solution to the problem.  At the same time Spoked informed Mr. Lovell of its solution, it requested that Besco provide elevator and tubing specifications for the ERIS to be appropriately sized.  Mr. Lovell provided those specifications on or around January 17, 2015.

23.     Spoked used these specifications to design a new prototype that would fit Besco's specifications with no involvement from Besco or Mr. Lovell. Spoked then set out to find a machine shop capable of performing the required work to create a prototype of the ERIS.  Mr. Lovell requested Spoked to expedite the manufacturing of the prototype to allow testing of the ERIS prior to an upcoming job that Besco would get from Anadarko if the ERIS were completed and tested in time.  Besco's required timeline made the search more for a machine shop much more difficult.  Therefore Mr. Lovell, on behalf of Besco, accompanied Spoked to some of these meetings with machine shops to try to help find a machine shop capable of turning out the ERIS

in Besco's required timeline.  Mr. Lovell witnessed Spoked request that each such machine shop enter into a confidentiality and non-disclosure agreement before Spoked would disclose the ERIS—and thus Mr. Lovell and Besco were aware of Spoked's continued treatment of the ERIS as its confidential and proprietary trade secret information.

24.     The prototype was completed within Besco's required timeline.  Once satisfied with the prototype's capabilities, on or around March 18, 2015, Spoked demonstrated the ERIS' abilities to Besco during tests conducted at Sea Ropes, LLC facility.

25.     Spoked filed U.S. Provisional Patent Application No. 62/136,978 on March 23, 2015 covering the ERIS.  Spoked subsequently filed U.S. Provisional Patent Application No. 62/292,988 on February 9, 2016 covering additional embodiments of and improvements to the ERIS.  Spoked filed U.S. International Patent Application No. PCT/US16/23686 on March 23, 2016, claiming priority to the '978 and '988 Applications.

26.     Shortly after the successful demonstration of the ERIS, Mr. Lovell informed Spoked that Esco Benton III, the Vice President of Besco, wished to patent the ERIS.  Spoked responded by informing Mr. Lovell that the ERIS was solely Spoked's invention and that Spoked had already sought patent protection.  Thus, at least as early as late March 2015, Mr. Lovell and Besco were aware that the ERIS was Spoked's confidential and proprietary trade secret information.

27.     At Besco's request, Spoked conducted another demonstration of the ERIS at Sea Ropes' facility on April 7, 2015.  Satisfied with yet another successful  demonstration of the ERIS, Mr. Esco called the ERIS a "game changer" and then left to prepare for a meeting in Houston with Anadarko.  Once he returned from Houston, Mr. Esco called for a meeting with Spoked to discuss the ERIS.  On or about April 15, 2016, Heath, Shane, Mr. Lovell, and Mr.

Esco met at Besco's office.  During this meeting, Mr. Esco inquired about purchasing the tool outright from Spoked.  Spoked reiterated that the tool was Spoked's patent pending invention and that it was not contemplating selling the invention, but that it was interested in renting and/or licensing the tool.  Thus, at least as early as April 2015, Mr. Esco was personally aware that the ERIS was Spoked's confidential and proprietary trade secret information.

28.     Besco expressed interest in exclusively licensing the ERIS, and Spoked presented Besco with a non-binding term sheet for discussion at the end of April 2015.  Besco never responded to the term sheet or entered into any discussions concerning an exclusive licensing agreement despite several attempts by Spoked to conduct such discussions.  Due to a lack of discussions concerning the licensing agreement, an agreement was never reached, but Besco remained interested and began renting the ERIS from Spoked.

29.     In order to create an inventory of the ERIS that would meet Besco's rental needs, Spoked approached several tool machine shops to obtain bids.  One such machine shop which Spoked approached was Elite.   Spoked and Elite subsequently entered into a Mutual Confidentiality and Non-Disclosure Agreement (the "Elite NDA") on September 24, 2015, which required each party to the Elite NDA to (1) hold the disclosing party's confidential information in trust and confidence, (2) not use the confidential information—including making no attempt to reverse engineer, copy, reproduce, or adapt such confidential information—other than in connection with the sole and limited purpose of reviewing and using it in connection with manufacturing the ERIS for Spoked, (3) not disclose any of such confidential information to any person under any circumstances, and (4) not use the confidential information, or knowledge or information obtained therefrom, for the purpose of competing with or in any way directly or indirectly detrimental to the disclosing party.

30.     After entering into and pursuant to the Elite NDA, in order to obtain a quote, Spoked provided Elite with its manufacturing drawings containing exact dimensions that would enable Elite to create some embodiments of the ERIS.  Additionally, the drawings provided to Elite contained the words "patent pending."   Spoked ultimately did not select Elite to manufacture the ERIS, opting to use a different machine shop to manufacture the ERIS for the purpose of renting the tool to Besco.

31.     Spoked began renting the ERIS to Besco on May 7, 2015.   Every rental of the ERIS was made pursuant to, and subject to Besco's acceptance of, Spoked's Equipment Rental/Services Agreement General Terms and Conditions ("Rental Agreement Terms & Conditions").  Moreover, the Rental Agreement Terms & Conditions were accepted each time Besco received any rental equipment and controlled and governed all rentals of the ERIS. Further, the Rental Agreement Terms & Conditions superseded any prior discussions and agreements between Spoked and Besco, any inconsistent terms submitted by Besco and any conflicting provisions of any contract, work order, purchase order or other similar document issued by Besco at any time:

> These Terms take precedence over any alternative terms in any other document connected with the Equipment and/or Services unless such alternative terms are part of a written master rental, service or other similar agreement which has been negotiated between Customer and Company and which Customer and Company have expressly agreed in writing overrides these Terms in the event of conflict. Except as provided in the immediately preceding sentence, the Terms constitute the sole and entire agreement governing the rental of Equipment or provision of Services by Company to Customer and supersede (a) all prior discussions and agreements between Customer and Company, (b) other inconsistent terms submitted by Customer and (c) any conflicting provisions of any contract, work order, purchase order or other similar document issued by Customer at any time. Customer shall be deemed to have accepted these Terms when Customer receives any Equipment and/or Services without previously providing to Company written notice of rejection of the Terms.

32.     By accepting the Rental Agreement Terms & Conditions, Besco agreed that rental charges for the ERIS would be charged, barring loss or damage, from the time the ERIS was delivered to Besco's receiving authority until the ERIS was returned to the original rental point and accepted by Spoked.  Further, Besco agreed that all invoices from Spoked would be paid within 30 days of the invoice date and that amounts not paid within such time would be subject to interest charged at the rate of 1.5% per month.  Finally, Besco agreed to pay all of Spoked's costs, including attorneys' fees and expenses, incurred in connection with the collection of past due amounts:

> Unless stated otherwise in Company's written quotation for the rental of the Equipment, rental charges will commence when the Equipment is delivered to Customer's receiving authority and will terminate when (a) the Equipment is returned to the original rental point and accepted by Company in accordance with these Terms, (b) Company is notified by Customer that the Equipment has been lost or damaged beyond repair, or (c) with respect to Equipment that is not returned, Company is notified by Customer that such Equipment is lost and will not be returned.
>
> …
>
> Invoices shall be due and payable within 30 days of the invoice date. Invoices not paid within 30 days of the invoice date shall be subject to interest charged at the rate of 1.5% per month. All invoices will be payable in US Dollars. Customer will pay all of Company's costs, including attorneys' fees and expenses, incurred in connection with the collection of past due amounts from Customer.

33.     Through its acceptance of By accepting the Rental Agreement Terms & Conditions, Besco additionally agreed not to alter, modify, disassemble, reverse engineer, or analyze the ERIS, and further agreed to assign any and all improvements and/or modifications made to the ERIS to Spoked:

> Customer shall not make any alteration to or modification of the Equipment, and shall not alter, deface, cover up or conceal any numbering, lettering, insignia or labels displayed on the Equipment.  Customer shall not disassemble, reverse engineer or analyze, nor have any other third-party disassemble, reverse engineer or analyze, any Equipment that may be furnished to or provided by Company under this Agreement, except as specifically allowed  under the terms and

conditions of this Agreement.  Company shall retain all right, title and interest to all improvements and modifications made to the Equipment, whether made by Company or Customer.  To ensure that ownership of the Equipment remains with Company, Customer hereby assigns all right title and interest in all information conceived of and/or reduced to practice that in any way relates to the Equipment.

34.     Besco agreed to the Rental Agreement Terms & Conditions each time it rented the ERIS from Spoked.  In total, Besco signed Rental Delivery Tickets setting forth the Rental Agreement Terms & Conditions, and thus explicitly agreed to the Rental Agreement Terms & Conditions, eight times between October 5, 2015 and June 28, 2016.

35.     Additionally, each ERIS tool rented to Besco had the words "Patent Pending" physically engraved into the side of the ERIS tool.  Additionally, the operation manual for the ERIS provided to Besco on several occasions explicitly stated that the tool is patent pending and comprises confidential trade secret information.  Thus, Besco was repeatedly reminded of the fact that Spoked continued to treat the ERIS as its confidential and proprietary trade secret information.

36.     Initially, Besco paid Spoked's invoices on time and in full.  However, beginning around the end of December 2015, Besco began submitting payment for only portions of the invoices, claiming their customer was only allowing them to charge for Spoked's tools when Besco personnel was on the rig, thus significantly reducing the amount of rental days.  In the interest of continuing the business relationship, Spoked worked with Besco to find an acceptable rental structure, ultimately deciding to allow a discount for rental days that Spoked's tools were not being used.  Part of the requirements for the discount of rental days was that Besco would submit weekly rig reports to Spoked to justify rental days. These concessions greatly decreased Spoked's revenues.

37.     Unfortunately, Spoked never received the rig reports as Besco promised. However to maintain a good relationship Spoked continued to allow the discount of rental days when Besco's personnel was not on the rig.  Moreover, Besco began demanding that Spoked increase its discounts for rental days even further.  Besco began requesting for Spoked to increase the discount to the rentals days and only charge Besco for the days the tools were actually being used.  Besco's actions forced Spoked to continue to receive decreased revenues. Further, Besco continued paying invoices later than due.

38.     Due to Besco's continued late and deficient payments, Spoked sent Besco correspondence on February 12, 2016 informing Besco that Spoked would no longer make pricing concessions and that going forward, all invoices would be due in full and within the timelines set forth in the Rental Agreement Terms & Conditions.  Besco agreed to these new parameters, both explicitly through responsive correspondence, and implicitly through continued acceptance of the Rental Agreement Terms & Conditions for subsequent rentals.

39.     After Spoked's February 2016 demand for payments in accordance with the Rental Agreement Terms & Conditions, Besco continued its past conduct, paying only the portions of Spoked's invoices that it unilaterally deemed appropriate.  Additionally, Besco began renting lesser quantities of the ERIS tool until finally ceasing rentals altogether in July 2016.

40.     Contemporaneous with its increasingly deficient payments, Besco began to exhibit other suspicious conduct.  For example, on or about February 27, 2016, a Besco employee informed Spoked that one of the ERIS tools that was being rented had come back in from offshore and was at Besco's shop, in breach of the Rental Agreement Terms & Conditions, which required that all rented tool be delivered back to Spoked one returned from offshore. Spoked immediately contacted Mr. Lovell.   Mr. Lovell stated that the employee was

12

misinformed and that the ERIS tool in question was still offshore.  Minutes after the call to Mr. Lovell, the Besco employee received a phone call while still at Spoked's facility and could be overheard stating that he did not know he was not supposed to say anything about the rollers being at Besco's shop.

41.      Shortly thereafter, on or around April 15, 2016, Spoked was informed by an inspector hired by Anadarko, that some of the ERIS tools Spoked had rented to Besco were in Besco's shop despite the fact that the tool was supposed to be offshore.  The inspector showed Spoked photos of the tool broken down in Besco's shop.  An inspector hired by Besco confirmed that the ERIS tool was at Besco's shop.  Spoked immediately contacted Mr. Lovell again, not mentioning that it been shown photos of the ERIS tool broken down at Besco's shop.  Mr. Lovell denied that the ERIS tool was at Besco's shop, stating that it was offshore.

42.      Besco ceased renting the ERIS tool from Spoked in July 2016.  Besco continued making partial payments on invoices until August 5, 2016, at which time Besco ceased paying any outstanding invoices as well.

43.      On or about July 20, 2016, an employee of Besco informed Spoked of various violations of the Rental Agreement Terms & Conditions, the Elite NDA, and Spoked's intellectual property rights.  Specifically, the employee informed Spoked that Besco, with the assistance of Elite, had used Spoked's rented ERIS tools and the manufacturing plans provided to Elite to reverse engineer and recreate several embodiments of Spoked's ERIS tool.  Further, Besco was operating these recreated tools on several of Anadarko's wells in the Gulf of Mexico.

44.      On or about August 30, 2016, Spoked received information from a third-party also working on the same Anadarko wells that corroborated what the Besco employee had told Spoked.  Specifically, the third-party informed Spoked that it had been present for a well on

paper presentation to Anadarko where Besco was presenting the system they would be providing for Anadarko's well.  Included within that system was an ERIS tool that had been recreated by Besco and Elite.

45.    Upon information and belief, Anadarko has no knowledge of Besco and Elite's actions, or that the ERIS is Spoked's confidential, proprietary, and patent pending trade secret information.

46.    On September 29, 2016, the '686 Application published as International Patent Publication No. WO2016/154253, a true and correct copy of which is attached hereto as Exhibit A.  The publication of the '253 Publication was the first non-confidential disclosure of the ERIS. Prior to such publication, Spoked made efforts that are reasonable under the circumstances to maintain the secrecy of the ERIS, and the ERIS was not generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.  All information disclosed in the '253 Publication was at all times until such publication treated as Spoked's proprietary and confidential trade secret information.  Further, information regarding the ERIS not contained in the '253 Publication, e.g. information related to further development, additional embodiments, manufacturing, etc., continues to be treated as Spoked's proprietary and confidential trade secret information.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**(Violation of Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.)**

47.    Spoked realleges and incorporates by reference paragraphs 1 through 46 of this Complaint as if set forth herein.

48.    The actions of Defendants, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.

14

49.     In the course of its business, Spoked creates and maintains a great deal of highly confidential and proprietary information, including the confidential and proprietary information identified and described above.

50.     Spoked possessed confidential and proprietary information, including business, scientific, engineering, and technical information such as designs, methods, techniques, processes, procedures, prototypes, tools, and schematics, which constitute trade secrets.

51.     Such information is used in connection with Spoked's products and services, which are offered across the country and throughout the world.

52.     Spoked's confidential and proprietary information is not readily ascertainable through proper means by persons not employed by, and under a confidentiality obligation to, Spoked.

53.     Spoked took reasonable measures to maintain the secrecy and confidentiality of such information, including by sharing such information on only a confidential basis, requiring contracts that prohibited, among other things, unauthorized access, uses, disclosure, and reverse engineering.  Such information cannot be properly acquired or duplicated because of the limited number of individuals who can access the information, and the contractual limitations imposed on such individuals.

54.     Spoked's confidential and proprietary information is of great value to Spoked, and this confidential and proprietary information would give any competitor who improperly acquired it an unfair competitive advantage.

55.     Such information relates to an oil and gas well tool conceived of and developed solely by Spoked that is not available through any other channel, and thus the information derives independent economic value from not being generally known to, and not being readily

ascertainable through proper means by others.  This information is crucial to the operation of Spoked's business, and, if available to others, would (and has) enable them to compete with Spoked to Spoked's detriment.

56.     Defendants knowingly and improperly obtained, used, and disclosed such trade secrets and confidential information in violation of its own duties.  Defendants continue to do so by manufacturing, servicing, offering, and operating the ERIS tool as their own, reaping significant revenues for themselves.

57.     Defendants were aware that they had a duty to maintain confidentiality and not to use for their own purposes the information that they received from Spoked.

58.     As such, Defendants used improper means to acquire knowledge of Spoked's confidential and proprietary trade secret information.

59.     Defendants' misappropriation of Spoked's confidential and proprietary information was knowing, willful and malicious.  Spoked is therefore entitled to an award of exemplary damages and attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

60.     As a direct and proximate result of Defendants' wrongful conduct, Spoked has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Defendants will cause further irreparable injury to Spoked.

61.     Spoked has no adequate remedy at law.  If Defendants are permitted to continue the unauthorized retention of Spoked's confidential and proprietary information, Spoked will suffer irreparable harm, inter alia, because Spoked will be deprived of its trade secrets and the competitive advantage it derives therefrom and because Defendants will continue to enjoy a commercial advantage by virtue of his acts of misappropriation.

62.     Spoked is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A)(i) enjoining Defendants, their agents and employees, and all persons acting in concert or participation with them, from engaging in any further use of Spoked's proprietary and confidential information.

63.     As a result of Defendants' actions, Spoked has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and enhanced damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Violation of Louisiana Uniform Trade Secrets Act, La. Rev. Stat. Ann. §§ 51:1431, *et seq.*)**

64.     Spoked realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as if set forth herein.

65.     The actions of Defendants, as set forth herein, constitute misappropriation under the Louisiana Uniform Trade Secrets Act, La. Rev. Stat. Ann. §§ 51:1431, *et seq*.

66.     In the course of its business, Spoked creates and maintains a great deal of highly confidential and proprietary information, including the confidential and proprietary information identified and described above.

67.     Spoked possessed confidential and proprietary information, including business, scientific, engineering, and technical information such as designs, methods, techniques, processes, procedures, prototypes, tools, and schematics, which constitute trade secrets.

68.     Such information is used in connection with Spoked's products and services, which are offered across the country and throughout the world.

69.     Spoked's confidential and proprietary information is not readily ascertainable through proper means by persons not employed by, and under a confidentiality obligation to, Spoked.

70.     Spoked took reasonable measures to maintain the secrecy and confidentiality of such information, including by sharing such information on only a confidential basis, requiring contracts that prohibited, among other things, unauthorized access, uses, disclosure, and reverse engineering.  Such information cannot be properly acquired or duplicated because of the limited number of individuals who can access the information, and the contractual limitations imposed on such individuals.

71.     Spoked's confidential and proprietary information is of great value to Spoked, and this confidential and proprietary information would give any competitor who improperly acquired it an unfair competitive advantage.

72.     Such information relates to an oil and gas well tool conceived of and developed solely by Spoked that is not available through any other channel, and thus the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by others.  This information is crucial to the operation of Spoked's business, and, if available to others, would (and has) enable them to compete with Spoked to Spoked's detriment.

73.     Defendants knowingly and improperly obtained, used, and disclosed such trade secrets and confidential information in violation of its own duties.  Defendants continue to do so by manufacturing, servicing, offering, and operating the ERIS tool as their own, reaping significant revenues for themselves.

74.     Defendants were aware that they had a duty to maintain confidentiality and not to use for their own purposes the information that they received from Spoked.

75.     As such, Defendants used improper means to acquire knowledge of Spoked's confidential and proprietary trade secret information.

76.     The above-described acts committed by Defendants constitute misappropriation, as defined in La. Rev. Stat. §51:1431(2), of Spoked's confidential and proprietary information, which comprises trade secrets pursuant to La. Rev. Stat. §51:1431(4), without Spoked's consent and in violation of the Louisiana Trade Secrets Act, La. Rev. Stat. §51:1431 *et seq.*

77.     Defendants' misappropriation of Spoked's confidential and proprietary information was willful and malicious.  Spoked is therefore entitled to an award of attorneys' fees pursuant to Louisiana Trade Secrets Act, La. Rev. Stat. §51:1434.

78.     As a direct and proximate result of Defendants' wrongful conduct, Spoked has been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendants will cause further irreparable injury to Spoked.

79.     Spoked has no adequate remedy at law.  If Defendants are permitted to continue the unauthorized retention of Spoked's confidential and proprietary information, Spoked will suffer irreparable harm, inter alia, because Spoked will be deprived of its trade secrets and the competitive advantage it derives therefrom and because Defendants will continue to enjoy a commercial advantage by virtue of his acts of misappropriation.

80.     Spoked is entitled to injunctive relief pursuant to La. Rev. Stat. §51:1432 enjoining Defendants, their agents and employees, and all persons acting in concert or participation with them, from engaging in any further use of Spoked's proprietary and confidential information.

### THIRD CAUSE OF ACTION
**(Violation of Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*)**

81.     Spoked realleges and incorporates by reference paragraphs 1 through 80 of this Complaint as if set forth herein.

82.     Through the above-described actions, Defendants have engaged in false, misleading, deceptive, and unethical conduct in engaging in unlawful competition with Spoked, including but not limited to, their misappropriation of Spoked's confidential and proprietary information and trade secrets through deception and reverse engineering and resulting manufacturing, servicing, offering, and operating of knock-off ERIS tools.

83.     The conduct of Defendants described above constitutes unfair trade practices pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law. La. Rev. Stat. § 51:1401 *et seq.*

84.     All of the aforementioned actions were done to benefit Defendants and harm Spoked.

85.     As a direct and foreseeable result of the unfair trade practices committed by Defendants, Spoked suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm, injuries, and damages, including loss of relevant market share, and injury to business reputation and goodwill pursuant to Louisiana's Unfair Trade Practices Act. La. Rev. Stat. § 51:1401 *et seq*.

86.     Spoked is also entitled to attorney's fees and costs as a result of Defendants' deceptive and unethical conduct pursuant to La. Rev. Stat. § 51:1409(A).

### FOURTH CAUSE OF ACTION
**(Breach of Contract in Bad Faith – Besco)**

87.     Spoked realleges and incorporates by reference paragraphs 1 through 86 of this Complaint as if set forth herein.

88.     The Rental Agreement Terms & Conditions between Spoked and Besco constitutes a valid and enforceable contract.

89.     Pursuant to Section 3.1 of the Rental Agreement Terms & Conditions, Besco agreed that rental charges for the ERIS would be charged, barring loss or damage, from the time the ERIS was delivered to Besco's receiving authority until the ERIS was returned to the original rental point and accepted by Spoked.

90.     Pursuant to Section 3.2 of the Rental Agreement Terms & Conditions, Besco agreed that all invoices from Spoked would be paid within 30 days of the invoice date and that amounts not paid within such time would be subject to interest charged at the rate of 1.5% per month.  Pursuant to this Section, Besco further agreed to pay all of Spoked's costs, including attorneys' fees and expenses, incurred in connection with the collection of past due amounts.

91.     Pursuant to Section 3.9 of the Rental Agreement Terms & Conditions, Besco agreed not to alter, modify, disassemble, reverse engineer, or analyze, nor have any other third-party alter, modify, disassemble, reverse engineer, or analyze, the ERIS, and further agreed to assign any and all improvements and/or modifications made to the ERIS to Spoked.

92.     As described above, Besco has failed to pay for rental charges from the time the ERIS was delivered to Besco's receiving authority until the ERIS was returned to the original rental point and accepted by Spoked.  Further, Besco has repeatedly failed to pay invoices within 30 days of the invoice date.  Finally, Besco, in conjunction with Elite, altered, modified, disassembled, reverse engineered, and analyzed the ERIS in violation of the Rental Agreement Terms & Conditions.

93.     Besco's breach of the Rental Agreement Terms & Conditions was and continues to be in bad faith.  Accordingly, pursuant to Louisiana Civil Code art. 1997, Besco is liable for all the damages, foreseeable or not, that are a direct consequence of [its] failure to perform.

94.     As a result of the conduct described herein, Spoked has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Fraud – Besco)

95.     Spoked realleges and incorporates by reference paragraphs 1 through 94 of this Complaint as if set forth herein.

96.     Defendant Besco made false and misleading statements in violation of the laws of the United States and the State of Louisiana as set forth herein.

97.     Additionally, Besco made these false and misleading statements to Spoked for the purpose of inducing Spoked to continue renting the ERIS to Besco so that Defendants could disassemble and reverse engineer the ERIS for the purpose of manufacturing their own inventory of knock-off ERIS tools.

98.     In order to induce Spoked to continue renting the ERIS to Besco, Besco made numerous knowingly false affirmative representations and intentional omissions of material facts to Spoked, including but not limited to:

a.      Feigning interest in exclusively licensing the ERIS from Spoked in order to induce Spoked to continue to pursue a business relationship with Besco;

b.      Misrepresenting the true purpose behind encouraging Spoked to provide Elite with its manufacturing diagrams for the ERIS, knowing that Elite would instead manufacture knock-off ERIS tools;

c.      Misrepresenting that Besco would submit weekly rig reports to Spoked to justify rental discounts in order to convince Spoked to charge Besco as little as possible while Besco completed its inventory of knock-off ERIS tools;

d.  When, due to past repeated violations, Spoked demanded that Besco begin abiding by all requirements of the Rental Terms and Conditions, Besco misrepresented its renewed commitment to abiding by the agreement in order to induce Spoked to continue to rent the ERIS to Besco;

e.  Falsely claiming on two occasions that the ERIS tools Besco rented from Spoked were offshore when Besco knew the tools were at its shop for the purposes of disassembly and reverse engineering.

99.   The above intentional omissions of material fact and/or affirmative representations made by Besco were false or were likely to be false when made and the Besco knew or should have known these representations to be false when made with the intention that Spoked rely on them in deciding whether or not cease renting the ERIS to Besco due to Besco repeated failures to abide by the Rental Terms and Conditions.  In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by Besco with the intent to induce Spoked to continue renting the ERIS to Besco.

100.   In reasonable reliance on Besco's false affirmative representations and intentional omissions of material facts, Spoked continued renting the ERIS to Besco—enabling Besco and Elite to continue disassembling and reverse engineering the ERIS for the purpose of manufacturing their own inventory of knock-off ERIS tools.

101.   But for Besco's intentional misrepresentations and material omissions described herein, Spoked would never have continued renting the ERIS to Besco.

102.   As a proximate cause of the foregoing, Spoked has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

103.    Spoked realleges and incorporates by reference paragraphs 1 through 102 of this Complaint as if set forth herein.

104.    As described more fully herein, Defendants knew that the ERIS is Spoked's confidential and proprietary trade secret information.

105.    Defendants knowingly acted in concert as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of knowingly, intentionally, and maliciously misappropriating Spoked's confidential and proprietary trade secret information.

106.    The acts of Defendants were contrary to numerous provisions of law, as stated herein.

107.    There was a meeting of the minds between and among Defendants to commit the unlawful acts alleged herein.  This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Spoked damages as set forth herein.

108.    As a result of the conduct of Defendants, Spoked has suffered injury to its business and property.

109.    Each of Defendants participated in a civil conspiracy and are therefore liable for the acts of one another.

110.    Defendants' actions and inactions constitute a conspiracy to engage in violations of the Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, and Louisiana Uniform Trade Secrets Act, as well as unfair competition and misappropriation under Louisiana common law.

111.    As proximate cause of the foregoing, Plaintiff has been injured in an actual amount to be proven at trial and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

112.    Plaintiff realleges and incorporates by reference paragraphs 1 through 111 of this Complaint as if set forth herein.

113.    Pursuant to Section 3.9 of the Rental Agreement Terms & Conditions, Besco agreed that Spoked "retains all right, title and interest to all improvements and modifications made to the [ERIS], whether made by [Spoked] or [Besco]…[t]o ensure that ownership of the [ERIS] remains with [Spoked], [Besco] hereby assigns all right title and interest in all information conceived of and/or reduced to practice that in any way relates to the [ERIS]."

114.    Pursuant to Section 3.10 of the Rental Agreement Terms & Conditions, Besco agreed that "[t]o ensure that ownership of the [ERIS], systems, and processes remains with [Spoked], [Besco] hereby assigns all right, title and interest in all information conceived of and/or reduced to practice, and any inventions, patents or patent applications resulting therefrom, that in any way relates to the [ERIS] systems, or processes."

115.    Defendants' actions and inactions have called into question, denied, and adversely affected Spoked's ownership of all right, title and interest to all improvements and modifications made to the ERIS, specifically, the inventory of knock-off ERIS tools created by Besco and Elite as a result of their intentional, willful, and malicious theft and misappropriation of Spoked's confidential and proprietary trade secret information.

116.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Spoked seeks a declaratory judgment (1) declaring that Spoked is the owner of

all right, title and interest to all improvements and modifications made to the ERIS, whether made by Spoked, Besco, or Elite on Besco's behalf; (2) declaring that Besco and Elite hereby assign all right title and interest in all information conceived of and/or reduced to practice that in any way relates to the ERIS; and (3) declaring that Besco and Elite hereby assign all right, title and interest in all information conceived of and/or reduced to practice, and any inventions, patents or patent applications resulting therefrom, that in any way relates to the ERIS systems or processes.

**EIGTH CAUSE OF ACTION**
**(Injunctive Relief)**

117.    Plaintiff realleges and incorporates by reference paragraphs 1 through 116 of this Complaint as if set forth herein.

118.    Absent appropriate orders of this Court, Defendants will continue the violations of the federal Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, Louisiana Uniform Trade Secrets Act, unfair competition, misappropriation, civil conspiracy fraud and breach of contract, causing continuing harm to Spoked.

119.    Spoked has been damaged and is threatened with further damages by violations of the federal Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, Louisiana Uniform Trade Secrets Act, unfair competition, misappropriation, civil conspiracy fraud and breach of contract complained of herein.

120.    Defendants have acted, and will continue to act, in ways that adversely affect Spoked, thereby making appropriate injunctive relief.

121.    Spoked will sustain irreparable harm if injunctive relief is not ordered.  For example, if injunctive relief is not ordered, Defendants will continue manufacturing, servicing, offering, and operating the ERIS tool—which is solely the product of Spoked's resources and

26

innovation—as their own.  Such a result allows Defendants, rather than Spoked to reap the financial rewards associated with recognition as the creator of the ERIS, including not only increased revenues from sales of the ERIs, but greater industry recognition of Spoked as a provider of solutions to seemingly unsolvable industry problems.  Unless enjoined by the Court, Defendants enjoy a windfall as a result of their unethical, willful, and malicious actions.

122.    It is in the public interest to enjoin the Defendants from engaging in acts that are intended to claim ownership of property that is owned by others.

123.    The balance of the equities favors granting an injunction because Spoked has been damaged by Defendants' violations of the federal Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, Louisiana Uniform Trade Secrets Act, unfair competition, misappropriation, civil conspiracy fraud and breach of contract complained of herein and will continue to be damaged absent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Spoked seeks compensatory and punitive damages in an amount to be proven at trial, pre-judgment and post-judgment interest, attorneys' fees, the costs of bringing this action, a permanent injunction enjoining Defendants from engaging in the acts of violations of the federal Defend Trade Secrets Act, Louisiana Unfair Trade Practices and Consumer Protection Law, Louisiana Uniform Trade Secrets Act, civil conspiracy, fraud, and breach of contract alleged in this Complaint, and such other and further relief as the Court deems just, necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Spoked demands a trial by jury as to all issues and claims triable to a jury.

DATED: January 20, 2017    Respectfully submitted,

             **SCOTT LAW GROUP, P.C.**
             3249 Lake Drive
             Southlake, TX 76092
             Tel: 214-755-1978
             Fax: 817-421-3915

By:  <u>/s/ Walter J. Scott, Jr</u>
    **Walter J. Scott, Jr.**
    State Bar Number: 17918405
    sscott@sscottlaw.com
    *Lead Attorney*

    **George T. Scott**
    State Bar Number: 24061276
    gscott@scottlawgroup-pc.com

    AND

    <u>_____S / Tori S. Bowling_____</u>
    Tori S. Bowling (Bar #30058)
    KEOGH, COX & WILSON, LTD.
    P.O. Box 1151
    Baton Rouge, Louisiana  70821-1151
    Phone: (225) 383-3796
    Fax:  (225) 343-9612
    Email:  tbowling@keoghcox.com

    **ATTORNEYS FOR PLAINTIFF**