UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CAJUN SERVICES UNLIMITED, LLC, ET AL. | CIVIL ACTION |
| | NO.  17-0491 |
| VERSUS | c/w 18-5630 and 18-5932 |
| BENTON ENERGY SERVICE COMPANY, ET AL. | SECTION:  M (2) |
| | *Pertains to all cases* |

**ORDER & REASONS**

Before the Court are three motions for partial summary judgment filed by defendant Benton Energy Service Company d/b/a Besco Tubular ("Besco"),[1] to which plaintiffs Cajun Services Unlimited, LLC d/b/a Spoked Manufacturing ("Cajun"), T2 Tools & Design, LLC ("T2 Tools"), Shane Triche, and Heath Triche (collectively, "Plaintiffs") respond in opposition,[2] and in further support of which Besco replies.[3]  Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

I.      **BACKGROUND**

A.  **Procedural History**

This action is one among three consolidated lawsuits over rights to an elevator roller insert system ("ERIS"), a technology used in drilling for oil.  On January 20, 2017, Cajun filed suit against Besco ("Cajun I Lawsuit"), alleging violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq.*; violation of the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. 51:1431, *et seq.*; violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. R.S. 51:1401, *et seq.*; bad faith breach of contract; fraud; and civil

---

[1] R. Docs. 216, 218, 219.
[2] R. Docs. 225, 226, 227.
[3] R. Docs. 234, 236, 238.

conspiracy.[4]  Cajun also sought injunctive relief and a declaratory judgment that Cajun was the owner of all right, title, and interest to all improvements and modifications made to the ERIS, its practice, and any inventions, patent applications, or patents that relate to the ERIS.[5]  Besco filed a motion for partial summary judgment to dismiss Cajun's claim under the DTSA on the ground that Cajun lacked standing because it did not own any trade secrets.[6]  To streamline the litigation, Cajun agreed not to oppose dismissal on that ground.[7]  The Court granted the motion for partial summary judgment, dismissed Cajun's DTSA claim without prejudice, and administratively closed the case in anticipation of Cajun's moving to amend its complaint to assert a patent-infringement claim.[8]

On June 4, 2018, the day before Cajun's ERIS patent issued (Patent No. 9,988,862, "the '862 Patent"), Besco filed suit against Cajun ("Besco Lawsuit"), seeking a declaration that Cajun's patent was invalid, unenforceable, and/or not infringed by Besco.[9]  On June 14, 2018, Cajun, its officers Shane Triche and Heath Triche, and a related entity, T2 Tools, filed suit against Besco, re-alleging the same causes of action asserted in the Cajun I Lawsuit and adding a patent-infringement claim ("Cajun II Lawsuit").[10]  Besco answered asserting counterclaims that re-alleged the same causes of action it alleged in the Besco Lawsuit plus allegations of unfair and deceptive trade practices, fraudulent inducement, and breach or invalidity of contract.[11]  The Court consolidated the Cajun I Lawsuit with the Besco Lawsuit and the Cajun II Lawsuit on August 15,

---

[4] R. Doc. 1 at 14-28.
[5] *Id.* at 27-28.
[6] R. Doc. 49.
[7] R. Doc. 135 at 5.
[8] R. Doc. 136.
[9] R. Doc. 1 at 1, 8 (Case No. 18-5630).
[10] R. Doc. 1 (Case No. 18-5932); *see also* First Amended Complaint, R. Doc. 175 (Case No. 18-5932).
[11] R. Docs. 20 at 21-27 (Case No. 18-5932) & 165 (Cases No. 17-491 & 18-5932).  The Court dismissed Besco's counterclaims that asserted invalidity of the '862 Patent based on any ground other than inventorship.  R. Doc. 240 (Case Nos. 17-491 & 18-5932).

2018.[12]  On April 3, 2019, the Court granted Cajun's motion to dismiss the Besco Lawsuit for lack of subject-matter jurisdiction; thus, remaining are the Cajun I and Cajun II Lawsuits.[13]

### B.  Plaintiffs' Allegations in the Cajun II Lawsuit

#### 1.  ERIS Technology

At issue here are the claims brought by Plaintiffs in the Cajun II Lawsuit.  In Plaintiffs' first amended complaint, Cajun asserts that Besco infringed Cajun's '862 Patent, which is directed to the invention of ERIS.[14] In the oil-and-gas industry, segments (*i.e.*, a single joint of pipe) or stands (*i.e.*, generally two or three joints of pipe) of tubulars are threaded together to form tubular strings that are inserted into a wellbore drilled into the earth.  Elevators are used to grip and secure each segment or stand to lift the segment or stand into position for threading the tubulars together.  Threading is typically performed by rotating the tubular in the elevator with a power tong or by rotating the entire elevator on a swivel.[15]

Difficulties can be encountered with maintaining proper thread integrity of the connections while making up the segment or stand to the string of tubulars because the threads of both connections may be damaged if the threads of the two connecting tubulars are not properly aligned when the rotation with power tongs begins.  Additionally, the ability to run segments or stands of weighty tubing can be hindered by the fact that the internally threaded sleeve of a segment generally rests on the top of the elevator, resulting in friction between the face of the sleeve and the shoulder of the elevator while the tubulars are threaded together.  This can cause the sleeve to back-off or become disconnected from the tubing, possibly allowing the tubing segment or stand to fall to the rig floor.  Further, in the event of the use of a swivel to rotate the entire elevator, there

---

[12] R. Doc. 11 (Case No. 18-5630).
[13] R. Doc. 205.
[14] R. Docs. 175 at 1, 20-29; 196-1 at 10.
[15] R. Doc. 196-1 at 10 (1:38-56).

is a risk that the swivel or the cable holding the swivel could become worn or fatigued to the point of failure, resulting in the elevator and the tubing falling to the rig floor.[16]

Because these issues posed serious cost and safety concerns, there was a need in the industry for a device that would allow tubulars to rotate freely within a closed elevator while supporting the weight of the tubular.[17] Plaintiffs maintain that its ERIS, which embodies the invention disclosed in the '862 Patent, provides a solution to this problem.[18] As described in the '862 Patent, the ERIS is comprised of elevator inserts (which are interchangeable to accommodate different diameter pipe) that interconnect with the inner surface of an elevator. The inserts themselves are further comprised of a plurality (*i.e.*, at least two) of upper rollers. The primary function of the upper rollers is to support the weight of the tubular within the elevator while facilitating free rotation of the tubular. In one embodiment of the ERIS, the upper rollers are further comprised of two faces – an upper face upon which the upset area of a tubular rests and a second face which is parallel with a central axis of the elevator. In some embodiments of the ERIS, the inserts are further comprised by a plurality of lower rollers with a single face, which is parallel with a central axis of the elevator and prevents a tubular from binding against the elevator roller insert. In other embodiments, the ERIS may not be comprised of lower rollers.[19] However, each independent claim (Claims 1, 9, 19, and 26) references a plurality of lower or second rollers.[20]

Following a claim construction hearing, the Court construed the '862 Patent's disputed terms as follows: the phrase "configured to" means "set up for operation especially in a particular way"; the term "contact" means "contact between the rollers and the tubular as would allow free

[16] *Id.* (2:14-43).
[17] *Id.* at 2, 10 (2:51-67) & 11 (3:1-5).
[18] R. Doc. 196 at 3.
[19] *Id.* (citations omitted).
[20] R. Doc. 196-1 at 13-15.

rotation"; and the term "contacts" means "to place, bring, or come into contact as would allow free rotation."[21]

## 2. The Business Relationship Between Plaintiffs and Besco

Besco is an oilfield service company specializing in oilfield pipe running services that utilizes specialized tubular handling equipment operated by Besco's personnel. Besco developed a system for compensating or offsetting suspended tubular goods during pipe installation and removal called the Bail Assisted Tubular Thread System, or "BATT System," which Besco patented (U.S. Patent No. 9,816,333, "the '333 Patent").[22] To accommodate applications of the BATT System where vertical space within a drilling derrick was limited, Besco decided to utilize a hydraulic single joint elevator as part of the BATT System in order to shorten the overall length of the equipment. Besco claims that the hydraulic single joint elevator is not sold separately by the manufacturer, Tesco Corporation ("Tesco"), but that it was able to acquire a used elevator from a third-party equipment broker. The hydraulic single joint elevator is a device that grips the external surface of a tubular to support and lift it. Interchangeable die inserts are installed within the Tesco elevator to accommodate tubular of varying diameters. Instead of interchanging the entire Tesco elevator for different sizes of tubular, only the die inserts must be removed and replaced.[23]

In an attempt to resolve the problem of maintaining the thread integrity of the tubular, Besco utilized a specialized hydraulic swivel that allowed the entire Tesco elevator, as well as any tubular gripped therein, to fully rotate. Besco says that the solution was not optimum because the lines supporting the swivel and the elevator had a tendency to wrap and tangle. As a result, Besco

---

[21] R. Doc. 210.
[22] R. Doc. 216-4 at 2-3.
[23] *Id.* at 3-4.

claims that its operations manager, Jamie Lovell, conceived of a solution to permit the tubular to spin inside of the Tesco elevator by installing rollers into the die insert.[24]  Besco contends that Lovell described his idea to Jeff Dufrene of Gulf Coast Manufacturing, LLC, sometime prior to September of 2014.[25]  Besco further contends that Lovell had previously approached Cajun on several occasions to prepare drawings and fabricate equipment unrelated to the Tesco elevator, but that Lovell also asked Cajun to prepare drawings reflecting his concept of the roller dies.[26]

While Plaintiffs admit that Cajun created drawings and fabricated components of the roller inserts customized for Besco's BATT System and the Tesco elevators, Plaintiffs deny that Lovell was the inventor of the disputed roller inserts.  Rather, Plaintiffs contend that Shane and Heath Triche, brothers and managers of Cajun, had conceived of the ERIS system by the end of September 2014 after Lovell introduced and discussed the problem with them.[27]  Plaintiffs further contend that, around April 15, 2015, Esco Benton, III ("Benton"), chief operating officer for Besco,[28] met with the Triches to purchase the ERIS system after observing successful testing.[29]  The Triches said that the ERIS, as to which T2 Tools had a patent pending, was not for sale but could be licensed or rented.[30]  On April 22, 2015, the Triches, through T2 Tools,[31] presented Besco with a non-binding term sheet for discussion of a purchase or licensing agreement.  In the email, Shane Triche stated: "T2 [T]ools is a company that we have created to handle all of our new tool designs.  Heath and I are the sole owners of this company."[32]  Besco did not respond to this email.

---

[24] R. Doc. 216-4 at 4.

[25] R. Doc. 216-2 at 2.

[26] R. Doc. 216-4 at 5.

[27] R. Doc. 226-1 at 3; 6 (citing R. Doc. 226-4 at 7).

[28] R. Doc. 216-4 at 2.

[29] R. Doc. 226-1 at 7 (citing R. Doc. 226-2 at 2).

[30] R. Doc. 226-2 at 2.

[31] While T2 Tools filed the '862 Patent application, T2 Tools eventually assigned its rights in the '862 Patent to Cajun.  *See* R. Doc. 226 at 21.

[32] R. Doc. 226-1 at 7 (citing R. Doc. 62-10).

While Plaintiffs contend that Benton expressed interest in licensing the tool at that time,[33] Benton denies having entertained such a relationship.[34]

Despite the apparent lack of communication, Plaintiffs contend that Lovell reached out to Cajun about renting the ERIS tool,[35] and that Besco began renting the ERIS tool from Cajun on May 7, 2015, for a project related to Besco's customer, Anadarko Petroleum ("Anadarko").[36] Besco contends that an oral agreement between it and Cajun controlled this rental (*i.e.*, the first rental project) and every subsequent rental of the ERIS tool, but that "there was never any discussion regarding any duration or length of the verbal agreement, minimum rentals or any commercial terms other than the rental rate."[37]   On the other hand, Plaintiffs contend that the Equipment Rental/Services Agreement General Terms and Conditions (what Cajun calls the "Rental Agreement"), which was posted on its website, applied to their contract from the outset, *i.e.*, as of May 7, 2015.   On July 20, 2015, Cajun provided Besco with a quote for its second rental project with Anadarko.[38]   Beginning with this quote, Cajun included a statement that its quotes were subject to the terms and conditions (*i.e.*, the Rental Agreement) viewable on its website. Besco rented the ERIS for 42 days in response to this quote.[39]   Cajun provided Besco with a quote for a third rental project with Anadarko on September 10, 2015, which Cajun emailed directly to Lovell.[40]   Besco rented the ERIS for six days in response to this quote.[41]   Cajun provided Besco with a quote for a fourth rental project with Anadarko on October 5, 2015, which Cajun again

---

[33] *Id.*
[34] R. Doc. 218-5 at 3, 7.
[35] R. Doc. 226-2 at 2.
[36] R. Doc. 226-1 at 7.
[37] R. Doc. 216-1 at 9.
[38] R. Doc. 226-1 at 7 (citing R. Doc. 50-9).
[39] *Id.* (citing R. Doc. 50-10).
[40] *Id.* (citing R. Doc. 50-11).
[41] *Id.* (citing R. Doc. 50-12).

emailed directly to Lovell.[42]  With this quote, Cajun began including the Rental Agreement with its quotes, which incorporated a disclaimer that "NON-R[E]FUTAL OF THIS QUOTATION CONSTITUTES ACCEPTANCE OF QUOTATION AND ALL TERMS AND CONDITIONS THER[E]TO."[43]  Besco rented the ERIS for 202 days in response to this quote.[44]

For the first two projects, Besco paid the invoices in full.  Beginning in September of 2015, Besco began to request that Cajun remove charges for certain rental days.  Besco claims that it only agreed to pay Cajun for whatever amounts it received from Anadarko.  Due to an economic down turn in the oil-and-gas industry, Besco permitted Anadarko to receive price concessions, and, in turn, asked Cajun for the same.[45]  Cajun denies that it ever agreed to bill Besco in correlation to Anadarko's payments.[46]  Amidst disputes about price in late 2015, Shane Triche emailed Lovell and Benton the Rental Agreement and called their attention to Cajun's policy regarding rental days.[47]  In January 2016, Cajun and Besco met to resolve the dispute.  Following this meeting, Shane Triche was under the impression Besco would submit a proposed compromise, but it never materialized.  Between January 25 and February 8, 2016, Shane Triche sent Benton several emails, including the Triches' own proposal.  They received no response.  As a result, Shane Triche rescinded the proposal, informing Benton of new terms to govern the relationship beginning February 1, 2016.[48]

With Besco's fifth rental project, Cajun says it began to require that Besco signify its assent to the Rental Agreement via signature.  In addition to the disclaimer, the following statement appeared above the signature line of each quote: "THIS IS A QUOTATION ON THE GOODS

---

[42] *Id.* at 8 (citing R. Doc. 50-13).
[43] *Id.* (citing R. Doc. 50-14).
[44] *Id.* (citing R. Doc. 50-14).
[45] R. Doc. 216-1 at 9 (citing R. Doc. 216-4 at 7).
[46] R. Doc. 226-2 at 3.
[47] R. Doc. 226-1 at 7 (citing R. Docs. 50-15 & 50-16).
[48] *Id.* at 8-9 (citing R. Doc. 50-17).

NAMED, SUBJECT TO THE TERMS AND CONDITIONS ATTACHED."[49]  Cajun sent its quote and Rental Agreement directly to Lovell and Benton, noting that the Rental Agreement was attached.  A Besco employee, Cody Simons, said that he needed Lovell's approval before issuing a purchase order for the quote, and he received that approval.[50]  Another Besco employee, Lee LeBlanc, signed the quote and associated delivery ticket and took delivery.  At no time did the employee indicate he was not authorized to sign the Rental Agreement.[51]  Between February 27 and June 28, 2016, Besco took delivery of the ERIS on five more projects, and on each occasion a representative of Besco signed the quotes and delivery tickets requiring acceptance of the Rental Agreement.[52]  Besco ceased renting the ERIS from Cajun in July 2016, and Plaintiffs contend the balances of eleven invoices issued between March 1, 2016, and July 5, 2016, remain outstanding.[53]

Meanwhile, sometime around February 2016, Lovell contacted Jerod Deroche of Elite Energy Services, LLC ("Elite") to design an elevator roller insert system for Besco.[54]  Lovell provided Elite with Cajun's ERIS drawings (which Besco maintains Cajun sent to it with no confidentiality notices)[55] and one of Cajun's ERIS tools that had the words "patent pending" engraved on it.[56]  Cajun alleges that Lovell represented to Elite that the "patent pending" was Besco's.[57]  Cajun maintains that Besco reverse engineered the infringed product through Elite's work and Besco's own disassembly of one of the ERIS tools.  Cajun's '862 Patent did not issue

---

[49] *Id.* at 9 (citing R. Doc. 50-18 at 3).
[50] R. Docs. 50-18 at 5; 50-19.
[51] R. Doc. 226-1 at 9 (citing R. Doc. 50-20).
[52] *Id.* (citing R. Doc. 50-21).
[53] *Id.* at 10 (citing R. Doc. 50-22).
[54] *Id.* (citing R. Doc. 62-5).  Elite was a defendant in the Cajun I Lawsuit, but was dismissed by Cajun.  R. Doc. 47.  In Elite's interrogatory answer, Elite stated that Lovell first contacted Elite about manufacturing the roller inserts in early 2014, but that Lovell did not follow up with drawings and a prototype until early 2016.  R. Doc. 226-4 at 71.
[55] R. Doc. 216-1 at 15 (citing R. Doc. 246-4 at 8-31).
[56] R. Doc. 226-1 at 9 (citing R. Doc. 50-23).
[57] *Id.* (citing R. Doc. 226-4).

until June 5, 2018.[58]  Prior to the '862 Patent's issuance, Cajun tested its ERIS at a facility in Houma, Louisiana, used it in well operations, and transported it between its facility, Besco's facility, offshore supply bases, and various drilling rigs, all allegedly while the ERIS tool was open to view and without requiring third parties to sign nondisclosure agreements.[59]

Using Elite's prototypes, Besco created its own ERIS system (what Cajun refers to as the "Accused First Design Products"), which Cajun contends literally infringe its patent.  In response to Cajun's expressed intent to file a motion for preliminary injunction, Besco agreed not to use the Accused First Design Products until the litigation resolves.  Cajun accordingly stipulated not to seek a preliminary injunction to prevent Besco from using the Accused First Design Products.[60]  As an alternative, Besco developed another version of the elevator system that uses filler pads instead of a second set of lower rollers ("Accused Second Design Products").  While Besco admits to having used the Accused Second Design Products for a short period in 2018, Besco contends it no longer uses the Accused Second Design Products, having removed the filler pads altogether for reasons unrelated to the scope of the lawsuit.[61]

\* \* \*

Cajun seeks injunctive relief to stop Besco from using its alternative designs; a declaratory judgment that it owns the ERIS and that Besco assign to it all right, title, and interest to all improvements and modifications made to the ERIS, as well as any information conceived of and/or reduced to practice that in any way relates to the ERIS; a declaratory judgment that Besco infringed the '862 Patent; and damages for (1) willful infringement of the '862 Patent; (2) willful and malicious violation of the DTSA; (3) violation of the LUTSA; (4) violation of the LUTPA; (5) bad

---

[58] R. Doc. 175 at 21 (citing R. Doc. 175-5).
[59] R. Doc. 216-1 a t13-14 (citing R. Doc. 216-4 at 8, 32-41).
[60] R. Doc. 155.
[61] R. Doc. 219-1 at 8, 12-13.

faith breach of contract; and (6) fraud.  Plaintiffs join Cajun's claims under the DTSA and LUTSA.[62]

## II.    PENDING MOTIONS

Besco seeks to dismiss Plaintiffs' first amended complaint in the Cajun II Lawsuit through a series of motions for partial summary judgment.   First, Besco contends that it did not breach the disputed terms and conditions of the Rental Agreement because the Rental Agreement is not a valid and enforceable contract.  Besco says that Benton and the Triches had an oral agreement that Besco would pay Cajun amounts received from Besco's customer, Anadarko.  Although Cajun claims that Besco later agreed to be bound by written terms and conditions listed on Cajun's website and attached to quotes and delivery tickets signed by Besco's employees, Besco maintains that these terms and conditions differed from the original, oral contract.  Therefore, Besco argues that any presentation of the Rental Agreement constituted counter-offers that Besco's low-level employees had no authority to accept on behalf of Besco; and that Cajun attempted to "dupe" Besco into agreeing to these terms and conditions by not bringing them to the attention of Benton – who Cajun knew to be the Besco representative with authority to bind Besco, having previously contacted him about the licensing agreement.  Besco asserts it would have never agreed to be bound by the modified terms and conditions because they reflected an unprofitable price structure.[63]  Further, Besco contends that Cajun conceded that the disputed terms and conditions are not part of any rental agreement between Cajun and Besco for rentals of the inserts on or after February 1, 2016, pointing to Shane Triche's testimony explaining that new terms controlled the rental agreement after that date.[64]

---

[62] R. Doc. 175 at 28-44.

[63] R. Doc. 218-1 at 3-13.

[64] *Id.* at 13.

Second, Besco contends that Plaintiffs cannot establish the existence of any trade secrets under the DTSA and LUTSA because the incorporation of a friction-reducing device in this lifting equipment is "generally known" and "readily ascertainable" by third parties who observed the ERIS in testing, use, and transportation.[65]  Besco also says that Plaintiffs cannot maintain trade-secrets claims because they did not take reasonable efforts to maintain secrecy, arguing that their failure to request that Besco sign a non-disclosure agreement and their delivery to Besco of drawings, photographs, and emails of the disputed technology without confidentiality notices or restrictions preclude them from seeking protection under the LUTSA.[66]  But even if Plaintiffs had protectable trade secrets, Besco contends it did not misappropriate them because its reverse engineering was a legal course of action and because Besco could not "misappropriate" an idea wholly conceived by its own employee, Lovell.[67]  Further, Besco claims that Plaintiffs forfeited any trade secrets upon T2 Tools' public application of the '862 Patent and that the Triches and T2 Tools cannot assert any cognizable trade-secrets claims against Besco because neither the Triches nor T2 Tools had a contractual relationship with Besco.[68]  Besco finally submits that, because Plaintiffs' DTSA and LUTSA claims fail, so too must Cajun's LUTPA claim.[69]

Third, Besco seeks to dismiss Cajun's claims based on patent infringement.  Besco argues that Cajun cannot assert a claim of literal infringement against the Accused Second Design Products because Besco's alternative design employs a single set of upper rollers and lower "filler" pads rather than the plurality of lower or second rollers claimed in each of the four independent claims of the '862 Patent.[70]  Further, Besco contends that it never used the Accused First Design

---

[65] R. Doc. 216-1 at 12-15.
[66] *Id.* at 15-16.
[67] *Id.* at 16-19.
[68] *Id.* at 19-23.
[69] *Id.* at 23.
[70] R. Doc. 219-1 at 5-8.

Products after the issue date of the '862 Patent. In response to Cajun's claim of infringement under the doctrine of equivalents, Besco also says its filler pads function to "reduce possible metal to metal contact in the case of incidental contact with the tubular," whereas the lower rollers of the '862 Patent are intended to contact the tubular to allow free rotation. Therefore, Besco argues that the filler pads do not perform the same function as the lower rollers, and so Cajun's theory of infringement under the doctrine of equivalents fails.[71]

In opposition to the motion for partial summary judgment on the contract claim, Cajun responds that genuine issues of material fact exist regarding whether Besco accepted the terms of the Rental Agreement by performing in compliance with the quotes and referenced or attached Rental Agreement. Cajun argues that the Rental Agreement was available on Cajun's website throughout the entirety of its relationship with Besco. Further, Cajun says that it directed Besco to the terms of the Rental Agreement when Cajun issued the second quote in July 2015. Because Besco rented the equipment in compliance with the terms and conditions of the Rental Agreement for the first four months of its rental relationship with Cajun, during which period Besco paid the invoices in full, Cajun contends that Besco accepted those terms and conditions by performance.[72] As to the eleven unpaid and disputed invoices between March 1, 2016, and July 5, 2016, Cajun argues that Besco had notice of Cajun's terms and conditions and alleges that the Rental Agreement had been twice communicated directly to Benton.[73] Three of these invoices relate to the October 2015 quote, which attached the Rental Agreement and which Cajun contends was accepted by performance. Cajun argues that the last seven invoices were issued pursuant to the Rental Agreement because Besco employees, who were expressly authorized to sign delivery

---

[71] *Id.* at 9-18.
[72] R. Doc. 225 at 3-6.
[73] *Id.* at 6 (citing R. Doc. 50-3).

tickets, signed said delivery tickets with the Rental Agreement attached.[74]  Alternatively, Cajun

argues that Besco's employees had apparent authority to accept the terms and conditions of the

Rental Agreement on behalf of Besco because the "employees appeared before Cajun to sign for

and take possession of Cajun's tool," and actually did so, and because "neither Besco nor the

employees ever represented to Plaintiffs that they had anything less than full authority to sign the

agreement as written at the time of execution."[75]  Cajun further argues that any purported counter-

offer in the form of a discrepant purchase order was ineffective because a valid contract was

formed each time Besco accepted delivery of the equipment.  Accordingly, Cajun's subsequent

reductions of the rental price were just "concessions" from the original terms.[76]  Moreover, Cajun

points out that Besco's purchase orders note that Besco owed **something** to Cajun for the rentals,

and suggests that the motion for partial summary judgment should be denied on the ground that

Besco has thus admitted to a breach of contract.[77]

    In opposition to Besco's motion for partial summary judgment on Plaintiffs' trade-secrets

claims, Plaintiffs argue that the technology embodied in the '862 Patent is not generally known,

as acknowledged by Besco's expert, who had stated that he was unaware of any commercial tool

that does what Plaintiffs' ERIS tool does except for Besco's "knock-offs."[78]  Plaintiffs further

contend that the ERIS design is not readily ascertainable because a third party cannot understand

the patented technology by merely observing the tool in transportation or use.  Rather, Plaintiffs

maintain that, as shown by Besco's alleged disassembly, the ERIS configuration and components

are not readily ascertainable.[79]  Accordingly, Plaintiffs argue that their use of the ERIS tool in the

---

[74] *Id.* at 6-9.
[75] *Id.* at 10.
[76] *Id.* at 4-5.
[77] *Id.* at 7.
[78] R. Doc. 226 at 13-14 (citing R. Doc. 49-8).
[79] *Id.* at 14-15; *see also id.* at 16-17.

presence of third parties involved in testing and transportation did not compromise their efforts to maintain the secrecy of their trade secrets.[80]  Furthermore, Plaintiffs say that their disclosure of certain drawings and concepts to Besco early on in their relationship plainly did not reveal the full extent of the technology because it was insufficient for Besco to use in duplicating the ERIS without also reverse engineering the tool.[81]  While Plaintiffs acknowledge that reverse engineering a readily available product does not amount to the acquisition of trade secrets by improper means, Plaintiffs maintain that Besco's reverse engineering of the ERIS tool in violation of the Rental Agreement's express prohibition does amount to improper means.[82]  Next, Plaintiffs note that the publication of the '862 Patent does not deprive Plaintiffs of a cause of action relating to Besco's misappropriation of trade secrets before the '862 Patent's issuance and that the '862 Patent does not comprise the entirety of Plaintiffs' trade secrets.[83]  Additionally, Plaintiffs contend that ownership of trade secrets rather than contractual privity creates a cause of action for misappropriation of trade secrets, and that Besco was aware that T2 Tools, the Triches, and Cajun were each owners of the trade secrets at some point.  Even so, Plaintiffs maintain that any transfer of rights related to the trade secrets was effective and does not preclude their claims here.[84]  Finally, Cajun argues that its LUTPA claim is not barred because, in addition to facts that remain disputed with regard to its claim of misappropriation of trade secrets,  Besco fails to address Cajun's separate claim of fraud and the other facets of Besco's allegedly false and deceptive conduct recited in Cajun's LUTPA claim.[85]

---

[80] *Id.* at 16-17.
[81] *Id.* at 15.
[82] *Id.* at 17-18.
[83] *Id.* at 20-21.
[84] *Id.* at 21-22.
[85] *Id.* at 22-23.

In opposition to Besco's motion for partial summary judgment on Cajun's patent-infringement claims, Cajun responds that it only asserts literal infringement against the Accused First Design Products, not the Accused Second Design Products. Because Besco only challenges a claim for literal infringement of the Accused Second Design Products, Cajun argues that its claim of literal infringement is left intact as unaddressed.[86] As to Cajun's theory of infringement under the doctrine of equivalents, Cajun asserts that the filler pads of Besco's Accused Second Design Products are the equivalent of the lower rollers.[87] Specifically, Cajun contends that both the filler pads and the lower rollers perform the same "function of preventing binding of the rotating tubular that would occur when it contacts the insert that would otherwise occur between the rotating tubular and the insert to achieve the result of allowing the tubular to rotate freely within the closed elevator."[88] While the filler pads are not made of a metal material like the rollers, Cajun notes that the filler pads are made of "CIP252B," a "self-lubricating" material designed to reduce friction.[89] Moreover, the inner diameter of the lower rollers (5.858") is, like the inner diameter of the filler pads (5.625"), greater than the maximum outer diameter of a tubular (5.555"), so as to allow a gap between the tubular and the alleged equivalent components.[90] Accordingly, Cajun maintains that the filler pads' non-constant contact with the tubular allow the tubular to rotate freely within the elevator insert, as is consistent with the same kind of non-constant contact a lower roller has with the tubular.[91]

Besco's replies in support of its motions directed to the breach-of-contract claim and trade-secrets claims largely repeat arguments made in its original memoranda.[92] Besco's reply in support

[86] R. Doc. 227 at 13.
[87] *Id.* at 14-19.
[88] *Id.* at 16.
[89] *Id.* at 15.
[90] *Id.* at 17.
[91] *Id.* at 16-17.
[92] R. Docs. 234 & 238.

of its motion for partial summary judgment as to Cajun's patent-infringement claims clarifies certain contentions. As to Cajun's argument for literal infringement, Besco says it remains undisputed that Besco has not made, used, or sold the Accused First Design Products on or after the issue date of the '862 Patent, pointing to the stipulation effective for the duration of the lawsuit.[93] Turning to the doctrine-of-equivalents theory and citing the '862 Patent specification, Besco maintains that the lower rollers function not only to prevent binding but to hold the tubular centrally within the elevator roller insert where an outer face of the tubular contacts the body of the tubing.[94] In contrast, Besco maintains that the filler pads were merely intended "to protect the tubular *in case of inadvertent contact* with the elevators/inserts during attachment of the elevators to a pipe section," and not "to intentionally contact the tubular during make up operations," as is evinced by the gap between the filler pads and the outer diameter of the tubular.[95] Finally, Besco contends that, even if Cajun's theory of infringement by equivalents had merit, Cajun cannot meet its burden on summary judgment to prove that Besco is currently using the filler pads because Besco removed the filler pads from the tool in July of 2018.[96]

## III.  LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

---

[93] R. Doc. 236 at 1-2.
[94] *Id.* at 3-4.
[95] *Id.* at 4 (emphasis in original).
[96] *Id.* (citing R. Doc. 236-1).

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

## B. Breach of Contract

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. Under Louisiana law, the formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and (4) a lawful cause. *Id.* arts. 1918, 1927, 1966 and 1971. "The burden of proof in an action for breach of contract is on the party claiming rights under the contract." *Rebouche v. Harvey*, 805 So. 2d 332, 334 (La. App. 2001). "The existence of the contract and its terms must be proved by a preponderance of the evidence." *Id.* Moreover, "[t]he existence or nonexistence of a contract is a question of fact and, accordingly, the determination of the existence of a contract is a finding of fact." *Sam Staub Enters., Inc. v. Chapital*, 88 So. 3d 690, 963 (La. App. 2012).

The parties offer competing versions of the existence and terms of their contractual relationship. Besco generally contends that an earlier oral agreement governed the relationship, but is rather short on details about its terms and how it came into existence. On the other hand, Cajun insists that the contractual relationship was governed by the terms of its Rental Agreement to which Besco consented at various times and in various ways. For instance, as early as October 5, 2015, Cajun emailed Lovell, Besco's operations manager, a quote including the terms and conditions of the Rental Agreement with a disclaimer that read, "NON-R[E]FUTAL OF THIS QUOTATION CONSTITUTES ACCEPTANCE OF QUOTATION AND ALL TERMS AND CONDITIONS THER[E]TO," and Besco subsequently rented the ERIS tool for a total of 202 days.[97] After further emails to Lovell and, notably, Benton, attaching the Rental Agreement,[98] Besco continued to rent the tool until July of 2016.[99] In the face of these communications, Besco's argument that its lower-level employees lacked authority to bind Besco to the terms printed on the back of the delivery tickets, and Cajun's response that Besco's continued rental of the ERIS tool after Besco employees signed the delivery tickets either evince the employees' authority to act on Besco's behalf or demonstrate Besco's ratification of its employees' unauthorized acts,[100] underscore the factual disputes that make partial summary judgment on Cajun's breach-of-contract claim inappropriate.

### C. DTSA, LUTSA, and LUTPA

DTSA and LUTSA are substantially similar. To prevail on a DTSA claim, a plaintiff must prove: (1) the existence of a trade secret; (2) the misappropriation of the trade secret by another;

---

[97] R. Doc. 227-1 at 8 (citing R. Doc. 50-13).
[98] *Id.* at 9 (citing R. Doc. 50-18).
[99] *Id.* (citing R. Doc. 175).
[100] *Id.* (citing R. Docs. 50-21 & 227-4); *see, e.g.*, *Houston Expl. Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 780-82 (La. App. 2004) (discussing Louisiana cases where principal bound by terms presented to employee).

and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). LUTSA provides for restraining the "actual or threatened misappropriation" of trade secrets. La. R.S. 51:1432(A) & 1438-39. The statute also permits a complainant to recover damages, in addition to or in lieu of injunctive relief, for the actual loss caused by the misappropriation of trade secrets. *Id.* 51:1433. To prevail on a LUTSA claim, "'a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation.'" *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000) (quoting *Reingold v. Swiftships, Inc.,* 126 F.3d 645, 648 (5th Cir. 1997)).

DTSA defines "trade secret" as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). LUTSA's definition of "trade secret" is nearly identical.[101]

---

[101] LUTSA defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. R.S. 51:1431(4).

The "trade secrets" that Plaintiffs allege Besco misappropriated include "confidential and proprietary information, including business, scientific, engineering, and technical information such as designs, methods, techniques, processes, procedures, prototypes, tools, and schematics."[102] In support of its summary judgment motion, Besco argues that the "general concept of installing rollers in pipe elevators" was generally known; that the "basic design" was readily ascertainable by third parties who observed the ERIS tool when tested, transported, and used on various drilling rigs; and that Plaintiffs took no reasonable efforts to maintain secrecy because Cajun permitted Besco to rent the ERIS tools without signing a non-disclosure agreement and because Cajun sent Besco drawings, photographs, and emails containing information related to the ERIS design without confidentiality notices.[103] Plaintiffs argue that it was not required to take these steps to protect the secrecy of the ERIS tool.[104] Moreover, Plaintiffs point to the Rental Agreement's provisions prohibiting others' improper use of the ERIS tool and assigning any improvements or modifications made to the ERIS to Cajun:

> 3.9. The Equipment [including particularly the ERIS tool] shall at all times remain the property of Company [*i.e.*, Cajun]. Nothing contained in these Terms shall confer any interest in the Equipment to the Customer [*i.e.*, Besco] and the Customer shall not assign, sublease, pledge, mortgage or encumber the Equipment or any interest therein. Customer shall not make any alteration to or modification of the Equipment, and shall not alter, deface, cover up or conceal any numbering, lettering, insignia or labels displayed on the Equipment. Customer shall not disassemble, reverse engineer or analyze, nor have any other third-party disassemble, reverse engineer or analyze, any Equipment that may be furnished to or provided by Company under this Agreement, except as specifically allowed under the terms and conditions of this Agreement. Company shall retain all right, title and interest to all improvements and modifications made to the Equipment, whether made by Company or Customer. To ensure that ownership of the Equipment remains with Company, Customer hereby assigns all right, title and interest in all information conceived of and/or reduced to practice that in any way relates to the Equipment.[105]

---

[102] R. Doc. 175 at 33.
[103] R. Doc. 216-1 at 12-15.
[104] R. Doc. 226 at 15-17.
[105] R. Docs. 50-13 at 4; 50-15 at 5; 50-18 at 4; 175-3 at 3.

"A trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011) (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). "Whether something is a trade secret is a question of fact." *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 796 (E.D. La. 2012) (citations omitted). "[T]he question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'" *Tewari De-Ox Sys.*, 637 F.3d at 613 (quoting *Lear Siegler*, 569 F.2d at 289). "'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.'" *CheckPoint Fluidic Sys. Int'l*, 888 F. Supp. 2d at 796-97 (quoting *Sheets v. Yamaha Motors Corp., U.S.A.,* 849 F.2d 179, 183 (5th Cir. 1988)).

DTSA defines "misappropriation" as:

**(A)** acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

**(B)** disclosure or use of a trade secret of another without express or implied consent by a person who –

   **(i)** used improper means to acquire knowledge of the trade secret;

   **(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was –

      **(I)** derived from or through a person who had used improper means to acquire the trade secret;

      **(II)** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

      **(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

**(iii)** before a material change of the position of the person, knew or had reason to know that –

    **(I)** the trade secret was a trade secret; and

    **(II)** knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5). LUTSA's definition of "misappropriation" is nearly identical.[106] Further, the DTSA defines "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6)(A). Whether a trade secret has been misappropriated is a question of fact. *Pontchartrain Med. Labs, Inc. v. Roche Biomedical Labs., Inc.*, 677 So. 2d 1086, 1091 (La. App. 1996).

    There are questions of material fact regarding whether the information Besco acquired constitutes trade secrets, and how Besco acquired it, that preclude summary judgment as to whether Besco misappropriated the alleged trade secrets. For example, the existence of a contract that restricts Besco's use of the ERIS tool is itself disputed. It is for the jury, then, to determine the nature of the contract and whether Plaintiffs' allegedly confidential and proprietary information

---

[106] "Misappropriation" is defined as:

(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i) used improper means to acquire knowledge of the trade secret; or

    (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (aa) derived from or through a person who had utilized improper means to acquire it;

        (bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

La. R.S. 51:1431(2).

constitutes a "trade secret." While Besco denies having reverse engineered the ERIS tool, it also asserts that reverse engineering is permissible under the DTSA. Besco further contends that it could not have misappropriated its own idea, claiming Lovell to be the true inventor.[107] Plaintiffs, on the other hand, contend that reverse engineering is prohibited by the terms of the Rental Agreement and constitutes improper means in the circumstances here, as did inducing Elite to disassemble its tool marked "patent pending."[108] Plaintiffs also claim the Triches to be the true inventors of the ERIS concept, pointing to Besco's failure to include the ERIS in its '333 Patent application for the BATT System in May 2014 and other conduct by Besco inconsistent with any notion that Lovell was the inventor.[109] Both sides present testimony telling different stories, and the contractual obligations remain undefined. Therefore, disputed issues of material fact regarding Besco's alleged misappropriation of trade secrets preclude summary judgment.

Regardless, Besco next contends that the alleged trade secrets were lost upon publication of T2 Tool's patent application on September 26, 2016. But publication of the '862 Patent application does not deprive Plaintiffs of a cause of action for misappropriation of trade secrets before the patent application was published.

Finally, Besco posits that Cajun never actually owned the purported trade secrets because T2 Tools and/or the Triches were the true owners, whose rights were lost upon publication of the patent, and any purported transfer of trade-secrets rights thereafter would be ineffective. And, because Besco never contracted with T2 Tools or the Triches, Besco asserts that these parties are improper plaintiffs. Plaintiffs submit that Besco's lack of a contractual relationship with T2 Tools and the Triches is immaterial to the trade-secrets claims. Plaintiffs further argue that T2 Tools and

---

[107] R. Doc. 216-1 at 16-19.
[108] R. Doc. 226 at 17-18.
[109] *Id.* at 18-20.

the Triches validly assigned their rights to the trade secrets to Cajun, and that Besco had full knowledge that T2 Tools, the Triches, and Cajun were the owners. In urging the dismissal of the Cajun I Lawsuit, Besco argued that Cajun lacked standing to bring trade-secrets claims because it did not own any trade secrets. Plaintiffs filed the Cajun II Lawsuit adding T2 Tools and the Triches as trade-secrets claimants. As with regard to the existence of the alleged trade secrets, material facts relating to ownership of the alleged trade secrets and the contractual or confidential relationship between Besco and the Plaintiffs are genuinely disputed. In view of these numerous disputed issues of material fact, Besco's motion for partial summary judgment is denied as to Plaintiffs' DTSA and LUTSA claims.

LUTPA provides a civil cause of action to recover actual damages to "[a]ny person who suffers any ascertainable loss of money or movable property … as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." La. R.S. 51:1409. Section 51:1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Courts determine "on a case-by-case basis" what conduct constitutes an "unfair trade practice" and "have repeatedly held that, under this statute, the plaintiff must show the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010) (quotation and citations omitted). A trade practice that amounts to fraud, deceit, or misrepresentation is "deceptive" for purposes of LUTPA. *Total Safety v. Rowland*, 2014 WL 6485641, at *4 (E.D. La. Nov. 18, 2014) (citations omitted).

Because Besco's argument for dismissal of Cajun's LUTPA claim depends upon dismissal of the DTSA and LUTSA claims, and those claims survive, Besco's motion for partial summary

judgment of the LUTPA claim must also be denied.  And, as Cajun notes, Besco did not move to dismiss Cajun's fraud claim, the allegations of which satisfy the elements for actionable conduct under LUTPA.  Thus, Besco's motion as to the LUTPA claim must be denied for this additional reason.

### D.  Patent Infringement

#### 1.  Literal Infringement

Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Active inducement of direct infringement is prohibited under 35 U.S.C. § 271(b), which requires the defendant to have knowledge of a patent and that the acts of inducement were infringing.  *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016).  Contributory infringement is prohibited under 35 U.S.C. § 271(c), which states:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Willful blindness can satisfy the knowledge requirement for active inducement and for contributory infringement.  *Warsaw Orthopedic, Inc.*, 824 F.3d at 1347 (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. ----, 135 S. Ct. 1920 (2015), and *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)).

According to Plaintiffs' opposition, Plaintiffs maintain a claim of literal infringement against only the Accused First Design Products.  Besco's first contention for non-infringement is

that it never used these products after the patent issued, submitting the affidavit of Benton, which states in part: "Besco has never used the [ERIS] roller inserts having lower or second rollers on or after June 5, 2018, the issue date of the U.S. Patent No. 9,988,862."[110]  Limited as it is to "use," this statement does not preclude the possibility that Besco made, sold, or offered to sell the Accused First Design Products after the '862 Patent issued, or that Besco induced its customers' direct infringement with respect to the Accused First Design Products, or that Besco contributorily infringed the '862 Patent with respect to the Accused First Design Products, as alleged.[111]  Further, Besco's stipulation not to use the Accused First Design Products *during the pendency of this lawsuit*[112] bears no relevance to any conduct constituting infringement prior to the stipulation, nor does it address potential infringing conduct after the lawsuit ends.  Besco's second contention for non-infringement is that Cajun has not carried its summary judgment burden to show that every limitation in the asserted claim is found in the accused product.[113]  In this motion, the only limitation placed at issue concerns the lower rollers in the ERIS and the filler pads in the Accused First Design Products.  At this juncture, the Court finds that Cajun has presented sufficient evidence to highlight the dispute regarding this issue.  Therefore, partial summary judgment is inappropriate as to Cajun's claims of literal infringement as to the Accused First Design Products.

### 2. Infringement Under the Doctrine of Equivalents

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)

---

[110] R. Doc. 219-4 at 3.
[111] R. Doc. 175 at 28-29.
[112] R. Doc. 155.
[113] R. Doc. 236 at 1-2.

(citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)).  Equivalence is found under the "insubstantial differences test" where the accused device contains "'an insubstantial change which adds nothing of significance to the structure, material[,] or acts disclosed in the' relevant patent," *Tomita Tech. USA, LLC v. Nintendo Co.*, 681 F. App'x 967, 972 (Fed. Cir. 2017) (quoting *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993)); or under the "function-way-result" test where the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention.  *Graver Tank*, 339 U.S. at 608 (quotation omitted).

As in claims of literal infringement, the "all limitations" rule applies to claims of infringement under the doctrine of equivalents.  *See, e.g.*, *Warner-Jenkinson*, 520 U.S. at 29 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."); *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001) ("No claimed element, or an equivalent thereof, can be absent if the doctrine of equivalents is invoked.").  The "all limitations" rule "holds that an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005).  The two main tenets of the "all limitations" rule when applied to the doctrine of equivalents are (1) to assess equivalence "on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole," and (2) to preclude a finding that an element is an equivalent "if such a finding would entirely vitiate the limitation."  *Id.* (citations omitted).  "[S]aying that a claim element would be vitiated is akin to saying that there is no equivalent to the claim element in the accused device based on the well-established 'function-way-result' or 'insubstantial differences'

tests." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

"There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co.*, 420 F.3d at 1358 (citations omitted); *see also Graver Tank*, 339 U.S. at 856-57 ("What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case.").

Ultimately, "[a] finding of equivalence is a determination of fact." *Graver Tank*, 339 U.S. at 857. Accordingly, "[w]hether the substitute element (1) has substantially the same function as the recited element, (2) achieves that function in substantially the same way, and (3) achieves substantially the same result are questions of fact." *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013) (citations omitted). A court, therefore, cautiously approaches a motion for summary judgment of infringement with "a care proportioned to the likelihood of its being inappropriate." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). In contrast to the factual question of infringement, the doctrine of "[v]itiation is 'a legal determination that "the evidence is such that no reasonable jury could determine two elements to be equivalent."'" *Charles Mach. Works, Inc.*, 723 F.3d at 1380 (quoting *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012), and *Warner-Jenkinson*, 520 U.S. at 39 n.8). The patentee bears the burden of raising a "genuine factual issue that the accused device, while literally omitting a claim element, nonetheless incorporates an equivalent structure." *See Deere*, 703 F.3d at 1357; *see also Tex. Instruments, Inc. v. Cypress Semiconductor*

*Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996) (equivalency must be proven "on a limitation-by-limitation basis" and with "particularized testimony and linking argument").

Dependent claims contain every limitation of the claims from which they depend. Therefore, it is "axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed." *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994) (quoting *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)). As a matter of law, if an accused product does not infringe an independent claim, then it necessarily does not infringe any claim dependent on that independent claim. *See id.* It is undisputed that each of the independent claims (Claims 1, 9, 19, and 26) recites a plurality of lower or second rollers. Besco argues that its Accused Second Design Products do not infringe the '862 Patent, then, because its filler pads are not equivalents to the lower or second rollers.[114]

Cajun argues that the filler pads perform the same function of reducing friction between the tubular and the elevator insert to achieve the same result as the lower rollers of allowing free rotation of the tubular within the elevator insert. In arguing that the filler pads have the effect of preventing the tubular from damaging the elevator insert in the event of "inadvertent contact," Besco effectively concedes that the filler pads serve to achieve the same result as the lower rollers – free rotation of the tubular. As to function, however, Besco asserts that there exists a substantial difference between its filler pads and Cajun's lower rollers: the lower rollers, unlike the filler pads, function to "hold" the tubular centrally in the elevator insert by means of a different degree of contact.[115] Besco quotes the '862 Patent's specification, urging that it supports the idea that the lower rollers "hold" the tubular and thereby perform a different function than the filler pads:

_____

[114] R. Doc. 219-1 at 6.
[115] R. Doc. 236 at 3-5.

[A] cross section is shown comprising of a tubing **34** with an integral connection **36** being held in place by the upper rollers **4** in a generally abutting relationship. Due to the weight bearing rotational capabilities of the upper rollers **4**, the tubing **34** will be allowed to rotate rather freely within the elevator roller insert **30**. The upper roller angle **10** is designed such that it will closely match the angle of the integral connection **36**. The lower rollers **16** will then *hold the tubing 34 centrally within the elevator roller insert* **30** and, *in the same manner as the upper rollers* **4**, would allow the tubular **34** to rotate rather freely.[116]

Reading this excerpt in context with the patent claims and specification as a whole, the Court disagrees with Besco's position. A reasonable jury could find that the lower rollers function in the same way as the filler pads – that is, to allow contact that facilitates free rotation of the tubular – and no more. It is essential to Besco's argument that the word "hold," as used in the '862 Patent, be read as requiring the "constant contact" the Court rejected in its claim construction as being necessary to the meaning of the disputed terms. As the Court noted in its construction of the term "contact," neither the claims nor the specification indicates that the lower rollers are in "constant contact" with the tubular in order to perform the function of facilitating its free rotation within the elevator insert.[117] Neither does Besco's design call for the filler pads to be in "constant contact" with the tubular. Therefore, both Besco's and Cajun's design components can be said to be configured to contact the tubular in a manner that facilitates free rotation and helps to align the tubular centrally in the elevator insert. Further, a reasonable juror could find that this is what is meant by the specification's reference to the lower rollers "holding the tubing centrally within the roller insert" – the same function performed by Besco's filler pads. Thus, the Court cannot conclude that Besco's filler pads are not, as a matter of law, an equivalent of Cajun's lower rollers, so the doctrine of vitiation does not apply. Because there are disputed issues of fact about whether Besco's filler pads have substantially the same function as the ERIS's lower rollers, achieve that

---

[116] *Id.* at 12 (emphasis added).
[117] R. Doc. 210 at 13-17.

function in substantially the same way, and achieve substantially the same result, Besco's motion for partial summary judgment on Cajun's patent-infringement claim must be denied.

## IV.	CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Besco's motions for partial summary judgment to dismiss Cajun's breach-of-contract claim (R. Doc. 218), to dismiss Plaintiffs' trade-secrets claims (R. Doc. 216), and to dismiss Cajun's patent-infringement claim (R. Doc. 219) are DENIED.

New Orleans, Louisiana, this 7th day of June, 2019.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE