UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CAJUN SERVICES UNLIMITED, LLC,                CIVIL ACTION
ET AL.
                                              NO. 17-0491
VERSUS                                        c/w 18-5630 and 18-5932

BENTON ENERGY SERVICE COMPANY,                SECTION M (2)
ET AL.                                        *Pertains to all cases*

## ORDER & REASONS

Before the Court are the following motions filed by defendant Benton Energy Service

Company d/b/a Besco Tubular ("Besco"): (1) a motion for post-trial relief on plaintiff's patent-

infringement claim;[1] (2) a motion for post-trial relief on fraud and Louisiana Unfair Trade Practices

Act ("LUTPA") claims;[2] (3) a motion for post-trial relief on trade-secret misappropriation and

breach-of-contract claims;[3] (4) a Rule 59 motion for new trial / alter / amend / for remittitur on

damages award to plaintiff;[4] and (5) a motion to stay execution of judgment;[5] as well as the

following motions filed by plaintiffs Cajun Services Unlimited, LLC d/b/a Spoked Manufacturing

("Cajun"), T2 Tools & Design, LLC ("T2 Tools"), Shane Triche, and Heath Triche (collectively,

"Plaintiffs"): (6) a motion to alter the judgment with respect to the scope of injunction;[6] and (7) a

motion for writ of execution and/or writ of fieri facias.[7] Plaintiffs oppose Besco's motions,[8] and

Besco opposes Plaintiffs' motions.[9] Besco replies in support of its motions.[10] Plaintiffs filed a

---

[1] R. Doc. 314.
[2] R. Doc. 315.
[3] R. Doc. 316.
[4] R. Doc. 317.
[5] R. Doc. 319.
[6] R. Doc. 318.
[7] R. Doc. 320.
[8] R. Docs. 327, 328, 330, 331 & 332.
[9] R. Docs. 326 & 329.
[10] R. Docs. 343, 345, 347, 349 & 351.

joint surreply in opposition to Besco's motions,[11] and Besco filed a sur-surreply in support of its motions.[12]   Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

## I.   BACKGROUND

### A.  Procedural Background

This action is one among three consolidated lawsuits over rights to an elevator roller insert system ("ERIS"), a technology used in drilling for oil.   On January 20, 2017, Cajun filed suit against Besco (the "Cajun I Lawsuit"), alleging violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq.*; violation of the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. 51:1431, *et seq.*; violation of the LUTPA, La. R.S. 51:1401, *et seq.*; bad faith breach of contract; fraud; and civil conspiracy.[13]   Cajun also sought injunctive relief and a declaratory judgment that Cajun was the owner of all right, title, and interest to all improvements and modifications made to the ERIS, and that Besco assign all right, title and interest in all information conceived of and/or reduced to practice, and any inventions, patent applications, or patents that relate to the ERIS.[14]   Besco filed a motion for partial summary judgment to dismiss Cajun's claim under the DTSA on the ground that Cajun lacked standing because it did not own any trade secrets.[15]   To streamline the litigation, Cajun agreed not to oppose dismissal on that ground.[16]   The Court granted the motion for partial summary judgment, dismissed Cajun's DTSA claim without prejudice, and administratively closed the case in anticipation of Cajun's moving to amend its complaint to assert a patent-infringement claim.[17]

---

[11] R. Doc. 366.
[12] R. Doc. 367.
[13] R. Doc. 1 at 14-28.
[14] *Id.* at 27-28.
[15] R. Doc. 49.
[16] R. Doc. 135 at 5.
[17] R. Doc. 136.

On June 4, 2018, the day before Cajun's ERIS patent issued (U.S. Patent No. 9,988,862, "the '862 Patent"), Besco filed suit against Cajun (the "Besco Lawsuit"), seeking a declaration that Cajun's patent was invalid, unenforceable, and/or not infringed by Besco.[18]   On June 14, 2018, Cajun, its officers Shane Triche and Heath Triche, and a related entity, T2 Tools, filed suit against Besco, re-alleging the same causes of action, except for civil conspiracy, asserted in the Cajun I Lawsuit and adding a patent-infringement claim (the "Cajun II Lawsuit").[19]   Besco answered asserting counterclaims that re-alleged the same causes of action it alleged in the Besco Lawsuit plus allegations of unfair and deceptive trade practices, fraudulent inducement, breach of oral contract, and invalidity of contract.[20]   The Court consolidated the Cajun I Lawsuit with the Besco Lawsuit and the Cajun II Lawsuit on August 15, 2018.[21]   On April 3, 2019, the Court granted Cajun's motion to dismiss the Besco Lawsuit for lack of subject-matter jurisdiction, leaving only the claims asserted in the Cajun I and Cajun II Lawsuits.[22]   On June 7, 2019, the Court denied Besco's motions for partial summary judgment to dismiss Plaintiffs' breach-of-contract claim, trade-secret claims, and patent-infringement claims.[23]   On July 8, 2019, a four-day jury trial commenced,[24] which resulted in a jury verdict in favor of Plaintiffs and against Besco on all claims.[25]

Following trial, the Court established a briefing schedule for all post-verdict/prejudgment motions the parties indicated they would file.[26]   Ahead of the established schedule, Plaintiffs filed

---

[18] R. Doc. 1 at 1, 8 (Case No. 18-5630).
[19] R. Doc. 1 (Case No. 18-5932); *see also* First Amended Complaint, R. Doc. 175 (Case No. 18-5932).
[20] R. Docs. 20 at 21-27 (Case No. 18-5932) & 165 (Case Nos. 17-491 & 18-5932).  The Court dismissed Besco's counterclaims that asserted invalidity of the '862 Patent based on any ground other than inventorship.  R. Doc. 240 (Case Nos. 17-491 & 18-5932).
[21] R. Doc. 11 (Case No. 18-5630).
[22] R. Doc. 205.
[23] R. Doc. 241.
[24] R. Doc. 257.
[25] R. Doc. 267.
[26] R. Doc. 272.

a motion for injunctive relief to prevent dissipation of assets and for writ of attachment,[27] and then on August 14, 2019, they filed a motion for declaratory judgment and injunctive relief,[28] and a motion for attorney's fees.[29]  In addition, Besco filed a motion to compel arbitration,[30] which the Court denied on November 19, 2019.[31]  On January 23, 2020, the Court denied Plaintiffs' motion for injunctive relief to prevent dissipation of assets and for writ of attachment,[32] granted in part and denied in part Plaintiffs' motion for declaratory judgment and injunctive relief,[33] and granted in part and denied in part Plaintiffs' motion for attorney's fees.[34]  On February 7, 2020, the parties submitted a joint proposed form of judgment,[35] which the Court used to enter final judgment that same day.[36]

### B.  Factual Background

#### 1.  The ERIS Technology[37]

In the oil-and-gas industry, segments (*i.e.*, a single joint of pipe) or stands (*i.e.*, generally two or three joints of pipe) of tubulars are threaded together to form tubular strings that are inserted

---

[27] R. Doc. 273.

[28] R. Doc. 283.

[29] R. Doc. 281.

[30] R. Doc. 279.

[31] R. Doc. 297.  On December 19, 2019, Besco filed a notice of its appeal of this decision to the Federal Circuit.  R. Doc. 299.  Whether a district court retains jurisdiction over a case upon an interlocutory appeal of an order denying a motion to compel arbitration is the subject of a circuit split.  *See Weingarten Realty Inv'rs v. Miller*, 661 F.3d 904, 907 (5th Cir. 2011) (collecting cases).  The Federal Circuit has yet to weigh in, although in addressing a completely different issue (*viz.*, the appropriateness of summary disposition of an appeal), it has cited with what might be read as approval the Seventh Circuit's holding that such an appeal divests the district court of jurisdiction.  *See Ecolab, Inc. v. Gardner Mfg. Co.*, 56 F. App'x 484, 485 (Fed. Cir. 2003) (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 506 (7th Cir. 1997)).  Because the Federal Circuit's observation is *dictum* and was made without the benefit of the Fifth Circuit's analysis of the issue in *Weingarten*, and because this Court lies within the Fifth Circuit, the Court will follow the Fifth Circuit's holding that an appeal from an interlocutory order denying a motion to compel arbitration does not divest it of jurisdiction to address the matters that remain before the Court, including the pending post-judgment motions.  *See Weingarten*, 661 F.3d at 907-10.

[32] R. Doc. 307.

[33] R. Doc. 308.

[34] R. Doc. 309.

[35] R. Doc. 311-1.

[36] R. Doc. 312.

[37] For a more complete discussion of the ERIS technology, *see* R. Docs. 210 at 1-3 & 241 at 3-5 and the documents cited therein.

into a wellbore drilled into the earth. Elevators are used to grip and secure each segment or stand to lift the segment or stand into position for threading the tubulars together. Threading is typically performed by rotating the tubular in the elevator with a power tong or by rotating the entire elevator on a swivel.

Difficulties can be encountered with maintaining proper thread integrity of the connections while making up the segment or stand to the string of tubulars. Because these difficulties posed serious cost and safety concerns, there was a need in the industry for a device that would allow tubulars to rotate freely within a closed elevator while supporting the weight of the tubular. Plaintiffs maintain that the ERIS, which embodies the invention disclosed in the '862 Patent, provides a solution to this problem.[38] As described in the '862 Patent, the ERIS is comprised of elevator inserts (which are interchangeable to accommodate different diameter pipe) that interconnect with the inner surface of an elevator. The inserts themselves are further comprised of a plurality (*i.e.*, at least two) of upper rollers. The primary function of the upper rollers is to support the weight of the tubular within the elevator while facilitating free rotation of the tubular. In one embodiment of the ERIS, the upper rollers are further comprised of two faces – an upper face upon which the upset area of a tubular rests and a second face which is parallel with a central axis of the elevator. In some embodiments of the ERIS, the inserts are further comprised of a plurality of lower rollers with a single face, which is parallel with a central axis of the elevator and prevents a tubular from binding against the elevator roller insert. In other embodiments, the ERIS inserts may not include lower rollers.[39] However, each independent claim (Claims 1, 9, 19, and 26) references a plurality of lower or second rollers.[40]

---

[38] R. Doc. 196 at 3.
[39] *Id.* (citations omitted).
[40] R. Doc. 196-1 at 13-15.

## 2.   The Business Relationship Between Plaintiffs and Besco[41]

Besco is an oilfield service company specializing in oilfield pipe running services that utilize specialized tubular handling equipment operated by Besco's personnel.  Besco developed a system for compensating or offsetting suspended tubular goods during pipe installation and removal called the Bail Assisted Tubular Thread System, or "BATT System," which Besco patented (U.S. Patent No. 9,816,333, "the '333 Patent").  To accommodate applications of the BATT System where vertical space within a drilling derrick was limited, Besco decided to utilize a hydraulic single joint elevator (the "Tesco elevator")[42] as part of the BATT System in order to shorten the overall length of the equipment.  In an attempt to resolve the problem of maintaining the thread integrity of the tubular, Besco utilized a specialized hydraulic swivel that allowed the entire Tesco elevator, as well as any tubular gripped therein, to fully rotate.  According to Besco, the solution was not optimal because the lines supporting the swivel and the elevator had a tendency to wrap and tangle.

Besco maintains that its operations manager, Jamie Lovell, conceived of a solution to permit the tubular to spin inside of the Tesco elevator by installing rollers into the die insert, and also asked Cajun to prepare drawings reflecting his concept of the roller dies.  While Plaintiffs admit that Cajun created drawings and fabricated components of the roller inserts customized for Besco's BATT System and the Tesco elevators, Plaintiffs deny that Lovell was the inventor of the disputed roller inserts.  Rather, Plaintiffs contend that Shane and Heath Triche, brothers and managers of Cajun, had conceived of the ERIS system by the end of September 2014 after Lovell introduced and discussed the problem with them.[43]  These roller inserts essentially constituted the

---

[41] For a more complete discussion of this business relationship, *see* R. Doc. 241 at 5-11 and the documents cited therein.

[42] The single joint elevator Besco utilized was manufactured by Tesco Corporation.

[43] R. Doc. 226-1 at 3; 6 (citing R. Doc. 226-4 at 7).

ERIS, for which Shane and Heath Triche sought patent protection on March 23, 2015.[44]  In mid-March 2015 and again a few weeks later in early April, Plaintiffs successfully tested the ERIS at Sea Ropes, LLC's facility in Houma, Louisiana, in the presence of Besco's personnel, including Esco Benton, III, chief operating officer for Besco.[45]

Following a series of conversations, it became evident that there was a dispute over who invented the ERIS and was entitled to its ownership.  Notwithstanding the dispute, Besco began renting the ERIS tool from Cajun on May 7, 2015, for a project related to Besco's customer, Anadarko Petroleum ("Anadarko").[46]  Besco contends that an oral agreement between it and Cajun controlled this rental and every subsequent rental of the ERIS tool.[47]  On the other hand, Cajun contends that the Equipment Rental/Services Agreement General Terms and Conditions (the "Rental Agreement"),[48] which was posted on its website, applied to their contract from the outset, *i.e.*, as of May 7, 2015.  Cajun later included in its quotes a statement that they were subject to the terms and conditions (*i.e.*, the Rental Agreement) viewable on its website, and eventually began including the Rental Agreement with its quotes.  Besco ceased renting the ERIS from Cajun in July 2016.[49]  Plaintiffs contend that the balances of eleven invoices issued to Besco between March 1, 2016, and July 5, 2016, remain outstanding.[50]

Meanwhile, sometime around February 2016, Lovell contacted Jerod Deroche of Elite Energy Services, LLC ("Elite") to design an elevator roller insert system for Besco.[51]  Lovell

---

[44] R. Doc. 242 at 18.  For a history of the patent-application process for the '862 Patent, *see infra* note 348.

[45] R. Docs. 242 at 19; 301 at 187-88, 198-99.

[46] R. Doc. 226-1 at 7.

[47] R. Doc. 216-1 at 9.

[48] Trial Ex. 25 (the Rental Agreement).

[49] R. Doc. 242 at 23.

[50] R. Doc. 226-1 at 9 at 10 (citing R. Doc. 50-22).

[51] R. Doc. 226-1 at 9 (citing R. Doc. 62-5).  Elite was a defendant in the Cajun I Lawsuit, but was dismissed by Cajun.  R. Doc. 47.  In Elite's interrogatory answer, Elite stated that Lovell first contacted Elite about manufacturing the roller inserts in early 2014, but that Lovell did not follow up with drawings and a prototype until early 2016.  R. Doc. 226-4 at 71.

provided Elite with Cajun's ERIS drawings (which Besco maintains Cajun sent to it with no confidentiality notices)[52] and one of Cajun's ERIS tools that had the words "patent pending" engraved on it.[53]   Cajun alleges that Lovell represented to Elite that the "patent pending" was Besco's.[54]   Cajun maintains that Besco reverse engineered the product through Elite's work and Besco's own disassembly of one of the ERIS tools.   Using Elite's prototypes, Besco created two versions of its own ERIS system, one using a second set of lower rollers (the "Accused First Design Products"), and the second using filler pads instead (the "Accused Second Design Products"). Cajun's '862 Patent did not issue until June 5, 2018.[55]   According to Plaintiffs, Besco rented the infringing tools to its customers while also failing to pay Cajun the amounts due under the Rental Agreement.

### 3.   Plaintiffs' Claims and the Jury Verdict

In this lawsuit, Cajun seeks injunctive relief to stop Besco from using its alternative designs of the ERIS; a declaratory judgment that it owns all right, title, and interest to all improvements and modifications made to the ERIS, and that Besco assign to Cajun any information conceived of and/or reduced to practice that in any way relates to the ERIS; a declaratory judgment of infringement because of Besco's retention of its Accused First Design Products, which Cajun contends literally infringe the '862 Patent; and damages for (1) willful infringement of the '862 Patent because of Besco's Accused Second Design Products, which Plaintiffs contend infringe the '862 Patent under the doctrine of equivalents; (2) violation of the DTSA; (3) violation of the

---

[52] R. Doc. 216-1 at 15 (citing R. Doc. 246-4 at 8-31).
[53] R. Doc. 226-1 at 9 (citing R. Doc. 50-23).
[54] *Id.* (citing R. Doc. 226-4).
[55] R. Doc. 175 at 21 (citing R. Doc. 175-5); *see* Trial Ex. 1 (the '862 Patent).

LUTSA; (4) violation of the LUTPA; (5) bad faith breach of contract; and (6) fraud. The other Plaintiffs join Cajun's claims under the DTSA and LUTSA.[56]

After trial, the jury determined that there was a written agreement between Cajun and Besco for rental of the ERIS tool (the Rental Agreement), that Besco breached the agreement, and that it did so in bad faith, awarding $866,103.10 in damages for breach of contract and another $552,000.00 in consequential damages for Besco's bad faith breach. The jury also found that Cajun was the owner of all right, title, and interest to all improvements and modifications made to the ERIS to the exclusion of all others. In addition, the jury found that Besco's conduct amounted to fraud, violated the LUTPA, violated the DTSA and LUTSA willfully and maliciously, and infringed the '862 Patent. As a result, the jury awarded $1.5 million in damages for these violations and another $2 million in exemplary damages for willful and malicious violation of the DTSA.[57]

### 4. The Final Judgment

Following its resolution of the parties' post-trial motions, the Court entered judgment for Plaintiffs and against Besco on all claims, pursuant to the jury verdict (1) enforcing Besco's post-trial stipulation,[58] insofar as it relates to the Accused First Design Products (*viz.*, Besco shall not manufacture, use, sell, or offer for sale the Accused First Design Products in the future), as a consent judgment; (2) declaring that Cajun is the owner of all right, title, and interest to all improvements and modifications made to the ERIS, and of the information conceived of and/or reduced to practice that in any way relates to the ERIS, to the exclusion of all others; (3) enjoining Besco from (a) making, using, selling, or offering for sale the Accused Second Design Products in the future; (b) disclosing or using Plaintiffs' trade secrets; and (c) using its tools and materials in

---

[56] R. Doc. 175.
[57] R. Doc. 267.
[58] R. Doc. 278.

any way that infringes upon Cajun's ownership by contract of all improvements, modifications, and information relating to the ERIS (but not from making or using a tool or material in a way that infringes neither upon Cajun's patent nor upon any information which is owned solely by Cajun); and (4) awarding all damages specified in the jury verdict, plus prejudgment and post-judgment interest, attorney's fees, and costs.[59]

## II.   PENDING MOTIONS

### A.   Besco's Motion for Post-Trial Relief on Plaintiffs' Patent-Infringement Claim

Besco argues that Plaintiffs[60] did not prove by a preponderance of the evidence that Besco infringed the '862 Patent and that it was therefore unreasonable for the jury to find infringement; accordingly, the Court should rule that Besco did not infringe the patent as a matter of law, or alternatively, grant a new trial on the merits.[61]  Besco asserts that Plaintiffs did not prove literal infringement because the "unrebutted evidence" showed that Besco ceased use of the Accused First Design Products (those with lower rollers) after issuance of the '862 Patent, and that furthermore, the Accused Second Design Products lack a key claim – namely, lower rollers.[62] Neither did Plaintiffs prove infringement under the doctrine of equivalents, says Besco, because

---

[59] *See* R. Doc. 312.

[60] Besco styles its motion as seeking post-trial relief on "Plaintiff's" patent-infringement claim, explaining that it refers to "Plaintiff" as the "collective Plaintiff," and then arguing that "[a] grievous issue of standing continues to pervade this litigation," because "none of the plaintiffs have [sic] demonstrated its particular ownership in any proprietary rights."  R. Doc. 314-1 at 6 n.1.  Besco asserts that the '862 Patent is owned only by Cajun, and so "[o]nly Cajun has standing to assert this claim or oppose [Besco's] motion."  R. Doc. 347 at 2.  Not only is this argument completely besides the point, since Besco admits that Cajun has standing to assert patent infringement, it has always been clear that *only* Cajun brought the patent-infringement claim and the claim for declaratory judgment of infringement.  *See* R. Doc. 175 at 28 ("First Cause of Action: Willful Infringement of the '862 Patent – *on behalf of Cajun*") (emphasis added); *id.* at 42 ("Ninth Cause of Action: Declaratory Judgment of Infringement of the '862 Patent – *on behalf of Cajun*") (emphasis added); *see also* R. Docs. 242 at 40 (contested issues of law include issues of patent infringement as between Cajun and Besco); 266 at 20-28 (instructing jury on patent infringement issues as between Cajun and Besco); 267 at 3 (asking jury whether "Cajun establish[ed] by a preponderance of the evidence that Besco infringed the '862 Patent").  Nor does Besco provide any authority that Plaintiffs cannot collectively oppose Besco's motion on behalf of Cajun, as they have done throughout this litigation, and as is not uncommon in multi-party litigation.  Thus, Besco's argument has no merit.  For a discussion on standing for the trade-secrets claims, *see infra* note 98.

[61] R. Doc. 314-1 at 1.

[62] *Id.* at 12-15.

(1) prosecution history estoppel bars the application of the doctrine of equivalents; (2) Plaintiffs failed to rebut the presumption of prosecution history estoppel; and (3) regardless, the filler pads in the Accused Second Design Products are not the equivalent of the '862 Patent's lower rollers.[63] Besco maintains that Plaintiffs relied on "unsubstantiated and incredulous evidence."[64]  It adds that "a reasonable jury would have found the patent invalid based on inventorship issues," because although throughout the litigation, Besco has asserted that "Jamie Lovell is either the inventor, or at least a co-inventor" of the ERIS, and Plaintiffs have asserted that Heath and Shane Triche are the sole inventors, at trial "Heath Triche unequivocally testified that he was the sole inventor."[65] Besco also argues that even if the judgment on the patent-infringement claim stands, the damages award should be reduced because the evidence at trial showed that it only used the Second Accused Design Products for a few days, after which it removed the filler pads, resulting in a revised third design without lower rollers or filler pads.[66]

Plaintiffs begin their opposition by arguing that Besco's motion must be treated as a Rule 59(a) motion for new trial, and not a Rule 50(b) motion for judgment as a matter of law, because Besco's single ground for its Rule 50(a) motion at trial was "that no evidence was presented of use of the Accused First Design Products after the '862 Patent issued – and [Besco's] counsel was clear that such motion pertained to Cajun's claim for declaratory [judgment] of patent

---

[63] *Id.* at 15-24.

[64] *Id.* at 19-21.

[65] *Id.* at 21 (emphasis omitted).

[66] *Id.* at 7-8 & 29.   In the alternative, Besco moves for remittur, adding that (1) damages for patent infringement should have been apportioned, so that Plaintiffs could recover only for patented features and not nonpatentable products or services, and (2) the jury's damages award for patent infringement was "erroneously" lumped together with damages for other claims, thereby allowing the jury to award inappropriately enhanced damages for patent infringement without first finding willful infringement on the part of Besco.  *See id.* at 28-29.  These arguments are discussed in conjunction with Besco's motion on the jury's damages award.  *See infra* section III.B.5.

infringement," yet Besco's Rule 50(b) motion does not relate to this issue.[67]  Indeed, according to Plaintiffs, Besco's argument that they did not prove that the Accused Second Design Products literally infringed the '862 Patent belies a misunderstanding of Plaintiffs' real contention on this score – specifically, "through Cajun's claim for declaratory judgment of patent infringement, Plaintiffs alleged that Besco's continued possession of nine Accused First Design Products … created a reasonable apprehension of future literal infringement."[68]  Next, Plaintiffs argue that Besco's "purported Accused Third Design" does not exist, and that the jury, in arriving at its verdict, already weighed Besco's evidence in support of its argument that it had ceased using the Accused Second Design Products.[69]  Plaintiffs contend that Besco's prosecution-history-estoppel argument is waived, and in any event, fails, and that furthermore, the evidence supports the jury's finding that the Accused Second Design Products infringed the '862 Patent under the doctrine of equivalents.[70]  Plaintiffs conclude by arguing that Besco's new inventorship argument is waived and meritless, but that even if it had merit, only harmless error would have resulted because a correction of inventorship pursuant to 35 U.S.C. § 255 could have been filed.[71]

In reply, Besco argues that its motion is "properly re-urged under Rule 50(b)," because "[i]n raising the Rule 50 [m]otions, [its] counsel unequivocally noted" that "it is clear there is no literal infringement for any times forward from the issue of the patent" and that "the evidence is clear that at that point … they went forward with removing the lower rollers, doing pads, and the issue becomes whether or not there is infringement under the [d]octrine of [equivalents]."[72]  Besco

---

[67] R. Doc. 332 at 4-5.  Out of an abundance of caution, Plaintiffs argue that they proved all elements of Cajun's claim for declaratory judgment of literal patent infringement with respect to the Accused First Design Products.  *See id.* at 5-6.

[68] *Id.* at 5-6.

[69] *Id.* at 6-8.

[70] *Id.* at 9-13.

[71] *Id.* at 13-14.  Plaintiffs explain that they address Besco's arguments for remittur in their opposition to Besco's motion with respect to damages.  *Id.* at 15.

[72] R. Doc. 347 at 2-3.

then asserts that Plaintiffs "concede[] that [Besco] did not literally infringe the '862 Patent," arguing that Plaintiffs' position that they never contended that the Accused Second Design Products literally infringed the '862 Patent "is not reflected anywhere in the trial record" because literal infringement was "clearly … a contested issue of law."[73]  Besco argues that Plaintiffs did not disprove the existence of its third design or that it infringed the '862 Patent, and that regardless, Plaintiffs did not present any evidence of alleged infringement after July 2018.[74]  As to the inventorship issue, Besco argues that evidence that Heath Triche alone invented the ERIS "was never raised before trial," and that "[i]t is material for the jury to consider [that] if the Triches could fabricate one inventor it is possible they removed another."[75]

In their surreply, Plaintiffs emphasize that Besco failed to include prosecution history estoppel in the pretrial order, resulting in waiver of the issue.[76]

In its sur-surreply, Besco reiterates its argument that the filler pads in the Accused Second Design Products did not function in the same way as the lower rollers in the '862 Patent.[77]  Besco also asserts that "Plaintiffs' new stance that they did not bring direct infringement as a claim at trial raises plain error in the jury instructions."[78]  Besco adds that "Plaintiffs were required to prove

---

[73] *Id.* at 3-4.

[74] *Id.* at 4-5.  In making this argument, Besco also moves to strike references to "new evidence" in Plaintiffs' opposition memorandum. *Id.* at 5.  The Court will not consider and has not considered any evidence presented for the first time in a post-trial opposition memorandum.

[75] R. Doc. 347 at 8.

[76] R. Doc. 366 at 6-7.

[77] R. Doc. 367 at 6-7.

[78] *Id.* at 6 n.6.  The Court supposes that Besco intended to use the term "literal" – as opposed to "direct" – infringement.  "Direct infringement may be proven **either** by literal infringement or infringement under the doctrine of equivalents." *Lunareye, Inc. v. Gordon Howard Assocs., Inc.*, 2013 WL 12147676, at *3 (E.D. Tex. Dec. 13, 2013) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005)) (emphasis added).  Whether infringement was direct or indirect (*viz.*, "induced" or "contributory") or whether there was any indirect infringement was never at issue in this litigation. *See id.* (citations omitted).  Cajun clearly alleged only direct patent infringement, *see* R. Doc. 175 at 28-29, and their opposition memorandum makes no reference to a stance that they did not bring a "direct" infringement claim. *See* R. Doc. 332.

the amount that [Besco] used the allegedly infringing" products, and that without such proof, recovery was precluded.[79]

**B. Besco's Motion for Post-Trial Relief on Fraud and LUTPA Claims**

Besco seeks judgment as a matter of law on Cajun's fraud and LUTPA claims, first attacking the jury's verdict on fraud by arguing that Plaintiffs failed to provide sufficient evidence that Besco had any fraudulent intent.[80]  Besco argues that fraudulent intent is not supported by Plaintiffs' "'reverse engineering' claim because the evidence overwhelmingly supports" finding that Besco "was under the impression that it owned the ERIS."[81]  Besco asserts that Plaintiffs' evidence is "mere speculation at best," and that the evidence shows that Besco "merely intended to extract itself from a failed business deal."[82]  Besco insists that there was no evidence that any of its agents had a "contemporaneous intent to breach" any alleged promise to pay Cajun "at the time the parties allegedly formed a contract."[83]  Next, Besco argues that the fraud claim cannot stand because Plaintiffs did not show any misrepresentation on the part of Besco.[84]  According to Besco, it was upfront with Cajun about its disagreements concerning the rental prices for the ERIS, and there can be no misrepresentation by silence or omission because there was no evidence that it owed Cajun any duty to disclose that it was creating new tools.[85]  Besco adds that Plaintiffs also failed to prove any harm caused by any alleged misrepresentation.[86]  Besco argues that if the Court finds no fraud as a matter of law, it must also set aside the jury's verdict on Cajun's LUTPA claim.[87]  In the alternative, Besco moves for a new trial on both the fraud and LUTPA claims,

---

[79] R. Doc. 367 at 7.
[80] R. Doc. 315-1 at 1, 10.
[81] *Id.* at 11.
[82] *Id.* at 12.
[83] *Id.*
[84] *Id.* at 16.
[85] *Id.* at 16-17.
[86] *Id.* at 18.
[87] *Id.*

emphasizing that the finding of a LUTPA violation is against the weight of the evidence because there is no evidence that Besco had any intent to "harm the competition."[88]

In opposition, Plaintiffs first object that Besco's Rule 50(a) motion at trial included only lack of intent as a basis for judgment as a matter of law on fraud.[89]  Therefore, they argue, all other grounds Besco raises to challenge the verdict on fraud, including misrepresentation, have been waived.[90]  Addressing intent, Plaintiffs argue that they presented sufficient circumstantial evidence of Besco's fraudulent intent, explaining that such intent is "rarely susceptible of proof by direct evidence," and emphasizing that this is a question of fact appropriately left to the jury.[91]  Finally, Plaintiffs assert that because the verdict on the fraud claim should stand, so must the verdict on the LUTPA claim.[92]

In reply, Besco insists that it did not waive its right to challenge the misrepresentation element of fraud under Rule 50(b), arguing that its Rule 50(a) motion encompassed both intent and misrepresentation.[93]  Besco asserts that because it was clear that it was challenging the sufficiency of the fraud claim, it is not now "ambush[ing]" Plaintiffs, and the Court may consider its argument on both lack of a misrepresentation and damage caused thereby.[94]  Besco argues that under either a Rule 50(b) or Rule 59 standard, when considering "all of the evidence," there can be no finding of fraudulent intent because Besco understood that the ERIS belonged to it.[95]  It maintains that while fraud presents factual inquiries, this does not prevent the Court from ruling

---

[88] *Id.* at 19-22.
[89] R. Doc. 331 at 1-2, 8-9.  Plaintiffs also move to strike all Rule 50(b) grounds not previously raised in Besco's Rule 50(a) motion.
[90] *Id.* at 2, 11
[91] *Id.* at 7-11.
[92] *Id.* at 12.
[93] R. Doc. 345 at 2-4.
[94] *Id.* at 4.
[95] *Id.* at 4-5 (citation and emphasis omitted).

as a matter of law that the requisite intent is absent, pointing to the Court's language in denying Besco's Rule 50(a) motion on the issue at trial.[96]

Plaintiffs' surreply adds only that "insofar as Besco suggests the Court expressed any reservations in denying Besco's oral 50(a) motion at the close of Plaintiffs' case in chief, the Court in fact later considered and again rejected Besco's oral 50(a) motion after both parties had rested."[97]

### C. Besco's Motion for Post-Trial Relief on Trade-Secret Misappropriation and Breach-of-Contract Claims

Besco moves for judgment as a matter of law, or in the alternative, a new trial on Plaintiffs' DTSA and LUTSA claims and Cajun's breach-of-contract claim.[98]   Regarding the trade-secrets claims, Besco argues that Plaintiffs failed to provide evidence that they took reasonable measures of secrecy to protect the ERIS design, emphasizing that the testing of the ERIS involved persons, including Besco, who were not bound by confidentiality agreements, and that Plaintiffs provided Besco with drawings of the ERIS without any notices of confidentiality.[99]   Besco also argues that

---

[96] *Id.* at 4-5 & n.5.

[97] R. Doc. 366 at 8.

[98] R. Doc. 316-1 at 1-2.  As referenced earlier, Besco argues in another motion that "[a] grievous issue of standing continues to pervade this litigation."  *See supra* note 60 (quoting R. Doc. 314-1 at 6 n.1).  Regarding the trade-secrets claims, Besco states that "the alleged trade secrets are asserted to be owned by T2 Tools & Design yet the patent on the same technology is independently owned by Cajun Services Unlimited, each of which are subject to different members and ownership rights."  R. Doc. 314-1 at 6 n.1.  But in their first amended complaint, Plaintiffs specifically allege:

> Shane and Heath owned the trade secrets at issue from their inception until March 22, 2016.  T2 Tools owned the trade secrets at issue from March 22, 2016 until July 27, 2017.  Cajun has owned the trade secrets at issue since July 27, 2017, and was at all times prior the implied licensee of T2 Tools and/or Shane and Heath.  *Cajun is the current owner of all claims regarding past infringement and misappropriation of the intellectual property relating to the ERIS*.  However, in anticipation of Besco's contention to the contrary, Plaintiffs plead this cause of action for misappropriation under the DTSA *in the alternative as to all Plaintiffs*.

R. Doc. 175 at 29-30 (emphasis added).  This same paragraph is repeated in regards to their cause of action under LUTSA.  *See id.* at 32.  Besco does not argue that *none* of the Plaintiffs – who bring the claims *in the alternative* – has standing to assert the alleged trade-secrets violations.  The Court does not see how this possibly results in a "grievous issue of standing."

[99] R. Doc. 316-1 at 11-19.

trade-secrets law does not protect against reverse engineering, and that information which is readily ascertainable without engaging in tortious behavior cannot constitute a trade secret, and so because Plaintiffs shared the information at issue before Besco allegedly owed any contractual duties of confidentiality, and Elite did not use any of this information to develop new tools for Besco, the jury could not reasonably have found misappropriation.[100]

Turning to Cajun's breach-of-contract claim, Besco first argues that the terms and conditions which Besco allegedly breached were not part of the alleged rental contracts.[101] Specifically, Besco argues that Plaintiffs' assertion that it breached an obligation "not to have a new tool created" under the terms and conditions of the rental contracts cannot stand because the terms and conditions could not have been effective before they first appeared on the documents in October 2015, and after that point, Besco still did not consent to the terms and conditions because "(i) [Besco] was already in possession of the information the Terms and Conditions sought to limit and (ii) no one with authority within [Besco] executed a delivery ticket with these Terms and Conditions."[102]  Next, Besco expands on its argument that none of its employees who allegedly signed the delivery tickets with the terms and conditions had authority to bind the company by arguing that (1) no one at Cajun inquired into whether the Besco employees had authority to bind Besco; and (2) the terms and conditions in question state that "no field employee of company shall

---

[100] *Id.* at 19-20.

[101] *Id.* at 21.  Throughout its memoranda, Besco refers to the various rental delivery tickets as "rental contracts" or "rental agreements," or otherwise implies that there are multiple versions of the Rental Agreement. *See, e.g.,* R. Docs. 316-1 at 21-25; 326 at 6-7 n.8 ("Plaintiffs do not even cite an exhibit for the alleged Rental Agreement from which it argues – is it the initial version which do not have the alleged terms and conditions attached to it, or the second version which referenced an arbitrary website … or was it the third version that had boiler plate language on the back … ?").  Plaintiffs urged throughout trial that the "Rental Agreement" refers to Cajun's Equipment Rental/Services Agreement General Terms and Conditions, of which there is only one version, and which Plaintiffs argue governed all Cajun's rentals of the ERIS to Besco, and to which Plaintiffs say Besco agreed multiple times through its signing of each individual delivery ticket.  Given the verdict, it is plain that the jury accepted Plaintiffs' position.

[102] R. Doc. 316-1 at 21-23.

be empowered to alter the terms," and thus Cajun could not accept a signature from a field employee.[103]   As a result, posits Besco, it was "wholly unreasonable" for Cajun to have believed that Besco's employees had authority to bind Besco, and so the doctrine of apparent of authority is unavailable to it.[104]

Plaintiffs counter that Besco waived any right to bring a Rule 50(b) motion on the contract claim altogether, and as to the trade-secrets claims, preserved only its argument based on the reasonableness of Plaintiffs' efforts to maintain secrecy.[105]   Substantively responding to Besco's arguments regarding the contract claim, Plaintiffs assert that (1) Besco ratified the terms and conditions of the Rental Agreement; (2) Besco is bound by the apparent authority of its "offshore and operations manager," regardless of Besco's "field hands" label; (3) Besco cannot reasonably contend that its employees had authority to accept delivery of Cajun's tools but no authority to accept the accompanying terms and conditions; and (4) Besco is estopped from making these arguments as a result of its own misconduct.[106]   As to Besco's arguments on their trade-secrets claims, Plaintiffs assert that they sufficiently showed at trial that they took reasonable efforts to maintain relative secrecy, emphasizing that absolute secrecy is not required.[107]   They point to evidence at trial of the measures taken to protect the secrecy of the information, and contend that the testing of the ERIS did not reveal protected information.[108]   Concerning their sharing of the ERIS drawings with Besco, Plaintiffs argue that the relationship with Besco "was one of confidence with an implied obligation to maintain the secrecy of the product," and that regardless, the drawings did not provide sufficient information for Besco to replicate the ERIS.[109]

---

[103] *Id.* at 23-24 (brackets omitted).
[104] *Id.* at 24-25.
[105] R. Doc. 328 at 2-3, 6.
[106] *Id.* at 3-6.
[107] *Id.* at 7-12.
[108] *Id.*
[109] *Id.* at 11-12.

In reply, Besco argues that the Court should not strictly construe its Rule 50(a) motion on the trade-secrets claims, but rather consider under Rule 50(b) its argument on lack of misappropriation in addition to its argument on lack of secrecy measures.[110]  Besco maintains that the measures presented by Plaintiffs are not sufficient to be considered "reasonable measures" necessary for trade-secrets protection.[111]  Responding to Plaintiffs' point that they applied for patent protection before any testing of the ERIS, Besco states that patent protection is the "opposite" of trade-secrets protection.[112]  As to Plaintiffs' argument on ratification, Besco responds that it cannot have ratified the terms and conditions in the rental contracts because Plaintiffs did not prove that Besco's principals had actual knowledge of them.[113]

### D. Besco's Rule 59 Motion for New Trial / Alter / Amend / for Remittitur on Damages Award to Plaintiffs

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Besco moves the Court to order a new trial on damages or to alter, amend, or reduce various categories of the jury's damages award, arguing that the award of $4,938,101.10 marks a manifest injustice and error of law.[114]  Besco begins by incorporating its three concurrently-filed motions substantively challenging the underlying verdict on patent infringement, fraud and violation of the LUTPA, and trade-secrets misappropriation and breach of contract.[115]  Besco asserts that the trial was marred by interruptions and delays due to flooding and threats of severe weather, disrupting the normal sequence, flow, and timing for jury trials.[116]  Besco then argues that "[i]t appears the jury mistook the claims for which Plaintiff[s] sought diverted rental damages," *i.e.*, under theories of fraud, violation of the

---

[110] R. Doc. 343 at 1-3.
[111] *Id.* at 4.
[112] *Id.* at 5.
[113] *Id.* at 6.
[114] R. Doc. 317-1 at 1.
[115] *Id.* at 5.
[116] *Id.* at 5-6.

LUTPA, patent infringement, and state and federal trade-secrets misappropriation, and awarded the requested $552,000.00 in diverted rentals as consequential damages for bad faith breach of contract in response to jury interrogatory number 13.[117]   Besco argues that the jury awarded speculative damages, not permitted under either Louisiana law or the DTSA, because Plaintiffs failed to prove with any particularity the $4 million in "additional business damages" which Plaintiffs sought as consequential damages for bad faith breach of contract, or in the alternative, as damages for fraud, violation of the LUTPA, and state and federal trade-secrets misappropriation.[118]   Besco explains that Plaintiffs requested three categories of damages for jury interrogatory number 14 (damages for fraud, violation of the LUTPA, patent infringement, and state and federal trade-secrets misappropriation): (1) $552,000.00 for diverted rentals; (2) $818,805.10 for unjust enrichment from misappropriation; and (3) $4 million in additional business damages; and so the jury's award of $1.5 million must contain speculative damages because the first two categories add up to only $1,370,805.10.[119]   Besco also posits that this figure likely includes an impermissible duplication of the $552,000.00 in the diverted rentals which the jury awarded under interrogatory number 13, and thus includes an even higher amount of speculative damages.[120]   Next, Besco argues that the jury awarded damages for time periods not applicable to any causes of action because there is a gap in claim coverage between the period when potential trade-secrets recovery lapses (according to Besco, this occurred here when the patent application was published on September 29, 2016) and the period when potential patent-infringement recovery begins (when the patent issued on June 5, 2018).[121]   Subsequently, Besco

---

[117] *Id.* at 7.
[118] *Id.* at 6-15.
[119] *Id.* at 14-15.
[120] *Id.* at 15-16.
[121] *Id.* at 17-18.

argues that jury interrogatory number 15 improperly instructed the jury it could enhance up to two times the damages awarded under jury interrogatory number 14, even though jury interrogatory number 14 lumped together damages under various theories, several of which do not allow for enhancement of damages; accordingly, says Besco, the enhanced damages must be reduced, or in the alternative, to the extent remittur is impractical, a new trial should be ordered on this issue.[122] Besco then attacks the figure Plaintiffs advanced for unjust enrichment damages for misappropriation ($818,805.10) as speculative; as including revenue though the LUTSA and the DTSA limit unjust enrichment damages to a defendant's profits; and as improperly including invoices unrelated to the roller inserts.[123]  Besco also attacks the figure for diverted rentals given by Plaintiffs ($552,000.00) as incorrectly calculated because (1) the number of days Plaintiffs used (736 rental days) included days covered neither by trade-secrets protection nor by patent protection;[124] and (2) the rate should have been $200 per ERIS insert per day, rather than $750 per ERIS insert per day.[125]  Finally, Besco asserts that a portion of any damages for misappropriation should have been attributed to Elite, who Plaintiffs initially alleged was a joint tortfeasor with Besco; Besco states that by voluntarily dismissing Elite from the suit, Plaintiffs surrendered any damages attributable to Elite.[126]

In opposition, Plaintiffs begin by objecting to and moving to strike Besco's challenges to the jury verdict form on any ground but plain error affecting substantial rights pursuant to Rule

---

[122] *Id.* at 19.

[123] *Id.* at 19-21.

[124] Besco notes that Plaintiffs' expert witness, Bryce Randle, indicated that "how the rollers function" may still be protectable as a trade secret because it was not disclosed in the '862 Patent, and so, says Besco, the Court should take any response by Plaintiffs that the patent does not contain all information on how to use or make the ERIS as a judicial admission of the patent's invalidity, or at least new facts triggering new defenses not previously available, and order a new trial on the merits of this defense to determine if the patent is invalid for lack of written description and/or enablement.  *Id.* at 17 n.45.

[125] *Id.* at 21-22.

[126] *Id.* at 22-23.

51(d)(2) under the Federal Rules of Civil Procedure.[127]  Plaintiffs maintain that the Court properly submitted damages to the jury in a verdict form to which the parties agreed.[128]  Next, citing the "strong presumption in favor of affirming a jury award of damages,"[129] Plaintiffs argue that the jury award is adequately supported because they presented evidence of: (1) $886,103.10 in unpaid rentals, which were awarded as actual damages for Besco's breach of contract; (2) $3-5 million in consequential damages, thus making the $552,000.00 awarded as consequential damages for bad faith breach of contract under interrogatory number 13 eminently reasonable, especially since the verdict form indicated that any consequential damages awarded under interrogatory number 14 was to be offset by the award made in response to question 13; (3) $552,000.00 in diverted rentals, calculated at the proper rate ($750 per ERIS insert per day, the rate Plaintiffs charged Besco throughout the rental relationship[130]) and for the proper time period (as Plaintiffs maintain that their trade secrets were never fully disclosed); and (4) $818,805.10 in unjust enrichment damages, which Plaintiffs calculated by taking Besco's $5,297,747.70 in revenue from Anadarko that it would not have received but for its use of its knock-off tools, but including only the period of time up to the date of the patent-application publication in late September 2016 plus six months (six months being the approximate time it took Besco to copy the ERIS, and thus Plaintiffs' estimate of how long it would have taken Besco to permissibly develop its own tools after the patent application published), thus leaving $1,370,805.10, and then subtracting another $552,000.00 to avoid double counting the diverted rentals.[131]  Plaintiffs explain that the jury's award under interrogatory number 14 can be apportioned among the specific claims in multiple ways that are

---

[127] R. Doc. 330 at 3.

[128] *Id.* at 5-7.

[129] *Id.* at 7 (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995)).

[130] More specifically, Plaintiffs explain that they charged Besco $750 per ERIS insert per day, with a $300 per day discount for on-time payment, but Besco does not receive the benefit of the discount for the diverted rentals because no payment, much less on-time payment, was made to Plaintiffs.  *Id.* at 13.

[131] *Id.* at 7-13.

reasonable and congruent with its award of DTSA exemplary damages under interrogatory number 15.[132]   In response to Besco's footnote arguing that a new trial should be ordered to determine patent invalidity based on lack of written description and/or enablement, Plaintiffs explain that such a defense involves whether the claims are supported by the specification and whether a person of ordinary skill in the art would be able to practice the claims without undue experimentation, yet that standard is easily met because a person of such ordinary skill would be able to make rollers that spin; Plaintiffs say that they specifically did not claim the roller configuration as part of the invention and maintain it as a trade secret, and note that discovering this secret required taking the rollers apart, which is precisely what Besco did.[133]   They add that Besco's counterclaim relating to patent invalidity was dismissed with prejudice in part due to Besco's "attempt to subvert the Court's scheduling order by reserving its rights to supplement its claims of invalidity at an unspecified time after the close of discovery."[134]   Finally, as to Besco's seeking "to belatedly attribute damages to Elite," Plaintiffs respond that Jamie Lovell told Elite that the ERIS and its pending patent belonged to Besco, and thus Elite, which was at best induced by Besco into its conduct, did not misappropriate Plaintiffs' trade secrets; accordingly, say Plaintiffs, no damages are attributable to Elite.[135]

In reply, Besco states that it properly invokes Rules 59 and 60 to request that the jury award either be vacated and a new trial ordered or be reduced and the judgment altered.[136]   Substantively,

---

[132] *Id.* at 12.

[133] *Id.* at 14.

[134] *Id.* (quoting R. Doc. 240 at 8) (alteration omitted).

[135] *Id.* at 15.

[136] R. Doc. 349 at 1-2.  In the memorandum in support of its "Rule 59 motion," Besco, in cursory fashion, recites the standard for Rule 60(b) of the Federal Rules of Civil Procedure in addition to that for Rule 59(e).  *See*. R. Doc. 317-1 at 8-9.  Besco does not, however, indicate that there is any substantive difference required for the analysis of its arguments under Rule 60(b) as opposed to Rule 59(e), but rather states that "[i]n deciding a motion for relief from judgment under Rule 60(b), the court must engage in the same balancing of competing interests as under Rule 59(e)."  *Id.* at 9 (citations and quotation marks omitted).  Accordingly, the Court conducts no separate analysis of the issues under Rule 60(b).

Besco argues that the record evidence Plaintiffs cite in opposition does not include evidence to support consequential damages, which Besco maintains are speculative.[137]  Besco explains that the only evidence Plaintiffs provided was a "discredited business plan created by the principals of Cajun *after* the commencement of litigation."[138]  Besco asserts that Plaintiffs' argument that there is more than one possible reading of the jury's apportionment of damages for interrogatory number 14 proves the problem with the "general damages nature of the verdict form," and why a new trial is needed.[139]  Finally, Besco argues that the rate used for the diverted rentals could not properly be $750 per ERIS insert per day due to the parties' "rental relationship" because Plaintiffs did not seek the diverted rentals pursuant to any contract claim, but rather under theories of trade-secrets misappropriation and patent infringement, and under these theories, Plaintiffs were entitled to recover only the lost value of the rented tools at best.[140]

In surreply, Plaintiffs say that "Besco ignores the case as already litigated."[141]  Responding to Besco's argument on speculative damages, Plaintiffs explain that they rely on "the totality of the evidence," including Shane Triche's testimony and accompanying documentation, as well as their underlying business plan, and counter that Besco's arguments "go to the weight and not admissibility of Plaintiffs' testimony."[142]  As to Besco's point that the verdict form's provision for general damages in interrogatory number 14 makes remittur impractical, Plaintiffs contend that this is precisely the reason there is a high burden under Rule 51(d)(2) if timely objections are not made, and reiterates that until now, Besco did not object to the form of the question.[143]  Plaintiffs conclude by arguing that Besco should not be able to benefit from the rate Plaintiffs included in

---

[137] *Id.* at 2.
[138] *Id.* at 3 (emphasis in original).
[139] *Id.* at 4.
[140] *Id.* at 5.
[141] R. Doc. 366 at 4.
[142] *Id.* at 5-6.
[143] *Id.* at 6.

their business plan for the purpose of obtaining a loan ($200 per ERIS insert per day) when the rate Besco actually paid ($750 per ERIS insert per day) was presented and available to the jury, who rejected Besco's assertions.[144]

In sur-surreply, Besco reiterates that the "additional business damages" are speculative, emphasizing that the business plan on which Plaintiffs rely was created by Plaintiffs using "guesstimating techniques" after litigation began, and was never accepted or successfully acted upon by any third parties, in that the plan was developed to obtain a loan and Shane Triche testified that "[they] didn't get the loan."[145]  Furthermore, Besco asserts that it was "improper for a lay person like Shane Triche to provide … opinions" on the perceived value of the intellectual property (the business plan was primarily premised on perceived sales of intellectual property), because "he outright admitted that he had no particularized experience and knowledge to form any opinion on the subject."[146]

### E.  Plaintiffs' Motion to Alter the Judgment With Respect to the Scope of Injunction

Plaintiffs move to alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure, so that the scope of the injunction authorizes Cajun's seizure of Besco's ten so-called knock-off ERIS tools,[147] which the Court previously denied in its January 23, 2020 Order & Reasons on Plaintiffs' motion for declaratory judgment and injunctive relief.[148]  According to Plaintiffs, the Court incorrectly interpreted section 3.9 of the Rental Agreement to hold that the jury's findings that Cajun is the owner of all right, title, and interest to all improvements and modifications made to the ERIS and that the Rental Agreement is enforceable, do not entitle Cajun

---

[144] *Id.*
[145] R. Doc. 367 at 3-5 & n.5.
[146] *Id.* at 3-4.
[147] R. Doc. 318.
[148] R. Doc. 308.

to seize Besco's physical tools.[149]  Plaintiffs argue that the Court's interpretation leads to absurd consequences and one sentence in this provision being superfluous.  They maintain that Louisiana law permits Cajun to seize these tools because it owns them.  Finally, they argue that allowing Besco to keep these tools will lead to more litigation because Besco cannot modify them without infringing upon Cajun's patent, trade-secrets, contractual, and/or ownership rights.[150]

In opposition, Besco argues that Plaintiffs once again cite no authority to support their extraordinary request for seizure of Besco's property, noting that up until filing their post-trial motion seeking this injunctive relief, Plaintiffs sought only a declaratory judgment of ownership, not a transfer of physical property.[151]  Besco posits that the Court's interpretation of section 3.9 is sound in that the two sentences at issue work together to establish Cajun's intellectual-property rights without leading to surplusage or absurdity.[152]  Besco adds its oft-repeated argument that Plaintiffs are cherry-picking provisions of the Rental Agreement.[153]

### F.  Besco's Motion to Stay Execution of Judgment

Besco moves to stay execution of the judgment entered in this matter against it pending disposition of its post-trial motions plus 30 days thereafter.[154]  According to Besco, because Rule 62(f) of the Federal Rules of Civil Procedure entitles it to the same stay of execution a state court would give, so long as a judgment is a lien on the judgment debtor's property under the law of the state where the district court sits, it is entitled to the requested stay.[155]  Besco explains that under

---

[149] R. Doc. 318-1 at 6-9.
[150] *Id.* at 8.
[151] R. Doc. 326 at 2-3, 6.
[152] *Id.* at 4-5.
[153] *Id.* at 7-8.  Besco also argues that Plaintiffs' citation to and attachment of a declaration by Shane Triche dated March 6, 2020, R. Doc. 318-2, regarding the intent behind section 3.9 is improper in that it constitutes impermissible parol evidence; ignores that under Rule 59 new evidence is limited to that which could not have been ascertained prior to trial; and is one-sided and self-serving.  R. Doc. 326 at 4-7.  In analyzing Plaintiffs' motion, the Court will not consider this declaration.
[154] R. Doc. 319.
[155] R. Doc. 319-1 at 1-3.

Louisiana law, a judgment is a lien on the judgment debtor's property, and that Louisiana Code of Civil Procedure article 2252 permits a judgment creditor to proceed with execution of judgment only after the expiration of the time to file a suspensive appeal, *i.e.*, 30 days after the mailing of notice of the court's denial of an application for a new trial or judgment notwithstanding the verdict. Besco also argues that the Court has discretion to stay execution of the judgment under Rule 62(b), including discretion to waive the bond requirement.[156]

In opposition, Plaintiffs argue that (1) the automatic stay under Rule 62(a) has expired, and Rule 62(b) no longer provides for a stay pending post-trial motions, but that even if it did, Besco has failed to provide a basis to waive the security requirement necessary to stay execution of judgment; (2) Besco has failed to properly invoke Rule 62(f) because it has not shown that it has real, immovable property to which a lien may attach, nor has it shown that such property suffices as security; (3) even if Rule 62(f) applies, the stay applies only to execution on immovable property and does not prevent seizure of movable assets, which otherwise, they say, Besco is free to wrongly dissipate; and (4) the judgment includes a bond requirement, and Besco has not objectively shown a reason to depart from the normal requirement of posting a full supersedeas bond to obtain a stay.[157] Plaintiffs request that if the Court grants a stay, it include protection against the dissipation of assets.[158] Finally, Plaintiffs assert that the injunction cannot be stayed because such a stay is governed by Rule 62(c) and (d), for which Besco has not made the proper showing.[159]

In reply, Besco argues that Plaintiffs incorrectly interpret Rule 62(f), and cases applying it, to require that even if the judgment creates a judicial mortgage, the judgment debtor must

---

[156] *Id.* at 3-5.
[157] R. Doc. 327 at 3-9.
[158] *Id.* at 9.
[159] *Id.* at 10-11.

affirmatively show that the judgment is properly secured.[160]  Besco argues it does not need to demonstrate that it owns immovable property over which a judicial lien arose in order to invoke Rule 62(f), but nonetheless attaches a sworn declaration of Esco Benton, III, in which Besco's immovable property is listed.[161]  Besco concludes by pointing out that Plaintiffs provide no authority that a stay would not apply to execution on movable property, noting that neither Rule 62(f) nor the Louisiana Code of Civil Procedure contains any such distinction.[162]

In surreply, Plaintiffs argue that the primary focus of the stay inquiry under both federal and state law is the adequacy of security, and thus the Court should use its discretion to require adequate security.[163]  Plaintiffs highlight Besco's previous allusions to bankruptcy, arguing that Besco's intention is to invoke all means of opposing the judgment until it is required to provide security, and then continue the fight in bankruptcy court.[164]  Plaintiffs assert that these "tactics border on a fraud on the Court," and that the Court should "prevent the injustice Besco seeks."[165]

### G.  Plaintiffs' Motion for Writ of Execution and/or Writ of Fieri Facias

Plaintiffs request the issuance of a writ of execution and/or a writ of fieri facias, pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and Louisiana Code of Civil Procedure article 2291.[166]  They assert that Besco has not made any payment on account of the judgment, nor has it posted a supersedeas bond to seek a stay of execution.  Plaintiffs argue that a stay is not warranted

---

[160] R. Doc. 351 at 3-5.

[161] *Id.* at 4 n.10; *see* R. Doc. 351-1.

[162] R. Doc. 351 at 5.  Besco also calls attention to two orders issued by the governor of Louisiana during the COVID-19 pandemic: (1) a March 16, 2020 proclamation suspending all legal deadlines in all state courts at least until April 13, 2020, which Besco argues entitles it to a stay at least until this date; and (2) a March 22, 2020 proclamation designating Louisiana's energy industry infrastructure workforce, which includes Besco, as essential critical infrastructure, and so, says Besco, Plaintiffs' seizure of Besco's assets would have a deleterious impact on its ability to continue to support this critical infrastructure. *Id.* at 1-2; *see* R. Docs. 351-2 (Proclamation Number 30 JBE 2020, issued March 16, 2020); 351-3 (Proclamation Number 33 JBE 2020, issued March 22, 2020).

[163] R. Doc. 366 at 2.

[164] *Id.* at 2-3.

[165] *Id.* at 3.  Plaintiffs also say that Besco is "hiding behind the current COVID-19 pandemic," knowing long before the pandemic that it would be required to provide security in order to stay execution of judgment. *Id.* at 2-3.

[166] R. Doc. 320.

under Rule 62(b) because Besco has not provided the security agreed upon and incorporated into the judgment.[167]

In opposition, Besco argues that Plaintiffs' requested relief is premature under both federal and state law, adopting the same reasons supplied in its motion to stay execution of judgment.[168]

## III.   LAW & ANALYSIS

### A. Applicable Standards

#### 1.  Motion and Renewed Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure requires a party to "specify the judgment sought and the law and facts that entitle the movant to the judgment" upon motion at trial before the jury renders its verdict.  Fed. R. Civ. P. 50(a)(2); *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019).  "If the pre-verdict motion is denied, then the party can renew its motion under Rule 50(b).  But the renewed Rule 50(b) is 'technically only a renewal of the [Rule 50(a) motion for judgment as a matter of law].'"  *Id.* at 290 (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985)) (bracketed language in original).  Rule 50(b) provides in part: "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  As a consequence, "[i]f a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal."  *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001); *see also In re Isbell Records, Inc.*, 774 F.3d 859, 867 (5th Cir. 2014) ("By not raising this argument at trial or in its Rule 50(a) motion,

---

[167] *Id.* at 2-3.
[168] R. Doc. 329 (citing R. Doc. 319).

[the appellant] has waived its right to bring a Rule 50(b) motion on this ground.").  The Rule 50(b) waiver is "designed to prevent a litigant from ambushing both the district court and opposing counsel after trial."  *Puga*, 922 F.3d at 290-91 (citing *Quinn v. Sw. Wood Prods., Inc.*, 597 F.2d 1018, 1025 (5th Cir. 1979) ("When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend his case.  But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial.  It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.")) (other citation omitted).

Judgment as a matter of law under Rule 50 is warranted only where "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes reasonable jurors could not arrive at a contrary verdict."  *Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 248-49 (5th Cir. 2005) (quoting *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997)) (citing Fed. R. Civ. P. 50(a)).  Stated differently, "[a] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did."  *Heck v. Triche*, 775 F.3d 265, 273 (5th Cir. 2014) (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)).  Thus, to prevail on a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of [its] claim."  *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011)).  "'Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017)).

"[W]hen evaluating the sufficiency of the evidence, [courts] view all evidence and draw all reasonable inferences in the light most favorable to the verdict." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005). However, "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" remain within the province of the jury. *Kelso v. Butler*, 899 F.3d 420, 425 (5th Cir. 2018) (quoting *Hurst v. Lee Cty.,* 764 F.3d 480, 483 (5th Cir. 2014)).

Rule 50(b) further provides that a party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."

## 2.  Motion for a New Trial

Rule 59(a) provides a district court discretion to grant a new trial "on all or some of the issues … after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a); *see also Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) ("the decision to grant or deny a motion for new trial … rests in the sound discretion of the trial judge"). While the rule does not specify the grounds necessary for granting a new trial, the Fifth Circuit has instructed that "[a] new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted). A district court may also grant a new trial when the jury's verdict is logically inconsistent if, after viewing the evidence in the light most favorable to a finding of consistency, reconciliation is impossible. *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 343 (5th Cir. 2001); *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978) ("Answers should be considered inconsistent, however, only if there is no way to reconcile them.").

31

When a movant argues that insufficient evidence supports the verdict, the district court should deny the motion "unless the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (quoting *Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1227 (5th Cir. 1986)); *see also Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) ("new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence") (quotation omitted). In contrast to the standard applicable to a Rule 50 motion, "[a] verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial evidence to support it," and a district court may weigh the evidence when resolving whether a new trial should be granted on this ground. *Shows*, 671 F.2d at 930.

### 3. Motion to Amend Judgment

A Rule 59(e) motion calls into question the correctness of a judgment. *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002). "Rule 59(e) is properly invoked to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* "Manifest error is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (internal quotation marks and citations omitted). "A Rule 59(e) motion should not be used to relitigate prior matters that should have been urged earlier or that simply have been resolved to the movant's dissatisfaction." *In re Self*, 172 F. Supp. 2d 813, 816 (W.D. La. 2001). The grant of such a motion is an "extraordinary remedy that should be used sparingly." *Indep. Coca-Cola Emps.' Union of Lake Charles, No. 1060 v. Coca-Cola Bottling Co. United, Inc.*, 114 F. App'x 137, 143 (5th Cir. 2004) (citation omitted). A district court has considerable discretion to grant or deny a Rule 59(e) motion. *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 353 (5th Cir. 1990).

**B.  Analysis**

**1.  Issues Preserved for Rule 50(b)**

*a.  Patent infringement*

Plaintiffs argue that Besco's sole Rule 50(a) motion at trial on patent infringement was based on use of the Accused First Design Products after the issuance of the '862 Patent, and thus pertained solely to Cajun's claim for declaratory judgment of patent infringement.[169]  Therefore, they assert, no other basis for a Rule 50(b) motion on patent infringement is permissible.

Besco responds that Rule 50(a) motions should not be construed so strictly for the purpose of renewal under Rule 50(b), maintaining that it broadly moved for judgment as a matter of law on the patent-infringement claim.[170]

The Court has reviewed Besco's Rule 50(a) motion made at the close of all evidence,[171] and agrees with Plaintiffs that Besco's challenge at trial was based only on literal infringement as

---

[169] R. Doc. 332 at 4.

[170] R. Doc. 347 at 2-3.

[171] Besco's counsel stated in full:

> One more [Rule 50 motion], Your Honor. …
>
> The *literal infringement*.
>
> The evidence is clear there was no use of what I'll call the "double roller," the upper and lower roller embodiment, post issue.
>
> I understand that *the request is for a declaratory judgment*.  You know, there's no evidence so I don't – on the one hand, I don't think, frankly, it matters that much, because, as we've testified, we're not going to use it and we have no intention of using it.  But on the other hand, I also don't want to be cast in judgment on – for some type of a claim or a declaratory judgment that's really not supported by the facts.

R. Doc. 305 at 192 (emphasis added).  The Court responded:

> Yeah.  And, I mean, before I even have a response, this is an item that we took off the jury verdict form because I think it's one for the Court anyway.
>
> And so to the – this jury is not going to be deciding, you know, ***declaratory relief with respect to literal infringement***.  I think that's something that you can brief post-trial to me.
>
> And hopefully you can just get an agreement by then.  If you're not going to use it and it's not been used, then it seems to me that there can just be an agreement without having the involvement of the Court with respect to some kind of remedy.
>
> So I'm going to deny this Rule 50 motion at this time, but I'll reserve it to a ruling post-trial.

it pertained to the Accused First Design Products (those *with* the lower rollers), which was raised only in connection with Cajun's claim for declaratory judgment of literal infringement.[172]  Hence, Besco cannot now raise a Rule 50(b) motion concerning patent infringement on any other ground.

### b. *Fraud*

According to Plaintiffs, at trial, Besco moved for judgment as a matter of law on fraud based solely on lack of intent.[173]  Therefore, Plaintiffs argue, Besco waived any other grounds to challenge the jury's verdict on the fraud claim.

In response, Besco argues that its Rule 50(a) motion on fraud was "quite broad" and encompassed both the elements of intent and misappropriation,[174] emphasizing that that the Fifth Circuit takes a "liberal view of what constitutes a motion for judgment as a matter of law for these purposes."[175]  Furthermore, says Besco, it "plainly complied with the spirit of the rule," so that it was clear Besco was contesting the sufficiency of the fraud claim, and the Court may consider its challenge to all elements of fraud.[176]

The Court has reviewed Besco's Rule 50(a) motion made at the close of Plaintiffs' evidence,[177] as well as its Rule 50(a) motion made at the conclusion of all evidence.[178]  Besco's

---

*Id.* at 193 (emphasis added).  Earlier, in the context of Besco's Rule 50(a) motion on fraudulent intent, discussed next in this Order & Reasons, Besco's counsel stated:

> … And when you look at the patent side of it, it is clear that there is ***no literal infringement*** for any times forward from the issue of the patent.
>
> And I think the evidence is clear that ***at that point***, then, [Besco] went forward with removing the lower rollers, doing pads, and ***the issue becomes*** whether or not there is infringement under the Doctrine of Equivalen[ts].

*Id.* at 188 (emphasis added).  That Besco's counsel mentioned the doctrine of equivalents in its Rule 50(a) motion at trial does not mean that Besco moved for judgment as a matter of law on the issue.  Rather, it is obvious that Besco's point in its motion at trial was that, as a matter of law, there was no literal infringement after the issuance of the patent, and that therefore, the only issue for the jury to decide was that of infringement under the doctrine of equivalents.

[172] *See infra* section III.B.2.a.
[173] R. Doc. 331 at 2.
[174] R. Doc. 345 at 2-3.
[175] *Id.* at 2 (quoting *Quinn*, 597 F.2d at 1025) (alterations omitted).
[176] *Id.* at 4.
[177] *See* R. Doc. 303 at 130-32.
[178] *See* R. Doc. 305 at 187-89.

argument for dismissing the fraud claim was based only on insufficient evidence of fraudulent intent.  Rule 50 was amended in 2006 to allow the renewal of any motion for judgment as a matter of law made under Rule 50(a), whether made before or at the close of all the evidence.  In arguing for a liberal construction of its Rule 50(a) motions, Besco points the Court to pre-2006-amendment cases in which the movant had failed to move for judgment as a matter of law at the close of evidence, technically waiving its right to renew the motion after trial.[179]  *See Quinn*, 597 F.2d at 1026-27 (defendants failed to move for directed verdict at close of evidence but objected to jury instructions on the same grounds as their subsequent motion for judgment notwithstanding verdict); *Scottish Heritage Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610-11 (5th Cir. 1996) (defendants failed to move for judgment as a matter of law at close of evidence but objected to jury charge on the same grounds as renewed JMOL motion).  It was in this context that the Fifth Circuit explained that "[t]echnical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied."  *Scottish Heritage*, 81 F.3d at 610.  When a party's argument – even regarding the same claim – differs in its Rule 50(b) motion from that it made in its Rule 50(a) motion, however, the Fifth Circuit has held such an argument waived.  *See, e.g., McCann v. Tex. City Refining, Inc.*, 984 F.2d 667, 672-73 (5th Cir. 1993) (defendant moved for directed verdict on ADEA claim on the grounds that the plaintiffs had presented insufficient evidence to show intentional discrimination, but did not challenge the sufficiency of plaintiffs'

---

[179] A leading commentator provides the historical context of the amendment:

> Prior to the 2006 amendment of the Federal Rule, it was long established that a post-verdict motion under Rule 50(b) for judgment as a matter of law could not be made unless a previous Rule 50(a) motion for judgment as a matter of law was made by the moving party at the close of all the evidence. …

> Because this requirement was a potential trap for the unwary, the federal courts fortunately took a liberal view of what constituted a motion for judgment as a matter of law at the close of all the evidence in deciding whether there was a sufficient foundation for the later motion under Rule 50(b).

9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil § 2537 (3d ed.).

evidence on the issue of willfulness, and thus waived the latter).  Granted, the issue here is certainly a closer one than that in *McCann*, in which the two grounds "require[d] *completely* different evidence."  *Id.* at 673 (emphasis added).  There is room for evidentiary overlap between the various elements of a fraud claim.  But the point stands that, as with the defendant's motion in *McCann*, Besco's motion for judgment as a matter of law at trial was "simply not specific enough" to apprise Plaintiffs and the Court of any challenge concerning fraud apart from intent, and thus Besco's motion cannot allow Besco to now challenge the sufficiency of the misappropriation or causation elements of fraud.  *Id.*  Indeed, while the Fifth Circuit has permitted a JNOV motion to proceed on an issue which was "only a more detailed version" of the ground stated in an earlier motion for a directed verdict, this holding was supported by the fact that the movant had raised the "more detailed version" in its objections to the jury instructions.  *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982) (defendant's initial motion on antitrust claim raised "no evidence of monopoly power" while its post-trial motion argued that there was insufficient evidence of the requisite market share).  Thus, "there [was] no doubt that the trial court was aware of the movant's position."  *Id.*  The same cannot be said here.

That Besco did not "alert" Plaintiffs or the Court to its plan to contest the sufficiency of the evidence on the misappropriation or causation elements of fraud can be gleaned not only from Besco's own language in its Rule 50(a) motion,[180] but also from Plaintiffs' response, which

---

[180] Besco's counsel:

As the Court is aware, they have made fraud claims.  But now that they have rested their case, they have not provided any evidence where a trier of fact could find that this fraud was a ***result of premeditated intent to deceive or anything like that***.  Not one of the witnesses have testified to any fact that would lead to substantiating an element of fraud as opposed to other claims of negligence or contractual claims or the like.  None of the testimony rose to the level of the high burden with regard to fraud, and we ask that those claims be dismissed. …

[In reply:] Fraud cannot be predicated – as you have in your jury instructions, it ***cannot be predicated on mere mistake or negligence*** however gross.  ***Fraudulent intent, the intent to deceive, or the equivalent thereof*** is an essential element of fraud, and they have not put on any evidence with regard to ***fraudulent intent to deceive***.

36

discussed intent alone.[181]  *See Scottish Heritage*, 81 F.3d at 610 ("As we have often recited, the two basic purposes of this rule are 'to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury.'") (quoting *MacArthur v. Univ. of Tex. Health Ctr.*, 45 F.3d 890, 896-97 (5th Cir. 1995)).  Besco's Rule 50(a) motion at the close of the evidence confirms that the challenge was based only on intent.[182]

---

R. Doc. 303 at 130-32 (emphasis added).

[181] Plaintiffs' counsel:

> Rarely is fraud demonstrated from direct evidence.  It is typically inferred from the totality of the circumstances.  A jury can find from the evidence here that in fact there was never ***any intent*** to fully pay as agreed; that the ***intent*** was to string things along and to basically bleed off and ultimately harm and defraud the plaintiffs.  That is sufficient evidence to go to the jury.

> [In surreply:] Your Honor, ***intent*** in particular is an inference to be drawn from the totality of circumstances.  In virtually every fraud case, that is the – that is something that has to be inferred, because, as cases say one after another, rarely does the fraudster admit his fraud.

*Id.* at 131-32 (emphasis added).

[182] Besco's counsel:

> As the Court is aware, a Rule 50 motion is a judgment as a matter of law in a jury trial, and we are, once again, reiterating our Rule 50 motion on the issue of fraud.  We feel that even with the cross-examination of the plaintiffs – the defendants' witnesses, as well as any rebuttal testimony, the plaintiffs have failed to prove fraud on the part of the defendant.

> As the Court is aware, fraud requires that there be clear and convincing evidence of ***intent to deceive***, and I think that when you take the testimony as a whole of Mr. Benton, Mr. Lovell – all of the witnesses – there is ***no proof of an intent to deceive anyone***.  This is purely a business – commercial dispute as to whether or not contractual obligations were formed.  And when you look at the patent side of it, it is clear that there is no literal infringement for any times forward from the issue of the patent.

> And I think the evidence is clear that at that point, then, they went forward with removing the lower rollers, doing pads, and the issue becomes whether or not there is infringement under the Doctrine of Equivalen[ts].  All of that was all out in the open.  There was ***nothing to intend to deceive*** anyone.  Anyone looking at the jobs would have seen the configuration of those products.

> So we would ask and urge the Court to dismiss the fraud claim under Rule 50.

R. Doc. 305 at 187-88 (emphasis added).  Plaintiffs' counsel responded:

> First of all, Your Honor, fraud as a whole and "intent" in particular, as I have previously stated, are proven by circumstantial evidence and the totality of circumstances.  Rare is the fraudster who admits his fraud.

> Second of all, the standard of proof just stated is not the standard of proof.

> And thirdly, the evidence is certainly such that a jury could reasonably find that not only did [Besco] and Mr. Esco Benton ***intend*** from the outset to essentially stoke the fire, string them along just long enough to bleed them out and rip them off, but also that he very much did so with respect to copying and replacing the ERIS under false pretenses.  This is not just a business dispute.  This is a swearing match.  Somebody is lying.  And that, when you get right down to it, is fraud.  And that's what we intend to argue, and I believe that the jury will be able to find.

Accordingly, Besco has waived its right to attack the verdict on fraud on any other ground under Rule 50(b).

### c. *Trade secrets*

Plaintiffs argue that Besco's Rule 50(a) motion on their trade-secrets claims was based solely on the reasonableness of their efforts to maintain the secrecy of the trade secrets, and thus, Besco waived all other grounds to challenge the jury's verdict on the trade-secrets claims under Rule 50(b).[183]  In response, Besco argues that Rule 50 should not be construed strictly, that its "arguments regarding the insufficiency of the evidence of Plaintiff[s'] trade secrets claims are necessarily bound together," and that it complied with the "spirit of the rule."[184]

Having reviewed Besco's Rule 50(a) motion made at the close of all evidence, the Court finds that Besco has waived all grounds to challenge the verdict on the trade-secrets claims other than its argument that, as a matter of law, because Plaintiffs failed to keep their design secret, they cannot maintain trade-secrets claims.[185]  Specifically, Besco stated that its "point" was that "the cat was out of the bag before … the terms and conditions" in the rental contracts first came about.[186]  That Besco gave notice about only its disclosure argument is apparent both from Besco's

---

*Id.* at 188 (emphasis added).

[183] R. Doc. 328 at 6.
[184] R. Doc. 343 at 1-3.
[185] *See* R. Doc. 305 at 190-91.
[186] Besco's counsel stated in full:

> Your Honor, we also have another Rule 50 motion, and this motion pertains – or maybe we'll split it into two motions, but it effectively is for the trade secret – the Louisiana misappropriation of trade secrets cause of action, and the [federal defend] trade secret cause of action.
>
> The basis for the motion is black letter law that a secret – a trade secret to be protectable must in fact be a secret. **Once a secret is publicly disclosed**, it's out there.  And so the evidence made it clear, their only basis for asserting that there's misappropriation is based on contractual language in the rental agreement.
>
> And if you look at the dates and you look at the evidence, the information regarding the roller inserts, the rollers, the internal components, the drawings that show all of the internal components, that was all disclosed with no restrictions or confidentiality obligation at all.  It only comes in later.  And the earliest that you're going to find it – and I could go back to the document. I'm not sure of the exact date, but I think it's October of 2015 where you're going to find the

framing of the issue and from Plaintiffs' response at trial,[187] as well as from the Court's decision at that time.[188]

### d.  Breach of contract

Plaintiffs argue that Besco waived any right to bring a Rule 50(b) motion on Cajun's breach-of-contract claim.[189]  Besco offers no counterargument.[190]  Because Plaintiffs are correct that Besco made no Rule 50(a) motion at trial on the contract claim, Besco may not now pursue a Rule 50(b) motion on it.

---

document that says "go to our website that has the terms and conditions."  And then later you have where the field hands execute a delivery ticket or a quote that has those terms and conditions.

***So my point is that the cat was out of the bag well before you even get to that first provision of the terms and conditions.***  And so once a secret is out and it's not out by improper means, which it is not improper if there is no restriction or limitation on its disclosure, it's not secret; and, therefore, you can't support those causes of action.

*Id.* (emphasis added).

[187] Plaintiffs' counsel responded:

I mean, this comes down to really the issue of whether or not a written, signed NDA [nondisclosure agreement] or confidentiality designation is required or that's any sort of black letter law in order for you to satisfy that you have taken ***reasonable steps to protect the trade secret information***.  And it just isn't.

You've heard from their own expert that that's not the requirement.  And the jury heard plenty of evidence that would allow them to determine ***whether or not Cajun took reasonable steps***, under the circumstances with their working relationship with [Besco], ***to keep the information secret***.

And beyond that, ***whether or not Cajun took reasonable steps to maintain the secrecy of the trade secrets*** that were not visible just from looking at the tool.  And you heard plenty of evidence from plenty of witnesses who said, No, they absolutely cannot determine what's on the inside of the rollers.

So based on that, we would say the jury should be able to consider this issue, Your Honor.

*Id.* at 191 (emphasis added).

[188] The Court:

All right.  And, you know, both of you are aware of the Court's jury instruction on this.  It goes into great detail about ***the standard for a secret*** under both the state and federal law.  This is an issue in which I'm not saying what I would do if I were a juror with respect to this, but that's not the standard that I have to apply at this point in time.

What I see is that there is evidence on both sides with respect to this issue.  It's been developed fairly clearly for the jury about what each side's position is.  I don't think it's right for me to take this issue away from the jury at this point in time, so I'm going to deny this Rule 50 motion as well.

*Id.* at 192 (emphasis added).

[189] R. Doc. 328 at 2-3, 6.

[190] *See* R. Doc. 343.

## 2.  Besco's Motion for Post-Trial Relief on Plaintiffs' Patent-Infringement Claim

### a.  *Literal infringement*

Besco asserts that Plaintiffs did not prove literal infringement because the "unrebutted evidence" showed that Besco ceased use of the Accused First Design Products (with lower rollers) after issuance of the '862 Patent, and that furthermore, the Accused Second Design Products lack a key claim, *i.e.*, lower rollers.[191]  Plaintiffs counter that they never contended that the Accused Second Design Products literally infringed the '862 Patent; rather, "through Cajun's claim for declaratory judgment of patent infringement, Plaintiffs alleged that Besco's continued possession of nine Accused First Design Products ... created a reasonable apprehension of future literal infringement."[192]  Besco seizes on this language in its opposition memorandum and asserts that Plaintiffs "concede[]" that Besco did not literally infringe the '862 Patent, and that if Plaintiffs never sought such a finding, then the Court should not have instructed the jury on literal infringement or declined to rule for Besco when it moved for judgment as a matter of law on the issue.[193]

The Court recognizes that Plaintiffs do not concede that literal infringement was not at issue at trial; instead, in the face of Besco's purported confusion, they merely clarify that Cajun did not assert that the Accused *Second* Design Products literally infringed the '862 Patent.  Literal infringement was certainly a contested issue at trial with respect to the Accused *First* Design Products.  Relevant to Cajun's claim for declaratory judgment of literal infringement, which Besco wholly ignores throughout its post-trial briefing, was whether the Accused First Design Products

---

[191] R. Doc. 314-1 at 12-15.
[192] R. Doc. 332 at 5-6.
[193] R. Doc. 347 at 3-4.

40

literally practice every limitation of the '862 Patent claims.[194]  Besco's argument that it stopped using the Accused First Design Products upon issuance of the '862 Patent is besides the point because Cajun never alleged that Besco used said products after issuance of its patent.  Rather, Cajun asserted that it was entitled to a declaratory judgment, and therefore injunctive relief, because of its *reasonable apprehension* of future literal infringement.[195]  Cajun's request for a declaratory judgment and injunctive relief was effectively granted by the Court's enforcement of Besco's post-trial stipulation[196] through a consent judgment,[197] in which Besco agreed to not manufacture, use, sell, or offer for sale the Accused First Design Products in the future, as memorialized in the final judgment.[198]  This relief was necessary because Besco retains the Accused First Design Products Cajun contends literally infringe the patent as copies of Cajun's roller inserts.

### b. *Evidence on use of the Accused Second Design Products*

Next, Besco argues that the evidence at trial showed that shortly after the issuance of the '862 Patent, it ceased use of the Accused Second Design Products.[199]  Besco maintains that it removed the filler pads from said products, resulting in a so-called "third design."[200]  Besco argues

---

[194] *See* R. Doc. 242 at 37 (contested issue of fact).  The jury, however, was not asked whether the Accused First Design Products literally practice every limitation in the '862 Patent.  As the Court reminded Besco at trial, this question was removed from the verdict form and left for the Court to later decide.  *See supra* note 171.  A post-trial stipulation obviated the need to do so.  That being said, it was not "plain error" to include instructions on literal infringement in the jury instructions, as Besco suggests.  *See supra* note 78 & accompanying text.  The parties disputed whether the Accused Second Design Products literally practice every limitation of the '862 Patent claims "*except* the 'lower rollers' limitations," which the parties did contest constituted an infringement under the doctrine of equivalents. R. Doc. 242 at 37 (emphasis added).  The instructions explained that the jury was to "determine literal infringement with respect to each patent claim individually," and then "if [it] decide[d] that Besco's product or method does not literally infringe an asserted patent claim, [it was to] decide whether it is more probable than not that the product or method infringes the asserted claim under … the 'doctrine of equivalents.'"  R. Doc. 266 at 22-23.  Thus, in order for the jury to find infringement under the doctrine of equivalents, it needed to examine every asserted claim in the '862 Patent, and determine whether the Accused Second Design Products practiced it literally, and if not, as an equivalent.

[195] *See* R. Doc. 175 at 42-43.
[196] R. Doc. 278.
[197] R. Doc. 308 at 11.
[198] *See* R. Doc. 312 at 2.
[199] R. Docs. 314-1 at 7-8; 347 at 5.
[200] R. Doc. 314-1 at 7.

it could not have infringed Cajun's patent through any use of this "third design" because this design lacked either lower rollers or filler pads.[201]  Plaintiffs respond that Besco's "purported Accused Third Design" does not exist, and that the jury already weighed and apparently rejected the evidence which Besco presented in support of its argument that it had ceased using the Accused Second Design Products.[202]

This is the second time that Besco insists post-verdict that Plaintiffs did not prove that it infringed the '862 Patent through its use of the Accused Second Design Products because the evidence, according to Besco, shows that it only used this design for a matter of days.[203]  Once again, "[t]he Court will not re-weigh the evidence, as Besco essentially proposes."[204]  All the evidence that Besco argues so clearly demonstrates that it ceased use of the Accused Second Design Products within days of issuance of the patent was before the jury.  Besco's re-framing of this question as revolving around the existence of a "third design" is merely a different way of putting the same point it has made before.  Besco has not shown that the verdict on infringement is against the great weight of the evidence, and the Court will not disturb the verdict on this basis.

### c. *Prosecution history estoppel*

Besco asserts that prosecution history estoppel bars the application of the doctrine of equivalents, and that Plaintiffs failed to rebut the presumption of prosecution history estoppel.[205]  Plaintiffs respond that Besco waived the defense of prosecution history estoppel, which Besco had sufficient opportunity to raise, but neglected to do so until now.  The Court agrees.

Besco has waived the defense of prosecution history estoppel with regard to infringement

---

[201] R. Doc. 347 at 4-5.
[202] R. Doc. 332 at 6-8.
[203] *See* R. Doc. 286 at 3.
[204] R. Doc. 308 at 11.  Besco also argues that Plaintiffs' "case relies upon unsubstantiated and incredulous evidence which belies its own positions." R. Doc. 314-1 at 19.  It is for the jury to determine the weight and credibility of evidence, and the Court declines to take this role away from the jury.
[205] R. Doc. 332 at 11-15.

under the doctrine of equivalents.  Besco raises this issue for the first time in a post-trial motion, having had notice that the doctrine of equivalents was at issue in this litigation since November 2018, when Plaintiffs added Cajun's patent-infringement claim based on the doctrine of equivalents to the complaint.[206]  Besco's failure to include prosecution history estoppel in the contested issues of law in the pretrial order,[207] compounded with its failure to object to the jury instructions on the doctrine of equivalents on this basis, and its failure to raise the issue at any other point during trial, including in its Rule 50(a) motions, undoubtedly resulted in waiver.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 876 F. Supp. 2d 295, 347 (S.D.N.Y. 2012) ("[The defendant's] prosecution history estoppel argument is even more egregious than 'trial by ambush' because it waited until after the trial to raise this defense."), *aff'd in part, rev'd in part on other grounds*, 723 F.3d 1363 (Fed. Cir. 2013), *vacated on other grounds*, 574 U.S. 318 (2015); *cf. Voda v. Cordis Corp.*, 536 F.3d 1311, 1325 n.6 (Fed. Cir. 2008) (agreeing with the district court's finding that the defendant waived prosecution-history-estoppel arguments by failing to raise them in its post-trial motion for judgment as a matter of law).  *See also Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) ("Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint.") (citations omitted); *SJD-CC, LLC v. Marsh USA, Inc.*, 2010 WL 1489723, at *1 (E.D. La. Apr. 13, 2010) ("Failure to object at trial to jury instructions results in a waiver of objections to such instructions.") (citing *Burdis v. Texas & P. Ry. Co.*, 569 F.2d 320 (5th Cir. 1978).  Had Besco raised this defense earlier, Cajun could have attempted to overcome any presumption that prosecution history estoppel barred a finding of equivalence, by providing expert testimony and other extrinsic evidence.  Without notice

---

[206] *See* R. Doc. 175.
[207] *See* R. Doc. 242.

that it needed to provide evidence on the issue, Cajun was prejudiced by Besco's failure to raise the defense until after trial. *See Teva Pharm. USA*, 876 F. Supp. 2d at 347.

### d. Doctrine of equivalents

Besco argues that the jury verdict cannot stand because the evidence does not support a finding that the filler pads in the Accused Second Design Products are the equivalent of the lower rollers in the '862 Patent.[208]  Specifically, Besco argues that under the "function-way-result test" used to determine equivalence, Plaintiffs were "required to show on a limitation by limitation basis that [the Accused Second Design Products] perform[] substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patent."[209]  Besco maintains that the filler pads are substantially different than the lower rollers in the ERIS, as described in the '862 Patent claims, because they do not function by rotating or rolling, and therefore they do not function "in substantially the same way" as the lower rollers.[210]

Plaintiffs respond that Besco has not met its heavy burden of showing that the verdict is against the great weight of the evidence, especially because the Court has already decided that there is no basis to question the jury's finding of infringement under the doctrine of equivalents.[211] They emphasize that their expert witness, Bryce Randle, explained to the jury that the lower rollers and filler pads both function to prevent the tubular from binding against the elevator insert (*i.e.*, to allow the tubular to spin); that Besco specifically sought out and selected the material it used for its filler pads, as would permit them "to perform the intended function in the same way as the lower rollers – by reducing friction in the event of contact with the spinning tubular"; and that both

---

[208] R. Doc. 314-1 at 15-19.
[209] *Id.* at 21.
[210] *Id.* at 17-19; R. Docs. 347 at 6-8; 367 at 6-7.
[211] R. Doc. 332 at 9-10.

the lower rollers and filler pads achieved the same result.[212]

"A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial *or* that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *Plastic Ominum Advanced Innovation & Res. v. Donghee Am., Inc.*, 943 F. 3d 929, 938 (Fed. Cir. 2019) (quoting *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007)) (emphasis added).

As the Court has previously stated, the jury was "instructed at length on the law concerning the doctrine of equivalents."[213]  Of pertinence to the issue at hand, the Court instructed the jury:

> An equivalent of an element is a component or action that is insubstantially different from the claimed element.  *One way* of showing that an element is insubstantially different is to show that it performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally present in the accused product or method.
>
> In deciding whether any difference between a claim requirement and the product or method is not substantial, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the component or method step with the claimed requirement.  However, known interchangeability between the claim requirement and the component or method step of the product or method is not necessary to find infringement under the doctrine of equivalents.[214]

Therefore, the jury was instructed that the function-way-result test is "relevant to," though not required for, the "insubstantial differences inquiry."  *See Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002) (citations omitted).  The jury was also instructed that "known interchangeability" between the claim requirement and the accused product sheds

---

[212] *Id.* at 10.
[213] R. Doc. 308 at 11.
[214] R. Doc. 266 at 24 (emphasis added).

light on this inquiry, and Besco does not challenge the evidence supporting "known interchangeability." Regardless, as Plaintiffs state, the jury did have evidence before it, *viz.*, Bryce Randle's testimony, supporting their position that the filler pads and lower rollers perform the same function, in the same way, to achieve the same result. Therefore, the jury had before it evidence that supported finding "insubstantial differences," as instructed, between the lower rollers and the filler pads, in order to find that Besco infringed the '862 Patent under the doctrine of equivalents. Besco has not shown that the jury's finding of infringement is against the great weight of the evidence.

### e. *Inventorship*

Besco argues that "a reasonable jury would have found the patent invalid based on inventorship issues," because although throughout the litigation Besco has asserted that "Jamie Lovell is either the inventor, or at least a co-inventor" of the ERIS, and Plaintiffs have asserted that Heath and Shane Triche are the sole inventors, at trial "Heath Triche unequivocally testified that he was the sole inventor."[215] Plaintiffs respond that this new inventorship argument is waived and meritless, but that even if it had merit, only harmless error would have resulted because a correction of inventorship pursuant to 35 U.S.C. § 255 could have been filed.[216]

Up until this point, Besco has contested that the '862 Patent is invalid based on incorrect inventorship because the patent does not name Jamie Lovell as an inventor. Never before has Besco based its patent-invalidity argument on the patent incorrectly listing Shane Triche as an inventor. Besco says that it raises this point now because of new evidence uncovered at trial.[217] To the extent that Besco did not waive this specific argument, the jury already considered and

---

[215] R. Doc. 314-1 at 26 (emphasis omitted).
[216] R. Doc. 332 at 13-14.
[217] R. Doc. 347 at 8.

rejected it.  The jury was instructed that "a patent is invalid if it fails to meet the requirement that all of the actual inventors, *and only the actual inventors*, be named as inventors in the patent."[218] The evidence that Besco now highlights was before the jury, Besco had the opportunity then to frame such evidence in argument to the jury, and the jury was instructed that the patent would be invalid if anyone but the actual inventors was named as inventors.[219]  Accordingly, the Court will not disturb the jury's finding of patent validity.

In sum, Besco has shown neither that it is entitled to judgment as a matter of law nor that a new trial is warranted on Cajun's patent-infringement claim.[220]

### 3.  Besco's Motion for Post-Trial Relief on Fraud and LUTPA Claims

#### a.  Fraud

Under Louisiana law, "fraud" is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other" and "may also result from silence or inaction."  La. Civ. Code art. 1953.  "'[T]he refusal to speak, in the face of an obligation to do so, is not merely unfair but is fraudulent.'"  *Lomont v. Bennett*, 172 So. 3d 620, 629 (La. 2015) (quoting *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1383 (La. 1990)).  The elements of a fraud cause of action are: (1) "a misrepresentation of material fact"; (2) "made with the intent to deceive"; and (3) "reasonable and

---

[218] R. Doc. 266 at 25-26 (emphasis added).

[219] It would have been reasonable for the jury to understand Heath Triche's testimony in context to describe different roles of the brothers in their collaborative invention of the ERIS.

Seeking to couch this new argument as relevant to whether Jamie Lovell should have been named as an inventor on the '862 Patent, Besco asserts that "[i]t is material for the jury to consider [that] if the Triches could fabricate one inventor they removed another."  R. Doc. 347 at 8.  Besco's counsel was free to make this argument to the jury after Heath Triche's testimony, yet failed to do so.  Again, the jury was fully instructed on the law of inventorship as relevant to Besco's defense of patent invalidity, and had Heath Triche's testimony before it, in determining that the patent is valid.

[220] In sur-surreply, Besco adds in conclusory fashion that "Plaintiffs were required to prove the amount that [Besco] allegedly used the infringing [tool]," without which recovery was precluded.  R. Doc. 367 at 7.  The Court need not consider new arguments raised in reply, much less sur-surreply.

justifiable reliance by the plaintiff and resulting injury." *Riedel v. Fenasci*, 270 So. 3d 795, 801 (La. App. 2018). A plaintiff must prove fraud by a preponderance of the evidence, and "[c]ircumstantial evidence, including highly suspicious facts and circumstances, may be considered in determining whether fraud has been committed." *Lomont*, 172 So. 3d at 629 (citations omitted).

*Intent*

Besco renews its motion for judgment as a matter of law on Cajun's fraud claim based on insufficient evidence of fraudulent intent.[221] Besco maintains that the evidence at trial showed that Besco and its agents believed it owned the ERIS at all times, and therefore there was no fraudulent intent in deciding to build new tools, when it was merely seeking to avoid rental charges on the ERIS.[222] Besco asserts that, though it denies the existence of a written contract between it and Cajun, that "does not demonstrate any intent of [Besco] to not perform when it started to work with [Cajun] in 2014."[223] According to Besco, its "later failure to fulfill the alleged promises is, at best, a breach of contract claim and does not support a heightened claim for fraud."[224]

Plaintiffs respond by pointing to the circumstantial evidence they provided at trial that, according to them, allowed the jury to infer Besco's intent to deceive.[225]

At the outset, despite Besco's assertion that "[i]t is axiomatic that the best evidence of a person's intent is that person's recount of his intentions,"[226] fraudulent intent is typically established through circumstantial evidence. *See In re Deepwater Horizon*, 857 F.3d 246, 251 (5th Cir. 2017) ("A person's state of mind is rarely susceptible of proof by direct evidence, so

---

[221] R. Doc. 315-1 at 10.
[222] *Id.* at 11-12.
[223] *Id.* at 13.
[224] *Id.* at 14.
[225] *See* R. Doc. 331 at 7-11.
[226] R. Doc. 315-1 at 12.

specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence.").

Next, Besco spends much of its memorandum seeking to paint Cajun's fraud claim as a breach-of-contract claim by repeatedly emphasizing that there was no evidence of intent on its part to not fulfill any alleged promises of payment.[227]  But this misconstrues Cajun's claim.  While Cajun alleges that "Besco made false and misleading statements … to Cajun for the purpose of inducing Cajun to continue renting the ERIS to Besco," the allegation is that Besco did this "so that Besco could disassemble and reverse engineer the ERIS for the purpose of manufacturing its own inventory of Accused Products."[228]  Whether or not there was a fraudulent intent to not pay for the rentals, and Plaintiffs' responses to the Rule 50 motions at trial certainly also argued this,[229] it is enough for the jury to have found that Besco rented the ERIS with the intention of turning around and secretly copying the tool.[230]  Plaintiffs presented evidence of Besco's reverse engineering the ERIS while renting it from Cajun (and Besco does not now question this evidence or deny having done so), and it is not unreasonable for the jury to have found such conduct, which would reasonably be considered antagonistic to fair commercial relations, indicative of fraudulent

---

[227] *See id.* at 12-15.

[228] R. Doc. 175 at 37-38.

[229] *See* R. Docs. 303 at 131 ("A jury can find from the evidence here that in fact there was never any intent to fully pay as agreed; that the intent was to string things along and to basically bleed off and ultimately harm and defraud the plaintiffs."); 305 at 188 ("[T]he evidence is certainly such that a jury could reasonably find that not only did [Besco] and Mr. Esco Benton intend from the outset to essentially stoke the fire, string them along just long enough to bleed them out and rip them off, but also that he very much did so with respect to copying and replacing the ERIS under false pretenses.").

[230] Furthermore, in making its argument that "fraud cannot be imputed by broken promises alone," R. Doc. 315-1 at 15, Besco discusses *Silver v. Nelson*, despite that fraud there was evaluated under a clear-and-convincing-evidence standard.  *See* 610 F. Supp. 505, 517 (E.D. La. 1985).  As Plaintiffs' counsel pointed out in response to Besco's Rule 50(a) motion made at the close of all evidence, *see* R. Doc. 305 at 189, and as stated previously, this is not the proper standard of proof.  "Prior to the enactment of Article 1957 in 1984, the Louisiana Supreme Court had held that because of the serious nature of a charge of fraud, the person alleging fraud was required to provide 'clear and convincing' or 'exceptionally strong' proof."  *Williamson v. Haynes Best W. of Alexandria*, 688 So. 2d 1201, 1239 (La. App. 1997) (citations omitted).  This is no longer applicable: not only can circumstantial evidence now be considered, but the "party alleging fraud need only prove [the requisite] elements by a preponderance of the evidence."  *Sun Drilling Prods. Corp. v. Rayborn*, 798 So. 2d 1141, 1153 (La. App. 2001) (citing *Williamson*, 688 So. 2d at 1239).

intent.  Besco did present evidence to the effect that it could ethically copy the ERIS because it thought itself the owner of the tool, but in finding for Cajun on its fraud claim, the jury apparently decided not to believe Besco or its agents.  "Questions concerning witness credibility are, except under the most extreme circumstances, properly reserved for the jury."  *United States v. Presley*, 2012 WL 4903357, at *3 (S.D. Miss. Oct. 16, 2012) (quoting *United States v. Hunt*, 412 F. Supp. 2d 1277, 1286 (M.D. Ga. 2005)).

Finally, Besco's argument that Plaintiffs' evidence showed fraudulent intent "over a year **after** the parties started to work together," therefore failing to prove such intent "***at the time*** the promise is made," as Besco says is required for fraud, is also misplaced.[231]  Cajun's allegation is not that Besco's fraud occurred at the commencement of their business relationship in 2014, but rather that Besco "induce[ed] Cajun ***to continue renting*** the ERIS to Besco" so that Besco could disassemble, reverse engineer, and copy it.[232]  Moreover, Cajun's fraud claim is predicated on both affirmative misrepresentation and misrepresentation by omission or silence.[233]  "Because [fraud by omission or silence] does not involve an affirmative misrepresentation, it often does not occur at a specific place ***or precise time***, or involve specific persons."  *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.* 178 F. Supp. 3d 390, 402 (E.D. La. 2016) (quoting *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 598 (E.D. La. 1993)) (internal citation omitted; emphasis added).  It is sufficient to show "the general time period during which the fraudulent conduct occurred."  *Id.*

---

[231] *See* R. Doc. 315-1 at 13 (emphasis in original).
[232] R. Doc. 175 at 38 (emphasis added).  It is uncontested that Besco began renting the ERIS from Cajun on May 7, 201**5**.  R. Doc. 242 at 19.  It is also uncontested that Besco rented and had possession of the ERIS every single day between February 1 and 29, 2016, and that between February 27 and June 28, 2016, Besco employees signed five delivery tickets.  *Id.*  It is during this time period (February – July 2016) that Plaintiffs allege Besco copied the ERIS.
[233] *See* R. Doc. 175 at 38-39.

Therefore, Besco has failed to show that there is insufficient evidence to support the jury's finding of fraudulent intent, particularly when considering – as Besco reminds the Court – "**all of the evidence**"[234] in "the light and with all reasonable inferences *most favorable to the party opposed to the motion*."[235] *Boeing*, 411 F.2d at 374 (emphasis added).

<u>Misappropriation and Causation</u>

Besco argues that Plaintiffs presented insufficient evidence to support a finding of either misappropriation or that any alleged misappropriation caused damage to Cajun.[236]  Regarding misappropriation, Besco asserts that Cajun premises Besco's "perceived 'misrepresentations' on [Besco's] statements that it intended to make rental payments" yet "[a] failure to pay is the classic example of breach, not fraud," and nevertheless, Besco was "upfront about its disagreements with the rental price."[237]  Nor can fraud based on silence or omission be proven, says Besco, because Plaintiffs failed to prove that Besco had a duty to speak.[238]  Besco adds that, regardless, "the evidence supports that [Cajun] knew [Besco] was intending to have a new tool created."[239]  Besco maintains that Plaintiffs also failed to prove any harm caused by such misrepresentation because, "any possible 'damage' to [Cajun] would be in the form of los[t] rentals from [Besco], who was under no obligation to continue using [Cajun's] devices" and so, "[i]f anything, such damages are the subject of breach of the alleged contract, not fraud."[240]

Plaintiffs provide no substantive rebuttal of these arguments, stating only that Besco waived any challenge to the fraud claim based on misrepresentation.[241]

---

[234] R. Doc. 345 at 5 (quoting *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969)) (emphasis in original).
[235] Besco omits this part of the standard in its admonition.  *See id.*
[236] R. Doc. 315-1 at 16.
[237] *Id.*
[238] *Id.* at 16-17.
[239] *Id.* at 17.
[240] *Id.* at 18.
[241] R. Doc. 331 at 11.

As previously explained, Besco waived its right to challenge the sufficiency of the evidence regarding the misappropriation or causation elements of fraud.  Accordingly, the Court considers Besco's arguments on these elements under a Rule 59, rather than a Rule 50, standard – although Besco's motion fails under either.

Besco's quest to describe the alleged fraud as a breach-of-contract claim is unavailing. Falsely representing that it would make payments is not the same as merely failing to make payments (*i.e.*, breaching a contract), especially when doing so to gain access to Cajun's tools for disassembly and copying.  Besco's assertion that it had no duty to disclose it was copying Cajun's tools while it was supposed to be renting them for their legitimate purpose (*i.e.*, for use with the BATT System for off-shore drilling) is mystifying.  "Louisiana courts have 'tended to impose a duty to speak when the circumstances are such that the failure to disclose would violate a standard requiring conformity to what the ***ordinary ethical person*** would have disclosed.'"  *First Am. Bankcard*, 178 F. Supp. 3d at 401 (quoting *Bunge*, 557 So. 2d at 1384) (alterations omitted; emphasis added).  This question is a legal one.  *Id.*  To the extent it is even necessary, the Court holds that no ordinary ethical person would have concealed such conduct.  Clearly, the jury agreed.[242]

Lastly, Besco's conclusory attack on the causation element misses the mark.  First, it is unclear how evidence that Besco was Cajun's only customer for the ERIS proves that Cajun could not have been harmed by Besco's conduct.  Second, that any possible damage would be in the form of "los[t] rentals" is directed to damages, not causation.[243]   Ironically, Besco's own

---

[242] Moreover, since the jury had before it conflicting evidence on the question, that there may have been evidence supporting that Cajun knew of Besco's intentions is far from sufficient to show that the jury's verdict was against the great weight of the evidence.

[243] Besco ignores that Cajun sought the diverted rentals, as well as additional business damages, as damages for fraud.

description of the holding in *Sun Drilling* illustrates this distinction: "plaintiff proved damages but, [the] court found no evidence in the record that the defendants' omissions or misrepresentations *caused* plaintiff's damages."[244]

In conclusion, Besco has not shown that the jury's finding of fraud was either based on insufficient evidence or against the great weight of the evidence. The Court will not upset the jury's verdict on fraud.

### b.  LUTPA

Besco posits that if the Court finds there was no fraud as a matter of law, it must also set aside the jury's verdict on Cajun's LUTPA claim.[245] In the alternative, Besco moves for a new trial on the LUTPA claim, arguing that because "a defendant's 'motivation' is a 'critical factor' under LUTPA," and "the record is devoid of any intent on the part of [Besco] to 'harm the competition,'" the LUTPA claim cannot stand.[246] Besco continues to assert that this matter revolves around "a business deal gone sour," and that to the extent a written agreement between it and Cajun existed, "a breach of such agreement does not constitute conduct proscribed by LUTPA."[247]

Plaintiffs oppose Besco's motion by stating that because "[f]raud, deceit and misrepresentation are examples of deceptive practice under [the LUTPA]," the same evidence that supports the fraud claim supports the LUTPA claim.[248]

The LUTPA provides a civil cause of action to recover actual damages to "[a]ny person who suffers any ascertainable loss of money or movable property … as a result of the use or

---

[244] R. Doc. 315-1 at 18 n.44 (citing *Sun Drilling*, 798 So. 2d at 1153) (emphasis added).
[245] *Id.* at 18.
[246] *Id.* at 20-21.
[247] *Id.* at 21.
[248] R. Doc. 331 at 12.

employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." La. R.S. 51:1409. Section 51:1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Courts determine "on a case-by-case basis" what conduct constitutes an "unfair trade practice" and "have repeatedly held that, under this statute, the plaintiff must show the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010) (quotation and citations omitted). A trade practice that amounts to "fraud, deceit, or misrepresentation" is "deceptive" for purposes of the LUTPA. *Total Safety v. Rowland*, 2014 WL 6485641, at *4 (E.D. La. Nov. 18, 2014) (citations omitted).

As it understands Besco's argument,[249] because the fraud claim stands as a matter of law, the Court need not consider setting aside the LUTPA claim. To the extent that Besco separately challenges the LUTPA verdict under Rule 59 for failure to show intentional deceptive conduct, the Court rejects this argument for the same reasons it rejects the similar argument made regarding fraudulent intent. Accordingly, the jury's verdict on Besco's violation of the LUTPA stands.

### 4. Besco's Motion for Post-Trial Relief on Trade-Secret Misappropriation and Breach-of-Contract Claims

#### a. *Trade secrets*

The DTSA and the LUTSA are substantially similar. To prevail on a DTSA claim, a plaintiff must prove: (1) the existence of a trade secret; (2) the misappropriation of the trade secret by another; and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). The LUTSA provides for restraining the "actual or threatened misappropriation" of trade secrets. La. R.S. 51:1432(A) & 1438-39. The

---

[249] *See* R. Doc. 367 at 2 n.2 ("The LUTPA claim fails alongside the claim for fraud.").

statute also permits a complainant to recover damages, in addition to or in lieu of injunctive relief, for the actual loss caused by the misappropriation of trade secrets.  *Id.* 51:1433.  To prevail on a LUTSA claim, "'a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation.'"  *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000) (quoting *Reingold v. Swiftships, Inc.,* 126 F.3d 645, 648 (5th Cir. 1997)).

> The DTSA defines "trade secret" as:
>
> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
>> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>>
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  The LUTSA's definition of "trade secret" is nearly identical.[250]

"A trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011) (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)).  "Whether

---

[250] The LUTSA defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

    (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

    (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. R.S. 51:1431(4).

something is a trade secret is a question of fact." *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 796 (E.D. La. 2012) (citations omitted). "[T]he question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'" *Tewari De-Ox Sys.*, 637 F.3d at 613 (quoting *Lear Siegler*, 569 F.2d at 289). "'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.'" *CheckPoint*, 888 F. Supp. 2d at 796-97 (quoting *Sheets v. Yamaha Motors Corp., U.S.A.,* 849 F.2d 179, 183 (5th Cir. 1988)).

The DTSA defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who –

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was –

        (I) derived from or through a person who had used improper means to acquire the trade secret;

        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    (iii) before a material change of the position of the person, knew or had reason to know that –

        (I) the trade secret was a trade secret; and

        (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).   The LUTSA's definition of "misappropriation" is nearly identical.[251]

Further, the DTSA defines "improper means" as including "theft, bribery, misrepresentation,

breach or inducement of a breach of a duty to maintain secrecy."  *Id.* § 1839(6)(A).  Whether a

trade secret has been misappropriated is a question of fact.  *Pontchartrain Med. Labs, Inc. v. Roche*

*Biomedical Labs., Inc.*, 677 So. 2d 1086, 1091 (La. App. 1996).

<u>*Reasonable Measures to Maintain Secrecy*</u>

Besco renews its motion for judgment as a matter of law on Plaintiffs' trade-secrets claims

based on Plaintiffs' failure to take reasonable measures to maintain the secrecy of their trade

secrets.[252]  Besco argues that the ERIS was tested twice at Sea Ropes in Houma, Louisiana, first

in late March 2015 and then around early April 2015, during which many Besco and Sea Ropes

employees were present, none of whom had executed confidentiality agreements with Plaintiffs,

and all of whom were "given unfettered access to the ERIS."[253]  Besco insists that "Plaintiff[s]

never imposed any confidentiality restrictions on [Besco] until, at best (if at all), the issuance of

---

[251] "Misappropriation" is defined as:

(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i) used improper means to acquire knowledge of the trade secret; or

    (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (aa) derived from or through a person who had utilized improper means to acquire it;

        (bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

La. R.S. 51:1431(2).
[252] R. Docs. 316-1 at 11-19; 343 at 2-5.  Besco's arguments are directed to both the DTSA and the LUTSA claims, and therefore the Court will address its arguments without any distinction between the two claims.
[253] R. Doc. 316-1 at 13-14.

the terms and conditions on the back of the alleged rental agreement in October of 2015, a full year after the parties started to design the tool, and months after the tests at Sea Ropes."[254]  That Shane Triche testified that he believed a non-disclosure agreement ("NDA") was unnecessary for Besco, because of their "partnership," is not enough to counter this issue, says Besco, because subjective intent alone is insufficient to warrant trade-secrets protection and there was no legal partnership between Besco and Plaintiffs.[255]  According to Besco, both Anadarko and Southern Fab employees also viewed the ERIS in operation or testing, and other third parties had access to the allegedly protected information whenever the ERIS required maintenance.[256]  Furthermore, says Besco, Plaintiffs provided drawings of the ERIS to Besco without any confidentiality designations, despite such designations being a typical practice in the industry to protect trade-secrets.[257]

Plaintiffs respond by pointing to the evidence of various measures they took to protect the secrecy of the ERIS design, including: applying for patent protection prior to any testing of the ERIS; keeping the ERIS tool secure at their shop and making it unavailable for general inspection or observation by customers; obtaining NDAs with several machine shops prior to testing the ERIS, noting that Jamie Lovell was present for the signing of at least one NDA in March 2015; and including a prohibition on disassembling, reverse engineering, or analyzing the ERIS in the Rental Agreement.[258]  Plaintiffs explain that the testing of the ERIS at Sea Ropes did not reveal their trade secrets, as viewing the tool alone does not allow a person to ascertain the protected information, *i.e.*, how the equipment operates.[259]  According to Plaintiffs, the evidence at trial showed that: any public access to the testing facility was not so expansive as to permit third parties

---

[254] *Id.* at 16.
[255] *Id.* at 16-17.
[256] *Id.* at 17.
[257] *Id.* at 18-19.
[258] R. Doc. 328 at 7-9.
[259] *Id.* at 9-10.

to obtain the configuration of tools; the three Sea Ropes employees who actually participated in the testing were limited to "rigging up" the system; and only the Triches handled the readjustment of the tool during the testing.[260]   Plaintiffs argue that the jury heard testimony to contextualize any alleged disclosure of information, including their sharing of the ERIS drawings with Besco, for which they did not believe an NDA was necessary because maintaining the secrecy of the product was "to their mutual benefit."[261]

"The elements of a trade secret claim are questions of fact and are usually reserved for the fact finder after all evidence has been presented." *CheckPoint*, 888 F. Supp. 2d at 799 (citing *Lear Siegler*, 569 F.2d at 289).  The fact-intensive question whether one took reasonable steps to protect a trade secret is one best left to the jury.  *See Hoover v. Fla. Hydro, Inc.*, 2009 WL 2391220, at *3 (E.D. La. July 31, 2009) (declining to decide this issue on summary judgment, explaining that though evidence had been presented of lack of effort to protect the trade secret, "the ultimate determination must be made at trial").  Besco and Plaintiffs point to evidence on both sides of the question, all of which was presented to the jury, who was fully instructed on trade-secrets law and the standard for a secret.[262]   Besco has shown only that there was evidence to support its side of the story, not that there was insufficient evidence to support Plaintiffs'.  For example, Besco places particular emphasis on the testing and viewing of the ERIS by third parties in 2015, but Plaintiffs point to testimony showing that simply observing the ERIS elevator insert is not enough to ascertain how it works, and that only the Triches handled the insert during the testing in a way that would have revealed its design.  Besco also argues that Plaintiffs revealed their trade secrets to it without requiring NDAs or other confidentiality agreements, but Plaintiffs presented evidence to

---

[260] *Id.* at 9-11.
[261] *Id.* at 11-12.
[262] *See* R. Doc. 266 at 16-19.

support that such disclosures, placed in the context of their working relationship at the time, are not in conflict with taking reasonable measures to protect trade secrets. That the jury chose to credit Plaintiffs' account over Besco's is not for the Court question.[263]

### *Misappropriation*

Besco argues that the evidence shows that it did not misappropriate any protectable trade secret.[264] It explains that there was "no need" for it to resort to subterfuge or other improper means to obtain the information pertaining to the ERIS, because Plaintiffs had provided it with drawings and allowed it to view the ERIS's testing without any restrictions, all before the rental contracts with the pertinent terms and conditions were allegedly confected, and so because information cannot be a trade secret "if it is readily ascertainable without engaging in tortious behavior," and Plaintiffs themselves shared the information at issue before May 2015 (the earliest point Besco may have owed duties under the Rental Agreement), Besco could not have misappropriated any trade secrets.[265] Besco adds that "Elite testified that it did not use any of Plaintiff[s'] information to develop new rollers for [Besco]."[266]

Plaintiffs respond that "the evidence reflects that Besco's misappropriations began well

---

[263] Regarding Besco's point that patent protection is the "opposite" of trade-secrets protection, R. Doc. 343 at 5, the Court does not read Plaintiffs' memorandum to imply that the two are "commensurate." Plaintiffs argue that evidence that the Triches ***applied*** for a patent before testing the ERIS is evidence of their having taken measures to protect their design. *See* R. Doc. 328 at 7-8. A filed patent application is kept confidential until it is published by the U.S. Patent and Trademark Office. 35 U.S.C. § 122; *see also infra* note 351 & accompanying text.

Besco also remarks that though Plaintiffs claim that the ERIS design was entitled to trade-secrets protection prior to the issuance of the '862 Patent in June 5, 2018, once the patent application was published on September 29, 2016, "any information contained therein could no longer be a trade secret." R. Doc. 316-1 at 11. Not only has this argument, which was not a ground asserted in Besco's Rule 50(a) motion at trial, been waived, it is of no consequence. Plaintiffs provided evidence that Besco misappropriated their trade secrets while renting the ERIS, *i.e.*, between February and July 2016. *See infra* note 356. Because the conduct in question allegedly began before September 2016, it is irrelevant to the substantive question on trade-secrets misappropriation whether after this date the trade secrets were extinguished.

[264] R. Doc. 316-1 at 19.

[265] *Id.* at 19-20.

[266] *Id.* at 20.

after the rentals started in May 2015, and approximately around February 2016."[267]   That their protected information was not "readily ascertainable" is supported, they say, by Besco's "having to resort to disassembling and analyzing the tool to copy it," which took Besco a full six months, *i.e.*, from February to July 2016.[268]

The Court has already stated that Besco waived its right to challenge the verdict on the trade-secrets claims on any other basis but the reasonableness of the measures taken to protect the secrets,[269] and so its other arguments must be evaluated under the Rule 59 standard.   Despite styling this section of its memorandum as an attack on the misappropriation element though,[270] substantively, Besco contests whether Plaintiffs' allegedly protected information is indeed a trade secret.   This is evident from Besco's stating that there was "no need" for it to resort to improper means to acquire the information, rather than arguing whether the challenged means – disassembling and reverse engineering the ERIS *after* Besco began renting the tool – were improper.[271]   Besco reiterates that Plaintiffs themselves disclosed the relevant information before May 2015, arguing that this shows that Besco did not acquire said information through improper means.   As Besco's similar point in its Rule 50(a) motion at trial shows,[272] this argument really relates to the question addressed above – namely, whether Plaintiffs took reasonable measures to protect the secret.   Needless to say, Plaintiffs do not assert that Besco's acquisition of limited

---

[267] R. Doc. 328 at 9.

[268] *Id.* at 9-10.

[269] *See supra* section III.B.1.c.

[270] *See* R. Doc. 316-1 at 19-20.

[271] As the Court reads them, Besco principally uses its breach-of-contract arguments to challenge whether its conduct could have constituted misappropriation.   Besco points to case law explaining that trade-secrets law alone does not protect against reverse engineering, and later argues that Plaintiffs cannot rely on the Rental Agreement to show that Besco was under obligation not to disassemble and reverse engineer the ERIS at the time the misappropriation allegedly occurred (because of the various arguments it presents regarding the contract).   *See id.* at 19-21; *see also infra* note 277.

[272] *See supra* note 186 ("And so once a secret is out and it's ***not out by improper means***, which it is not improper if there is no restriction or limitation on its disclosure, ***it's not secret*** … .") (emphasis added).

information *from Plaintiffs themselves* before the Rental Agreement was first signed constitutes misappropriation.[273]

To the extent that Besco makes a different argument – that regardless of any disclosures prior to May 2015, the allegedly protected information was "readily ascertainable without engaging in tortious behavior,"[274] a point that also goes to the question whether the information constitutes a trade secret, not whether the challenged conduct constitutes misappropriation – Plaintiffs presented the jury with sufficient evidence to reject it. Plaintiffs presented evidence that Besco, through its hiring of Elite, disassembled and reverse engineered the ERIS in order to copy it;[275] a reasonable juror could certainly have found this to be proof that the protected information was not "readily ascertainable without engaging in tortious behavior."

Finally, only Besco's single sentence regarding Elite's testimony that it did not use any protected information to develop new rollers is arguably relevant to the question of whether Besco misappropriated Plaintiffs' trade secrets.[276] But this testimony was before the jury, and it is in the domain of the jury to make credibility determinations and findings on questions of fact such as whether a trade secret has been misappropriated. Regardless, even if true, Besco has not shown that this piece of testimony is enough to conclude that the verdict is against the great weight of the evidence.

In sum, none of Besco's arguments regarding Plaintiffs' trade-secrets claims demonstrates that judgment as a matter of law or a new trial is warranted.

---

[273] Again, according to Plaintiffs, the alleged misappropriation began in February 2016 while Besco was renting the ERIS.

[274] Besco makes this point earlier in its memorandum as well. *See* R. Doc. 316-1 at 12-13 ("[T]he idea of using elevator roller inserts was readily ascertainable before the patent published in 2016. … [A]ny information Plaintiff[s] claim[] as a 'trade secret' was already widely known, and therefore readily ascertainable.").

[275] *See infra* note 356.

[276] *See* R. Doc. 316-1 at 20.

### b. *Breach of contract*[277]

Besco argues that the jury's verdict on breach of contract is erroneous as a matter of law and against the weight of the evidence. Besco asserts that it could not have breached an obligation "not to have a new tool created" under the terms and conditions in the rental contracts because, even if the rental contracts were valid contracts (which Besco disputes), the terms and conditions could not have been effective until October 2015.[278] According to Besco, the May 7, 2015 delivery ticket did not reference any terms and conditions, and even if these terms and conditions were on Cajun's website, they did not appear on the documents until that October.[279] Even after that point, Besco argues that the evidence shows it still did not consent to these terms because (1) it already possessed the information that the terms sought to limit because Plaintiffs had provided Besco with drawings of the ERIS and permitted Besco to view its testing without restrictions, and (2) no one with authority at Besco executed a delivery ticket with these terms.[280]

Plaintiffs respond by pointing to Heath Triche's testimony that he specifically directed one of Besco's employees to Cajun's terms and conditions for rental of the ERIS (the Rental Agreement), and the employee reviewed them, "close to the beginning of the rentals"; that these terms and conditions were listed on the website at all relevant times; and that in December 2015

---

[277] Cajun alleges that Besco breached the Rental Agreement in two ways: by failing to pay for rental charges for the ERIS within the time allotted under the Rental Agreement (violating sections 3.1 and 3.2); and by altering, modifying, disassembling, reverse engineering, and analyzing the ERIS (violating section 3.9). R. Doc. 175 at 36-37. Besco does not specifically challenge, either in this motion or any of its other post-trial motions, the jury's finding that Besco breached the Rental Agreement by failing to pay Cajun or the jury's award of the unpaid invoices as contract damages. Furthermore, the jury's finding of bad faith breach of contract is not placed at issue in this motion. Rather, Besco's argument concerning section 3.9 serves to attack the finding of *trade-secrets misappropriation* by urging that the protections Cajun was afforded by section 3.9 were not in place before Besco disassembled, reverse engineered, analyzed, and copied the ERIS. However, Besco does seek to undermine the breach-of-contract claim as a whole in this motion by contending that its employees did not have authority to agree to any of the terms and conditions, not only section 3.9, in the Rental Agreement on Besco's behalf.

[278] R. Doc. 316-1 at 21-23.

[279] *Id.*

[280] *Id.* at 23.

and January 2016, they were presented directly to both Jamie Lovell and Esco Benton.[281]

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."  La. Civ. Code art. 1906.  "Under Louisiana law, the 'essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee.'"  *Express Lien, Inc. v. Handle, Inc.*, 2020 WL 1030847, at *6 (E.D. La. Mar. 3, 2020) (quoting *Denham Homes, L.L.C. v. Teche Fed. Bank*, 182 So. 3d 108, 119 (La. App. 2015)).  "The burden of proof in an action for breach of contract is on the party claiming rights under the contract."  *Rebouche v. Harvey*, 805 So. 2d 332, 334 (La. App. 2001) (citations omitted).  "The existence of the contract and its terms must be proved by a preponderance of the evidence."  *Id.*  Moreover, "[t]he existence or nonexistence of a contract is a question of fact and, accordingly, the determination of the existence of a contract is a finding of fact."  *Sam Staub Enters., Inc. v. Chapital*, 88 So. 3d 690, 693 (La. App. 2012) (citations omitted).

Besco has waived any right to challenge under Rule 50(b) the jury's findings on the existence of the Rental Agreement or Besco's breach of the Rental Agreement; accordingly, the Court reviews Besco's arguments under a Rule 59 standard.  At the outset, the Court notes that Cajun does not allege that Besco breached an obligation "not to have a new tool created," as Besco characterizes it, but rather an obligation "not to alter, modify, disassemble, reverse engineer, or analyze, nor have any other third-party alter, modify, disassemble, reverse engineer, or analyze, the ERIS."[282]  Next, whether the Rental Agreement was incorporated into the delivery tickets in

---

[281] R. Doc. 328 at 4.  Plaintiffs add that, during the period Besco rented the ERIS from Cajun, Besco never disputed that these terms and conditions were reflective of their arrangement, and so Besco effectively ratified them, *id.*, to which Besco responds that because its principals lacked actual knowledge of these terms and conditions, there could not be any ratification.  R. Doc. 343 at 6.  In light of the Court's disposition of the breach-of-contract issue, the Court finds it unnecessary to determine whether Besco ratified the terms and conditions (the Rental Agreement), and notes that the jury was fully instructed on the law of ratification.  *See* R. Doc. 266 at 12.

[282] R. Doc. 175 at 37.

May 2015 or October 2015, or sometime in between, is irrelevant to the question whether Besco breached said obligation in 2016.  Regardless, as can be discerned from the jury's award on contract damages, the jury found that the Rental Agreement existed by the time period in question, rejecting the same argument Besco makes now.[283]  Besco's argument that it could not have consented to the trade-secrets-protection provisions of the Rental Agreement because it already had the pertinent information due to Plaintiffs' disclosure of the drawings and the testing of the ERIS is also meritless.  In finding for Plaintiffs on their trade-secrets claims, the jury was presented with competing evidene about this point and rejected Besco's argument that it already had the protected information – the alleged trade secrets – before the rentals began.

Besco's second basis for challenging the verdict is an elaboration of its second point on lack of consent: not only did no Besco employee who signed the delivery tickets have authority to bind Besco, says Besco, but Plaintiffs cannot rely on the doctrine of apparent authority because this doctrine places a "duty to inquire into the nature and extent of the agent's power" on the party seeking to benefit from it, yet Cajun did not do so.[284]  Besco adds that the Rental Agreement explicitly says that "no field employee of company shall be empowered to alter the terms," which, according to Besco, indicates that Cajun could not accept a signature from a field employee.[285]  Thus, Besco argues, it is "wholly unreasonable" for Cajun to have expected that Besco's "field employees had authority to bind the company."[286]

Plaintiffs respond that the evidence supports the jury's finding that Besco is bound by the apparent authority of its offshore supervisor and operations manager, despite Besco's

---

[283] The jury found that a written agreement existed between Cajun and Besco for rental of the ERIS, and awarded Cajun the full $886,103.10 in unpaid rental invoices it requested as damages for breach of contract.  R. Doc. 267 at 1, 3.  The earliest unpaid invoice was dated March 31, 2016, for rentals beginning March 1, 2016.  *See* Trial Exs. 56; 385.

[284] R. Doc. 316-1 at 23-24.

[285] *Id.* at 24-25 (brackets omitted).

[286] *Id.* at 25.

characterizing them as "field hands."[287]   Plaintiffs assert that Besco's position – that it provided employees with authority to "acknowledge receipt and/or delivery of equipment for and on behalf of Besco," but not authority to accept the terms and conditions accompanying the rentals – is "bizarre" and "defies reason."[288]   They add that Besco should be estopped from denying or avoiding the Rental Agreement due to its conduct which "belies the basic tenets of elementary fairness."[289]

In Louisiana, a person who causes a third person to believe that another is his mandatary (or agent, in common law terms) is bound to the third person who, in good faith, contracts with the putative mandatary.  La. Civ. Code art. 3021.  This concept is analogous with the common law doctrine of apparent authority, recognized by Louisiana courts prior to 1998 when article 3021 went into effect.  *See Am. Bank & Trust v. Singleton*, 233 So. 3d 730, 736 (La. App. 2017) (citations omitted).   "Apparent authority is a doctrine by which an agent may bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent."  *Id.* at 735-36 (citing *Tedesco v. Gentry Dev., Inc.*, 540 So. 2d 960, 963 (La. 1989)).  For the doctrine to apply, two elements are required: "1) that the 'principal must first act to manifest the alleged agent's authority to an innocent third party;' and 2) that the 'third party must rely reasonably on the manifested authority of the agent.'"  *Quilio & Assocs. v. Plaquemines Par. Gov't*, 931 So. 2d 1129, 1135 (La. App. 2006) (quoting *Boulos v. Morrison*, 503 So. 2d 1, 3 (La. 1987)).  The third party has a "duty to inquire into the nature and extent of the agent's power,"

---

[287] R. Doc. 328 at 5.
[288] *Id.*
[289] *Id.* at 5-6.

after which the third party must have a "'reasonable belief,' based on the facts of the case, that the agent has authority." *Id.* (quoting *Boulos*, 503 So. 2d at 3, and *Salley v. Colonial Marine Indus., Inc.*, 680 So. 2d 1242, 1250 (La. App. 1996)); *see also McCray v. S. Aggregates, LLC*, 282 So. 3d 262, 268 (La. App. 2019) (apparent authority is "established by the words and conduct of the parties and the circumstances of the case"). "One must look from the viewpoint of the third party to determine whether an apparent agency has been created." *McCray*, 282 So. 3d at 268 (citation omitted). The party seeking to bind the principal has the burden of establishing apparent authority. *Id.*

The jury was instructed on the doctrine of apparent authority,[290] was presented with competing evidence on the issue including the same testimony to which Besco now points (*viz.*, Shane Triche's response to Besco's counsel, stating that "[they] never asked to see who had authority to sign the terms and conditions"),[291] heard Besco's counsel question witnesses on the issue,[292] and rejected Besco's arguments at trial that it was unreasonable under the circumstances for Cajun to believe that Besco's employees had authority to accept the Rental Agreement when said employees retrieved the rented ERIS tools. The Court will not disturb the jury's finding of the existence of the Rental Agreement, which Besco has not shown to be against the great weight of the evidence.

---

[290] *See* R. Doc. 266 at 11-12. While the instructions did not explicitly include language on the "duty to inquire," Besco's own proposed instructions did not include this language, *see* R. Doc. 248 at 4-5 (indeed, they did not address the doctrine of apparent authority at all, as objected to by Plaintiffs, *see* R. Doc. 255 at 3-4), nor did Besco object to the instructions either before or during trial, nor does Besco do so now. The jurors heard Besco's arguments on the issue, and the instructions explained that they needed to determine the reasonableness of Cajun's belief that the Besco employees had authority to bind Besco.

[291] *See* R. Doc. 302 at 121.

[292] *See id.*

Finally, that the Rental Agreement states that "no field employee of company shall be empowered to *alter* the terms" has no bearing on whether a field employee has authority to ***accept*** its terms on behalf of the company.[293]

The Court concludes that Besco has not shown that a new trial on Cajun's breach-of-contract claim is warranted.[294]

### 5. Besco's Rule 59 Motion for New Trial / Alter / Amend / for Remittitur on Damages Award to Plaintiffs

#### a. *Sequence, flow, and timing of trial*

Besco commences its damages argument by describing the trial as one "marred by interruptions and delays," detailing the sequence of severe weather events in New Orleans the week trial began on July 8, 2019, which led to disruptions and alterations to the planned trial schedule at the courthouse.[295]  Plaintiffs do not respond to this; indeed, it is unclear if Besco actually argues that the delays are a basis for a new trial, or merely includes this description in its background section to cast doubt on the verdict.  Regardless, Besco omits to mention that the Court conferred with all parties, all counsel, and the jury every step of the way during the trial, ensuring that both sides and the jury agreed to proceed despite the weather-related delays.  Besco never voiced any objection either to proceeding with trial despite the relatively short interruptions and delays or to the resulting amount of time it had to present its side of the case,[296] and it cannot now complain about the sequence, flow, and timing of the trial.

---

[293] *See* R. Doc. 316-1 at 24-25 (brackets omitted; emphasis added).
[294] Accordingly, the Court finds it unnecessary to examine Plaintiffs' estoppel argument.
[295] R. Doc. 317-1 at 5-6.
[296] *See* R. Doc. 304 at 4 (Besco's counsel agreeing to Court's proposed schedule for final two days of trial).

### b. *Verdict form*

Besco challenges the jury's damages award by arguing that jury interrogatory number 14 "lumps together all damages that may be attributable to fraud, unfair trade practices, misappropriation of trade secret[s] (under LUTSA and DTSA), and patent infringement," and then interrogatory number 15 "directs the jury that it could enhance the collective damages up to '***two times*** (2x) the amount awarded under question 14."[297]   Besco argues that this direction is erroneous as a matter of law because enhancement of damages is not available for fraud, violation of the LUTPA, and patent infringement without a finding of willful infringement.[298]   Accordingly, says Besco, the enhanced damages award must be reduced, and to the extent this is impractical, a new trial should be ordered.[299]

Plaintiffs counter that Besco did not ask that damages be segregated per claim, nor did it ever dispute the Court's proposed verdict form with respect to how the jury was asked to award damages, and thus, having failed to object to the verdict form before the jury retired for deliberations as permitted under Rule 51(b)(2), Besco may only challenge the verdict form for plain error affecting substantial rights under Rule 51(d)(3).[300]   Plaintiffs also highlight the jury's discernment and discretion in awarding just $2 million in exemplary damages as a result of Besco's DTSA violation, rather than $3 million, which would have been two times the $1.5 million awarded under interrogatory number 14, and suggest various ways in which the jury could reasonably have calculated this amount of exemplary damages, given its handling of question 14.[301]

---

[297] R. Doc. 317-1 at 19 (emphasis in original).
[298] *Id.*   Besco notes that the jury made no finding of willful patent infringement, *id.* at n.56, nor was it asked to make any such finding.
[299] *Id.* at 19; *see also* R. Doc. 349 at 4.
[300] R. Doc. 330 at 3, 5-7.
[301] *See id.* at 11-12.

A party who objects to a jury instruction or interrogatory, or the failure to give one, "must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). An objection is timely if it is made before the instructions are delivered. Fed. R. Civ. P. 51(c)(2)(A). "Objections that were not timely raised before the jury retired to deliberate are reviewed for plain error, and overturned only for 'an obviously incorrect statement of law that "was probably responsible for an incorrect verdict, leading to substantial injustice."'" *Personal Audio, LLC v. Apple, Inc.*, 2011 WL 3269330, at *5 (E.D. Tex. July 29, 2011) (quoting *Tompkins v. Cyr*, 202 F.3d 770, 784 (5th Cir. 2000)).

Having failed to raise the question at trial, Besco now takes issue for the first time with the wording of interrogatory number 14, which groups together several categories of damages, yet its own proposed verdict form included only one interrogatory for damages for ***all*** of Plaintiffs' claims.[302] It was Plaintiffs who in their 21-page proposed verdict form included a separate damages interrogatory for each of their claims.[303] The Court opted for a middle ground, including more than one damages interrogatory, but separating interrogatories addressed to damages for breach of contract and for consequential damages due to bad faith breach of contract, from the interrogatory addressed to damages for Plaintiffs' remaining claims, and then including a separate interrogatory for exemplary damages under the DTSA. Besco did not object to the proposed verdict form's questions 14 or 15 either at the charge conference or at trial before the jury was charged. Rather, as Plaintiffs note,[304] Besco's sole objection to the verdict form was based on its tardy arbitration argument.[305] Accordingly, the Court reviews this question now for plain error.

---

[302] *See* R. Doc. 247 at 4.
[303] *See* R. Doc. 250.
[304] R. Doc. 330 at 7.
[305] *See* R. Docs. 253; 305 at 4-10. The Court has addressed Besco's argument regarding its right to compel arbitration, *see* R. Doc. 297 (holding that Besco waived any such right), and this ruling is on appeal to the Federal Circuit.

Besco's challenge to the form of interrogatory number 14 is based on its assertion that it is unclear which damages the jury enhanced under interrogatory number 15, speculating that several categories of damages awarded under number 14 may have been improperly enhanced. But contrary to Besco's description, interrogatory number 15 *does not* instruct the jury that it could double "the collective damages" awarded under number 14.[306]   Interrogatory number 15 specifically tells the jury that, should it find that Besco violated the DTSA, and should it find that exemplary damages ought to be awarded as a result of such violation, the jury is to "state the amount of *such damages*."[307]  The interrogatory then instructs that the "award may not exceed *two times* (2X) the amount awarded under question 14," wholly consistent with limiting exemplary damages to the DTSA.[308]  After all, the jury could have awarded only DTSA damages under question 14, and then doubled that amount under question 15. That the jury awarded $2 million under question 15, rather than $3 million (*i.e.*, double the amount awarded under question 14), indicates that the jury understood it could enhance only DTSA damages up to two times.[309]  Indeed, the wording of these questions does not make it impossible or impractical to tell how the jury arrived at $2 million in enhanced damages, as Besco suggests, since the plain language of question 15 shows that the jury necessarily awarded at least $1 million in trade-secrets damages, which it then doubled.

---

[306] *See* R. Doc. 317-1 at 19.

[307] R. Doc. 267 at 4 (emphasis added).

[308] *Id.* (emphasis in original).

[309] That the jury understood from the verdict form which damages could be enhanced is reinforced by examining the charges to the jury. Interrogatory number 15's language is mirrored in the language of the instructions on trade-secrets damages. *See* R. Doc. 266 at 20 ("If you find that Besco engaged in willful and malicious misappropriation of the trade secret, you may award 'exemplary' damages, that is, damages meant to make an example of Besco. Exemplary damages may be awarded in an amount not more than two (2) times the amount awarded for compensatory damages."). Exemplary damages are mentioned only in reference to the DTSA, which is the subject of the preceding paragraph. Moreover, the instructions on "damages in general" state that Louisiana law "does not permit an award of punitive damages," which would preclude exemplary damages for Plaintiffs' fraud, LUTPA, and LUTSA claims, and the instructions on patent-infringement damages state that the jury is not to "add anything to the amount of damages to punish an accused infringer or to set an example." *Id.* at 9, 27.

Thus, the Court finds no plain error with jury interrogatory numbers 14 and 15.

### c. *Consequential damages for bad faith breach of contract*

Besco asserts that "[i]t appears the jury mistook the claims for which Plaintiff[s] sought diverted rentals damages and awarded Plaintiff[s] the $552,000 requested for diverted rentals as consequential damages for bad faith breach of contract."[310]  It then argues that the jury impermissibly duplicated the diverted rentals damages in its award under interrogatory number 14.[311]  Plaintiffs respond that the jury reasonably awarded $552,000.00 for consequential damages for Besco's bad faith breach of contract (interrogatory number 13), because Plaintiffs sought up to $4 million in such damages, and $552,000.00 is considerably less than the requested amount.[312]

Besco points the Court to Plaintiffs' submitted damages chart which clearly indicates that the diverted rentals were not available as damages for breach of contract or consequential damages for bad faith breach of contract.[313]  The Court is unwilling to assume, as Besco does, that the jury – in direct contravention of the chart – awarded the diverted rentals as consequential damages for bad faith breach of contract,[314] and thus, the jury could not have duplicated the diverted rentals damages by awarding them under both interrogatory numbers 13 and 14.  The chart indicates that as contract damages Cajun sought $886,103.10 for the unpaid invoices (awarded as damages for breach of contract under interrogatory number 12) and another $4 million in consequential

---

[310] R. Doc. 317-1 at 7.

[311] *Id.* at 15-16.

[312] R. Doc. 330 at 10.

[313] *See* R. Doc. 317-2 at 257.

[314] In its ruling on prejudgment interest, the Court mistakenly described the jury's award of consequential damages for bad faith breach of contract as the diverted rentals.  *See* R. Doc. 309 at 24-25.  However, this inadvertence led to no error on the total amount of prejudgment interest due.  (Nor has Besco taken issue with the Court's calculation of prejudgment interest.)  As is made clear in this Order & Reasons, the diverted rentals were a component of the jury's award of non-contract damages under interrogatory number 14, not the jury's award of consequential damages for bad faith breach of contract.  The Court will amend the final judgment to remove the mistaken reference to "diverted rentals" in the paragraph awarding consequential damages.  *See* R. Doc. 312 at 3.

damages for bad faith breach of the contract.  Because $552,000.00 is less than the $4 million sought as consequential damages, this award was not unreasonable.

Furthermore, the chart specifically explains that if the jury was to award the $4 million in damages for the contract claim, it could not duplicate these damages in any award relative to the other non-contract/non-patent claims, for which these same damages were sought in the alternative.  More importantly, the verdict form indicates that any amount awarded under interrogatory number 13 (consequential damages) could not be included in the amount of damages awarded under interrogatory number 14 (for fraud; LUTPA, LUTSA, or DTSA violations; or patent infringement).[315]  So, having awarded $552,000.00 for consequential damages for bad faith breach of contract (interrogatory number 13), the jury understood it could award only up to $3,448,000.00 under the other legal theories for which these damages were available (all under interrogatory number 14).  And, in fact, the jury awarded only $1.5 million for these claims, an amount well within the remaining limit.

### d.   Diverted rentals

Besco challenges Plaintiffs' calculation of $552,000.00 in diverted rentals by arguing that they improperly accounted for the nearly two-year period between the date of the patent application publication and the issuance of the patent, which Besco argues is covered by no cause of action.[316] According to Besco, once a patent application is published, no trade-secrets recovery is possible, and so there is a "gap in claim coverage," between September 29, 2016, and June 5, 2018, when patent-infringement recovery became available.[317]  Therefore, says Besco, since 390 rental days

---

[315] *See* R. Doc. 267 at 4.
[316] R. Doc. 3-17 at 17-18.
[317] *Id.*

are not recoverable, the diverted rentals should have been calculated by multiplying the rate times 346, not 736, rental days.[318]

Plaintiffs counter that Besco ignores their undisclosed trade secrets in the make-up and configuration of the roller inserts when arguing that it would have discovered any trade secret upon publication of the patent application.[319]  Plaintiffs maintain that this was the "secret sauce" that Besco obtained only by tearing the roller inserts apart and studying them.[320]

The diverted rentals, which date from March 1, 2016, to December 7, 2018,[321] were available as damages for every theory under interrogatory number 14 (*viz.*, fraud, violation of the LUTPA, federal and state trade-secrets misappropriation, and patent infringement).[322]  The Court agrees with Besco that the jury could not reasonably have awarded any diverted rentals dated before June 5, 2018, as damages for patent infringement.[323]  However, not only was the jury presented with evidence that Plaintiffs' trade secrets were not totally extinguished upon publication of the patent application,[324] and so the diverted rentals could reasonably have been awarded in full as damages for trade-secrets misappropriation, but Besco makes no argument why the diverted rentals' time frame is a problem under the theories of fraud and violation of the

---

[318] *Id.* at 21.

[319] R. Doc. 330 at 13-14.

[320] *Id.*

[321] *See* R. Doc. 317-2 at 258-59; Trial Ex. 386.

[322] *See* R. Doc. 317-2 at 257.

[323] The jury was instructed that Cajun and Besco agreed that the start date of a damages calculation for any infringement is June 5, 2018, the date that the '862 Patent issued.  *See* R. Doc. 266 at 28.

[324] Besco, apparently surprised by the testimony of Plaintiffs' expert witness, Bryce Randle, "hint[ing]" that "how the rollers function" might still be a protectable trade secret, argues that any contention by Plaintiffs that the '862 Patent does not contain information on how to make or use the ERIS is "a judicial admission as to the patent's invalidity," or at minimum presents "new facts triggering new defenses," for which the Court should order a new trial. R. Doc. 317-1 at 17 n.45.  But the pretrial order lists as contested issues of fact both whether "[a]ll information related to the ERIS disclosed in Cajun's patent application was kept as Cajun's trade secret information until such application was published on September 29, 2016," and whether "Cajun continues to maintain as trade secrets several aspects of the ERIS that are not disclosed in the patent application and can only be discovered by disassembling and analyzing the ERIS." R. Doc. 242 at 33.  Accordingly, Besco was fully aware of Plaintiffs' assertion that the patent application did not reveal all their trade secrets allegedly embodied in the ERIS.  By failing to raise the issue until now, Besco has waived its right to assert the patent invalidity for lack of written description and/or enablement. *Elvis Presley*, 141 F.3d at 206 (failure to include an issue in pretrial order results in waiver).

LUTPA.  In asserting that there is a "gap in claim coverage," Besco ignores these claims, acting as if the diverted rentals were sought as damages only for trade-secrets misappropriation and patent infringement.[325]  Because the jury could reasonably have awarded the diverted rentals as damages for Besco's fraud and LUTPA violation, as well as for its trade-secrets misappropriation, the Court finds no error in the requested time frame.

Besco also questions the rate Plaintiffs used to calculate the $552,000.00 in diverted rentals.[326]  Besco argues that the rate should be changed to $200 per ERIS insert per day, because this is listed "as the going rate in Plaintiff[s'] Business Plan."[327]  Besco argues that the $750 rate "was nothing more than an initial offer," that Plaintiffs had "requested the rate be based off [Besco's] rental amount with Anadarko," that Plaintiffs later discounted the rate to $450 per day after the oil-and-gas market downturn, "which was still too high," and that no third party ever rented the ERIS at either the $750 rate or the discounted $450 rate.[328]  It adds that the diverted rentals were not sought pursuant to any contract claim, that the "rental relationship" between Cajun and Besco was terminated before the diverted rentals arose, and that under the theories of trade-secrets misappropriation and patent infringement, only the lost value of the tools was recoverable, and this must be calculated at the $200 rate.[329]

Plaintiffs respond that the proper rate is $750 per insert per day because "[t]hroughout the rental relationship, Plaintiffs charged, and [Besco] paid, $750 per ERIS insert per day, with a $300 per rental day discount for on time payment, which [Besco] does not receive the benefit of for its

---

[325] *See* R. Doc. 349 at 5 ("Plaintiff[s] asked the jury to award diverted rentals under the theories of trade secret misappropriation and patent infringement.").
[326] R. Doc. 317-1 at 18 n.52 & 21-22.
[327] *Id.* at 21.
[328] *Id.* at 21-22.
[329] R. Doc. 349 at 5.

diverted rentals."[330]  Nor, Plaintiffs argue, should Besco receive the benefit of the "conservative number" they included in their business plan for the purpose of obtaining a loan.[331]

First, that the diverted rentals were sought as damages for Plaintiffs' non-contract claims, and that the "rental relationship" ended before the diverted rentals commenced,[332] does not mean that the diverted rentals could not be calculated using the contract rate.  Besco provides no authority that this rate could not properly be used as evidence of the amount Plaintiffs would have earned, but for Besco's fraud, LUTPA violation, trade-secrets misappropriation, or patent infringement.[333]  Second, in his testimony at trial, Shane Triche explained that the $552,000.00 figure was calculated using the $750 rate,[334] while Besco's expert witness, Charles Theriot, testified that the $200 rate listed in Plaintiffs' business plan was "more reflective of reality."[335] The jury was free to disregard the $750 rate advocated by Plaintiffs and substitute the $200 rate advocated by Besco if it had found Theriot's testimony compelling or Triche's testimony insufficient.  It was not unreasonable, then, for the jury to have agreed with Plaintiffs' calculation using the higher rate.[336]

---

[330] R. Doc. 330 at 13.

[331] R. Doc. 366 at 6.

[332] The first diverted-rentals invoice dates to March 2016, before Cajun and Besco's rental relationship ended. *See* Trial Ex. 386.  The start date for the next diverted rental is July 5, 2016, the day Besco ceased renting the ERIS from Cajun.  *See id.*; R. Doc. 242 at 23.

[333] Furthermore, the jury was fully instructed on the types of damages recoverable under the available theories, including patent infringement and trade-secrets misappropriation.  *See* R. Doc. 266.  Because these damages (the diverted rentals) were available for all of Plaintiffs' non-contract legal theories, and these damages in turn were grouped together with unjust enrichment damages and additional business damages under interrogatory number 14, to which Besco did not object, there is no need to analyze whether the jury may have awarded damages for "unpatented features" resulting from any failure on Plaintiffs' part to apportion patent-infringement damages, as Besco suggests. *See* R. Doc. 314-1 at 28-29.

[334] R. Doc. 302 at 69, 72-73.

[335] R. Doc. 305 at 34.

[336] This is especially so because it is clear that the jury rejected Besco's assertions that the $750 rate was only an initial offer or otherwise not the correct rental rate, as the jury awarded in full the requested $886,103.10 for the unpaid invoices, which Shane Triche testified was calculated using the $750 rental rate.  *See* R. Doc. 302 at 66-67.  Besco does not challenge this portion of the jury's award.

### e.   *Unjust enrichment from misappropriation*

Besco contends that the $818,805.10 sought by Plaintiffs as unjust enrichment damages from trade-secrets misappropriation (1) is speculative and unsupported because Plaintiffs offered no evidence as to the revenue or profits that Besco allegedly obtained from its clients, and Plaintiffs did not even mention these damages until closing arguments; (2) improperly includes revenues from invoices issued after September 29, 2016, *i.e.*, the patent-application-publication date; (3) improperly represents Besco's revenue, not profits, although both the LUTSA and the DTSA limit unjust enrichment damages to a defendant's profits; and (4) improperly includes revenue generated by all services and goods provided by Besco, even those not related to the ERIS.[337]

Plaintiffs respond by explaining that they calculated this amount ($818,805.10) by (1) taking the amount Besco received in revenues from Anadarko that, according to Plaintiffs, Besco would not have received but for its use of the knock-off tools, $5,297,747.70, as reflected in the diverted rentals table (Trial Ex. 388[338]) which includes Besco's invoice amounts, and was derived from Besco's interrogatory answers (Trial Ex. 148); (2) including only the period of time up to the patent-application publication at the end of September 2016 plus six months, to capture the time it took Besco to copy and replace the ERIS with its knock-off tools, leaving $1,370,805.10; (3) and then deducting the $552,000.00 for the diverted rentals, to prevent double counting.[339]   They maintain that the jury found that Plaintiffs still held undisclosed, protectable trade secrets following the patent-application publication.[340]   They argue that insofar as the amount was reflective of revenue, not profits, Besco refused to produce cost information and, furthermore, it was Besco's burden to prove costs.  The amount encompasses Besco's "whole job" with Anadarko

---

[337] R. Doc. 317-1 at 17-21.
[338] Plaintiffs incorrectly cite this table as Trial Exhibit 387.  *See* R. Doc. 264 (trial exhibit list).
[339] R. Doc. 330 at 12-13.
[340] *Id.* at 13-15.

and not only invoices related to the roller inserts because, say Plaintiffs, the evidence showed that Besco "could not have gotten the jobs without Plaintiffs' ERIS."[341] Plaintiffs add that the amount for all the invoices for work involving use of Besco's knock-off tools was $4,658,080.22.[342]

While Besco is correct that Plaintiffs' counsel did not specifically discuss the $818,805.10 figure until closing arguments, Besco is incorrect to assert that Plaintiffs presented no evidence of Besco's revenue from its clients for jobs where Besco's tools were used. As Plaintiffs state, the diverted rentals table shows the total amount Besco charged Anadarko for each invoice,[343] and this information was derived from Besco's interrogatory responses, also offered as evidence.[344] In his testimony at trial, Shane Triche explained the table and Besco's interrogatory responses, specifically pointing out the amounts Besco charged Anadarko on two invoices by way of example.[345] Later, Besco's expert, Charles Theriot, testified that this table "purported to list all of the [Besco] invoices to Anadarko," but when asked whether the lump sum pricing of each invoice is a "reliable and indicative way to determine what those diverted profits are," responded that they are not.[346] Thus, again, the jury was presented with competing evidence on the issue. Finally, in closing arguments, Plaintiffs' counsel explained the $818,805.10 figure as being the amount that Besco wrongly benefitted from in renting the knock-offs to Anadarko, in addition to the $552,000.00 in diverted rentals already accounted for.[347]

---

[341] *Id.* at 13.

[342] *Id.*

[343] *See* Trial Ex. 388.

[344] *See* Trial Ex. 148.

[345] *See* R. Doc. 302 at 69-72.

[346] *See* R. Doc. 305 at 41, 46-47.

[347] *See id.* at 220-21. In recounting the various categories of damages, and just after referencing the $552,000.00 in diverted rentals, Plaintiffs' counsel explained the $818,805.10 unjust enrichment figure in full:

> The next one is what did they gain? What was the benefit that they received? And I'm just going to tell you that the math is a little – you've got to take and deduct some things. In other words, you've got to deduct the amount of $552,000, but if you go through those diverted rentals – I'm just going to give you the bottom line number which is, based on the evidence according to the plaintiffs, $818,805.10 is the amount that [Besco] benefitted from renting their knock-offs after – to

Regarding Besco's complaints about the time frame for these damages, as previously explained, the jury was presented with evidence that Plaintiffs' trade secrets were not all encompassed within the '862 Patent, and therefore, the jury could reasonably have awarded unjust enrichment damages for the entire period of the invoices. Even if the jury found that the patent did reveal all Plaintiffs' trade secrets, however, it would not have been erroneous to award unjust enrichment damages arising after September 29, 2016. Notably, Besco did not mention the September 29, 2016 patent-application-publication date at trial,[348] much less argue to the jury that after this date, trade-secrets damages were unavailable.[349] While this issue is listed in the pretrial order,[350] Besco did not request (or object to the lack of) an interrogatory asking the jury whether the issued patent or its published applications revealed any remaining trade secrets pertaining to

---

Anadarko. And it's based upon the revenues that they received taking out the amounts that are already accounted for, and that's what we arrive at.

*Id.*

[348] Rather, Plaintiffs' counsel's question regarding patent publication in "September of 2016" is the only time this date was discussed at trial. *See infra* note 352.

The jury was presented with evidence regarding Shane and Heath Triche's filing of a provisional application on March 23, 2015, and the second provisional application on February 9, 2016. *See* R. Docs. 301 at 169-70, 198; 304 at 61, 267; 305 at 134; Trial Exs. 1 (the '896 Patent); 18 (first provisional application); 19 (second provisional application). The testimony explained that a provisional application is not a full-fledged application. R. Docs. 301 at 149; 304 at 128. The jury was also presented with evidence that on March 23, 2016, T2 Tools (to whom Shane and Heath Triche had assigned all their right, title, and interest in and to the ERIS and any related intellectual property, including the two provisional applications) applied for international patent protection (the "PCT Application"). R. Doc. 175 at 20; *see* Trial Ex. 20 (the PCT Application). Plaintiffs allege that on September 29, 2016, the PCT Application was published. R. Doc. 175 at 20; *see* R. Doc. 175-4 (International Patent Publication No. WO 2016/154253, "the '253 Publication"). According to Plaintiffs' pleading, "publication of the '253 Publication was the first non-confidential disclosure of the ERIS." R. Doc. 175 at 20.

Before the jury was also evidence that T2 Tools subsequently assigned all of its right, title, and interest in and to the ERIS and any related intellectual property, including the two provisional applications and the PCT Application, to Cajun, who then filed U.S. Patent Application No. 15/679,696 ("the '696 Application"), claiming priority to the provisional applications and the PCT Application, on August 17, 2017. R. Doc. 175 at 21; *see* Trial Exs. 1; 176 (the '696 Application). The '696 Application was published on November 30, 2017, and was issued as the '862 Patent on June 5, 2018. *See* Trial Ex. 1.

[349] Instead, Besco focused on arguing that the alleged trade secrets were fully revealed prior to the commencement of the rental relationship in May 2015 (and thus, before any obligations arose under the Rental Agreement), as a result of the testing of the ERIS and Plaintiffs' limited disclosures to Besco. *See supra* section III.B.4.a. Besco also emphasized that there was no bad intent behind its conduct, so there could not have been willful and malicious trade-secrets misappropriation. *See* R. Doc. 305 at 241 (Besco's counsel in closing argument: "[W]e didn't do anything sinister. I mean, you're out there testing this product in the public. … We're not doing anything sinister so that the Defense Trade Secrets Act, unfair trade practice – all of that should be denied if you see fit.").

[350] *See supra* note 324.

the ERIS, or whether the period for trade-secrets recovery ended on September 29, 2016.  Besco should not be heard now to complain about the significance of a date about which it provided no guidance to the jury.

Nonetheless, the jury was presented with testimony regarding publication of the patent application and its effect on Plaintiffs' trade secrets.  Bryce Randle testified that once a patent is published – but not before that – the public can access it.[351]  Plaintiffs' counsel asked whether before publication of the '862 Patent (really, the '253 Publication) in September 2016 the information would have been secret, which Randle answered in the affirmative.[352]  Randle then

---

[351] Plaintiffs' direct examination of Randle:

Q: Do – once a patent publishes, is the information in that patent publicly available?

A: Once it's published, yes, it's in the public domain.  You can google it at that point.

Q: But before it publishes, can anyone access it?

A: They shouldn't be able to, no.  It's not public.

Q: So the information that you put in a patent is secret before it publishes, correct?

A: Correct.

R. Doc. 303 at 74.
[352] Direct examination continued:

Q: And so before this patent application – before the '862 patent published back in September of 2016, was the – do you contend that the information in that patent was secret?

A: Yes, it would have been secret before the publishing.

Q: And now obviously it's published and, in fact, issued, so that information is in the public domain, correct?

A: Correct.

*Id.*  On cross examination, Randle testified:

Q: In looking at these inserts and in looking at time frames, would you agree that patent protection for a plurality of upper and lower rollers applies when the patent is issued by the Patent & Trademark Office?

A: Could you say that one more time, please?

Q: You had talked about – there were questions asked on direct about when do you get protected because it goes into the public domain, and that's when the patent issues, right?

A: When it goes into the public domain.

Q: Okay.  And so once it goes into the public domain and people can see that patent, talking about a plurality of upper rollers and lower rollers, then according to what I understand you said, that's when these things are protected from being used by somebody else in a competing product, right?

A: Yes.  They – well, yes, it is supposed to protect you from someone using it in a competing product.

Q: Okay.  And before that, what method is there to protect someone who wants to keep this secret?

testified that he believed trade secrets relating to the ERIS (*viz.*, how the parts inside the rollers make them function), still exist, notwithstanding publication of the patent.[353]   Furthermore, the jury was fully aware that if a patent application revealed all Plaintiffs' asserted trade secrets relating to the ERIS, trade-secrets protection was no longer available once the application entered the public domain, as it was instructed: "Information that is public knowledge, ***such as a patent application once filed***, or that is generally known in an industry, cannot qualify as a trade secret."[354]

Moreover, merely because a trade secret ceases to exist does not mean that a plaintiff is barred from recovering damages arising after that date.  The Court further instructed the jury:

> Monetary recovery for trade secret misappropriation is permitted only for the period in which information is entitled to protection as a trade secret, ***plus the additional period, if any, in which a misappropriating party retains an advantage over good faith competitors because of misappropriation***.  Actual damage to a complainant and unjust benefit to a misappropriating party are caused by misappropriation during this time alone.[355]

This additional period is permitted in order "to remedy a head start or other unfair advantage attributable to the defendant's prior access to the information."  RESTATEMENT (THIRD) UNFAIR COMPETITION § 45 cmt. h (AM. LAW INST. 1993).  It would not have been unreasonable for the

---

A: Well, you are patent pending prior to it – once the USPTO pushes you so far, you're patent pending.  Other than that, it's protecting your trade secrets.

*Id.* at 111-13.  If anything, it was the questions of Besco's own counsel that insinuated it is the date of the patent's issuance, not the patent application's publication, when the information within the patent enters the public domain.

[353] *See* R. Doc. 303 at 75.

[354] R. Doc. 266 at 17 (emphasis added).

[355] *Id.* at 19 (emphasis added).

jury to award trade-secrets damages arising through March 2017, by using six months – the time that it took Besco to create its own tools[356] – as the appropriate measure of Besco's head start.[357]

Finally, the Court addresses Besco's argument that these damages represent its revenues, not only profits, from its business with Anadarko, and that they include revenues from work not involving the roller inserts.  While it is a plaintiff's burden to establish the defendant's sales attributable to use of the trade secret, "the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits."  RESTATEMENT (THIRD) UNFAIR COMPETITION § 45 cmt. f.  The jury heard the testimony of Besco's expert explaining why lump sum invoices are not reliable indicators of profits, but Besco did not present evidence breaking down the numbers in these invoices or otherwise demonstrate that there were any expenses to be deducted.  Besco cannot now complain that it did not meet its own burden.   Moreover, sales *dependent* on the trade secret, not only those incorporating the trade secret, are included in unjust enrichment damages.  *Id.*  Because Plaintiffs urged that Besco would not have landed the Anadarko job without the ERIS,[358] it would not have been unreasonable for the jury to award damages relating to invoices that did not also include the roller-insert rentals.

### f.   *Additional business damages*

Besco argues that the $4 million in additional business damages requested by Plaintiffs as consequential damages for bad faith breach of contract, or alternatively, as damages for fraud,

---

[356] Plaintiffs presented evidence to support their contention that six months (from February 2016 until July 2016) was the amount of time it took Besco to create its knock-off tools after it disassembled the tools it rented from Cajun. *See* R. Docs. 302 at 186-95 (Testimony of Brandon Costlow); 262 (Deposition Testimony of Jered Deroche, played at trial, *see* R. Doc. 302 at 197-99).

[357] And Besco presented no evidence or argument at trial that there was no appropriate "additional period" or that the "additional period," if any, should be less than six months.

[358] R. Docs. 301 at 197-204; 302 at 47; 303 at 80-81; 305 at 167-68, 201-04.

violation of the LUTPA, and state and federal trade-secrets misappropriation,[359] were impermissibly speculative.[360]  In Besco's view, no record evidence supported these damages, as they were based on a "discredited" business plan that relied primarily on the sale of intellectual property rights, though Plaintiffs never sold any such rights to a third party, and that failed to account for an economic downturn in the oil-and-gas industry.[361]  Besco argues that the "veracity of this plan is summarily debunked," pointing to its expert Charles Theriot's testimony highlighting the shortcomings of the plan.[362]  Besco stresses that the plan was created after the commencement of litigation and that Shane Triche admitted that the plan was based on "feelings."[363]

Plaintiffs respond by emphasizing the discretion of the jury and the high bar protecting a jury's damages award, and arguing that where the right to damages is certain, the amount of damages need not be calculated with absolute mathematical precision and certainty, particularly where the defendant's wrongful acts create the difficulty in computation.[364]  Plaintiffs then point to evidence that, in their view, shows that: (1) Besco's actions led to a "chronic and permanent set back to their business"; (2) Plaintiffs would have generated additional revenues and profits but for Besco's purposeful violation of their rights; (3) they have since realized upon their business plan, but would have done so even more but for Besco's actions; and (4) the requested $4 million represents a conservative midpoint between the $3-5 million in consequential damages they attributed to Besco, approximately 10% of the $40 million they reasonably projected to achieve

---

[359] Plaintiffs did not include patent infringement as an available theory of recovery for these damages.  *See* R. Doc. 317-2 at 257.

[360] R. Doc. 317-1 at 10-15.

[361] *Id.*; R. Doc. 349 at 2-3.

[362] R. Doc. 317-1 at 11.

[363] *Id.* at 11, 14.

[364] R. Doc. 330 at 7-9.

over five years.[365]  Plaintiffs contend that "[f]ar from being 'discredited,'" their business plan was "fundamentally substantiated" at trial, pointing to Shane Triche's hours of testimony and accompanying documentary evidence.[366]  They add that Triche's testimony and the business plan were all admitted by the Court, mostly without objection, and that regardless, Besco's arguments go to the weight, not the admissibility, of the testimony.[367]

As has been established, the jury awarded $552,000.00 of the proposed $4 million in business damages as consequential damages for bad faith breach of contract, leaving $3,448,000.00 available for a potential award of damages for fraud, violation of the LUTPA, and state and federal trade-secrets misappropriation.  Because the Court finds that the requested $552,000.00 in diverted rentals and $818,805.10 in unjust enrichment damages are adequately supported (a total sum of $1,370,805.10), only $129,194.90 of the $1.5 million awarded under interrogatory number 14 remains to be supported by the additional business damages pool.  Put another way, given the amounts established as diverted rentals and unjust enrichment damages, only $681,194.90 (the $552.000.00 awarded as consequential damages plus $129,194.90 as the portion of the $1.5 million awarded as non-contract/non-patent damages after deducting the amounts constituting diverted rentals and unjust enrichment damages) must be supported by the additional business damages pool.

Plaintiffs requested additional business damages based on Cajun's five-year business plan, which projected approximately $40 million in profits.  According to Shane Triche, approximately 10 percent of that value is where the company would have been had Besco not copied the ERIS, which is why Plaintiffs sought $4 million.[368]

---

[365] *Id.* at 9-10.
[366] R. Doc. 366 at 5 & n.4.
[367] *Id.* at 5-6.
[368] R. Doc. 302 at 74-75.

84

The jury was instructed that "damages for loss of profits may not be based on speculation and conjecture, such damages need only be proven within a reasonable certainty."[369]  "Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Maloney Cinque, L.L.C. v. Pac. Ins. Co.*, 89 So. 3d 12, 25 (La. App. 2012) (citations omitted).  A jury's award of damages "may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) (citing *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985)).

The Court initially observes that $681,194.90 is far less than the requested $4 million in additional business damages, demonstrating that the jury exercised caution and restraint in fashioning its award.  Clearly, the jury credited much of Besco's argument that this figure was unreasonably high.  Besco's expert Theriot assailed Cajun's business plan, testifying that approximately 80% of the revenue generating the projected profits would come from sales of intellectual property, yet there was no evidence that Plaintiffs had sold any intellectual property rights, and there was no source provided for these projected sales.[370]  Indeed, according to the plan, Cajun expected to generate net profits of $110,000 in year 1 (2017), $1,500,000 in year 2 (2018), $650,000 in year 3 (2019), $22,600,000 in year 4 (2020), and $13,100,000 in year 5 (2021); projected sales of "some large [intellectual property] products" explains the significant jump in profits for the last two of these years.[371]  Theriot also testified that the business plan expected profit margins in the 70 percent range, although in the oil-and-gas industry, 25 to 35 percent is considered a good profit margin, and he had no knowledge of such high profit margins in the machine

---

[369] R. Doc. 266 at 13.
[370] R. Doc. 305 at 26-27.
[371] R. Doc. 317-2 at 113; Trial Ex. 26.

shop/fabrication sector.[372]  Plaintiffs did not contradict this last aspect of Theriot's testimony, and through Shane Triche's testimony indicated that Plaintiffs were three years behind in executing their business plan, and so, it was reasonable for the jury to refrain from awarding the full $4 million requested by Plaintiffs as additional business damages.

However, the business plan is not devoid of concrete financial support.  As Theriot stated, Cajun's financial statements reported a loss of $224,142.44 in 2014; a profit of $5,044.98 in 2015; and a profit of $664,875.18 in 2016.[373]  When asked about evidence of Cajun's past performance that would be indicative of its ability to produce revenue, Theriot testified that Cajun broke even in 2015 "when they began to do work with [Besco], and in 2016, they had a $660,000 profit again doing work with [Besco]."[374]  "Louisiana courts … permit projections of future profits to be used as evidence of lost profits, so long as there is a reasonable basis for making those projections, such as the business's past performance."  *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 295 (5th Cir. 2012) (citations omitted).  With evidence that Cajun's business was trending upward, earning a profit of $664,875.18 in 2016, the jury could have estimated that Cajun would have earned at least the $681,194.90 it awarded as additional business damages in profits over the course of the next several years had Besco's misconduct not occurred, even accounting for the amount it awarded for diverted rentals which would have constituted at least a portion of Cajun's lost profits in 2017 and 2018.[375]  Fully apprised of these facets of Plaintiffs' damages case, the jury exercised its discretion conservatively in awarding much less than the amount Plaintiffs requested in additional business damages.  Accordingly, based on the financial statements alone, the award of $681,194.90 for additional business damages was neither excessive nor speculative.

---

[372] R. Doc. 305 at 29-32.
[373] *Id.* at 23; R. Doc. 317-2 at 242-50; Trial Ex. 26.
[374] R. Doc. 305 at 29.
[375] *See* Trial Ex. 388.

### g. Elite

Besco asserts that because Cajun initially brought suit against Elite as a joint tortfeasor, along with Besco, for trade-secrets misappropriation, Plaintiffs surrendered any portion of the misappropriation damages attributable to Elite when Elite was voluntarily dismissed from the matter.[376]  Plaintiffs respond that Jamie Lovell told Elite that the ERIS and its pending patent belonged to Besco, and thus Elite, which was at best induced by Besco into its conduct, did not misappropriate Plaintiffs' trade secrets and was appropriately dismissed; accordingly, no damages are attributable to Elite.[377]

Whether Elite also misappropriated Plaintiffs' trade secrets or whether any trade-secrets damages were attributable to Elite are questions that were not identified as contested issues in the pretrial order.  Nor did Besco include these questions in its proposed verdict form,[378] or object to the absence of them in the Court's proposed verdict form.  Accordingly, Besco has waived its right to raise this argument at this late juncture.  *Elvis Presley*, 141 F.3d at 206; *SJD-CC, LLC*, 2010 WL 1489723, at *1.

### 6. Plaintiffs' Motion to Alter the Judgment With Respect to the Scope of Injunction

Plaintiffs seek to alter the judgment on the basis that the Court mistakenly interpreted section 3.9 of the Rental Agreement in its prior ruling concerning declaratory judgment and injunctive relief.[379]  Section 3.9 reads in full:

> The Equipment [the ERIS tools] shall at all times remain the property of Company [Cajun].  Nothing contained in these Terms shall confer any interest in the Equipment to the Customer [Besco] and [Besco] shall not assign, sublease, pledge, mortgage or encumber the Equipment or any interest therein.  [Besco] shall not make any alteration to or modification of the Equipment, and shall not alter, deface, cover up or conceal any numbering, lettering, insignia or labels displayed on the

---

[376] R. Doc. 317-1 at 22-23.
[377] R. Doc. 330 at 25.
[378] *See* R. Doc. 247.
[379] R. Doc. 318-1 at 5-8 (referencing R. Doc. 308).

Equipment.  [Besco] shall not disassemble, reverse engineer or analyze, nor have any other third-party disassemble, reverse engineer or analyze, any Equipment that may be furnished to or provided by [Cajun] under this Agreement, except as specifically allowed under the terms and conditions of this Agreement.  *[Cajun] shall retain all right, title and interest to all improvements and modifications made to the Equipment, whether made by [Cajun] or [Besco].  To ensure that ownership of the Equipment remains with [Cajun], [Besco] hereby assigns all right, title and interest in all information conceived of and/or reduced to practice that in any way relates to the Equipment.*[380]

Plaintiffs assert that the Court incorrectly interpreted the two italicized sentences in finding that "this provision provides Cajun with intellectual property rights but does not provide that these rights confer on Cajun ownership of the physical materials constituting the ten tools in Besco's possession."[381]  Plaintiffs argue that the first sentence, providing that Cajun retains "all right, title, and interest to **all improvements and modifications made to the Equipment**" ensures that "customers do not take for themselves the physical improvements or modifications to the tools made possible by the rental of the tools," and is not limited in scope to intellectual property, while the second sentence, providing that Cajun is assigned "all right, title, and interest **in all information** conceived of and/or reduced to practice **that in any way relates to the Equipment**," encompasses all intellectual property, including any improvements and modifications.[382]  Therefore, they say, if the "improvements and modifications" sentence is limited to intellectual property rights, the second sentence is rendered superfluous.[383]  Plaintiffs also argue that the effect of the Court's construction leads to absurd consequences, because under this construction if Besco had made modifications to the actual ERIS tools, those physical modifications would clearly

---

[380] Trial Ex. 25 (emphasis added).
[381] R. Doc. 318-1 at 5 (citing R. Doc. 308 at 17).
[382] *Id.* at 3, 7 (emphasis in original).
[383] *Id.* at 7.

belong to Cajun, while Besco's "more egregious conduct of making its own knock-offs results in Besco being able to circumvent the intent of the protections" in the provision.[384]

Besco counters that, contrary to Plaintiffs' assertions, these two sentences "work together in tandem" because the first establishes Cajun's ownership in the improvements and modifications, while the second "takes the next step and assigns any related information (i.e. the intellectual property) to Cajun."[385] Besco explains that the first sentence would be ineffective without the second because "intellectual property law generally imposes an affirmative assignment requirement," pointing to statutory provisions in copyright and patent law.[386] Besco stresses that Plaintiffs also ignore section 1.5 of the Rental Agreement, which defines "Equipment" as "all equipment, tools, products, materials and supplies and/or merchandise rented or sold by [Cajun] and/or provided in connection with Services performed by [Cajun]."[387]

As the Court previously decided, the plain language of section 3.9 does not "confer on Cajun ownership of the physical materials constituting the ten tools in Besco's possession."[388] The first sentence at issue states that Cajun "***shall retain*** all right, title and interest to all improvements and modifications ***made to the Equipment***, whether made by [Cajun] or [Besco]."[389] As Besco points out, "Equipment" clearly refers to Cajun's physical property (the actual ERIS tools). This sentence establishes, then, that Cajun retains ownership of "all improvements and modifications" – physical or otherwise – made to its own physical property, regardless of which party makes them.[390] But Cajun cannot "retain" what is not its own. So, "[t]o ensure that ownership of the

---

[384] *Id.*

[385] R. Doc. 326 at 5.

[386] *Id.*

[387] *Id.* at 4 & n.4; Trial Ex. 25.

[388] R. Doc. 308 at 17.

[389] Trial Ex. 25 (emphasis added).

[390] Even if the phrase "improvements and modifications" refers more narrowly to only physical "improvements and modifications," as Plaintiffs propose, it can mean only "improvements and modifications" made to Cajun's physical tools. This sentence cannot reasonably be read to mean that Cajun "retains" ownership of Besco's

Equipment remains with [Cajun]," the second sentence ***assigns*** to Cajun any of Besco's information, *i.e.* any intellectual property, "that in any way relates to the Equipment."[391]  Thus, the two sentences serve distinct but complementary functions.  That Besco assigned to Cajun any intellectual property relating to the ERIS does not mean that it also assigned the physical property it may have used to "reduce[] to practice" this intellectual property.  Plaintiffs fail to explain how Cajun's ownership rights in "improvements and modifications ***made to the Equipment***" confer on Cajun ownership of Besco's physical equipment.

There are no "absurd consequences" resulting from this interpretation.  Plaintiffs propose that Besco's knock-off tools, made with its own physical property, are "effectively no different" than Besco's making physical improvements or modifications to Cajun's physical property, the rented tools.[392]  Not true.  The Court has enjoined Besco from using the knock-off tools, but it has not prohibited Besco from breaking down these tools and re-using the physical materials (which it still owns) in some other form.  To read section 3.9 as requiring that Cajun be given the knock-off tools would amount to an absurd consequence Plaintiffs purportedly abjure.  Section 3.9's assignment to Cajun of any of Besco's intellectual-property rights relating to the ERIS prevents Besco from "circumvent[ing]" Cajun's ownership of all improvements and modifications made to the ERIS by copying the ERIS using its own physical materials.  Plaintiffs, without providing any legal authority,[393] seem to believe that to protect Cajun's intellectual-property rights, Besco's

---

[391] *Id.* (emphasis added).

[392] *See* R. Doc. 318-1 at 7.

[393] Plaintiffs cite article 526 of the Louisiana Civil Code which entitles an "owner of a thing … to recover it from anyone who possesses or detains it without right and to obtain judgment recognizing his ownership and ordering delivery of the thing to him." *Id.* at 6, 8 (quoting La. Civ. Code art. 526).  But contrary to Plaintiffs' assertion, Cajun has ***not*** "obtained judgment recognizing its ownership of the knock-off tools." *See* R. Doc. 318-1 at 8.  Cajun has not shown how judgment recognizing its ownership of "all right, title and interest to all improvements and modifications made to the ERIS, and the information conceived of and/or reduced to practice that in any way relates to the ERIS" entitles it to seize Besco's physical tools. *See* R. Doc. 312 at 2.

improvements and modifications made to Besco's physical tools, or put another way, that Cajun "retains" ownership of Besco's physical tools because Besco made improvements and modifications to them.

physical property must be seized. But the damages, injunction, and declaratory judgment of ownership obtained by Plaintiffs against Besco serve to protect these intellectual-property rights.

Plaintiffs' concern – that "Besco cannot 'fully re-purpose its tools and materials so that they do not in any way infringe upon Cajun's ownership by contract of all improvements, modifications, and information relating to the ERIS'" because "[a]ny further modification of the knock-offs is necessarily owned by Cajun" and the tools "embody information that Besco is enjoined from using"[394] – is premature. If Besco fails to ***fully re-purpose*** its physical tools and materials, and uses them so that they infringe any of Plaintiffs' rights, it will risk the consequences of acting in violation of the judgment of this Court.[395]

### 7. Besco's Motion to Stay Execution of Judgment

Besco moves the Court to stay execution of judgment pending resolution of its substantive post-trial motions plus 30 days.[396] Besco argues that under Rule 62(f) of the Federal Rules of Civil Procedure, as applied by federal courts in Louisiana, it is entitled to such a stay. Plaintiffs respond that no such stay is, or should be, permitted without requiring Besco to post a bond or show that any judicial mortgage which may have been created covers the amount of $7,744,798.32, the amount of the security agreed upon and incorporated into the judgment.[397]

Rule 62(f) entitles a judgment debtor to the same stay of execution of judgment as the judgment debtor would have received in state court. Fed. R. Civ. P. 62(f). This rule "is qualified by the requirement that the state forum treat judgments as a lien, or encumbrance, on the property of judgment debtors." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 771 F.3d 301, 303-04 (5th Cir. 2014) (quoting *Castillo v. Montelepre, Inc.*, 999 F.2d 931, 942 (5th Cir. 1993)). "[I]n Louisiana,

---

[394] *Id.* at 8 (quoting R. Doc. 308 at 17).
[395] This applies to any use by Besco of any accused products or the so-called "third design."
[396] R. Doc. 319.
[397] R. Doc. 327.

the filing of a judgment with the recorder of mortgages creates a judicial mortgage that burdens certain real and immovable property."  *Id.* (quotations omitted).  No other steps must be taken to create this judicial mortgage.  *See id.* (discussing and quoting *El Paso Indep. Sch. Dist. v. Richard R.*, 599 F. Supp. 2d 759, 764 (W.D. Tex. 2008): "Once filed, the judgment itself creates the lien, and this Court is aware of no other requirements with which the judgment creditor must comply.").

Article 2252 of the Louisiana Code of Civil Procedure provides that a judgment creditor may proceed with execution of a judgment only after the time in which to file a suspensive appeal has elapsed.  La. Code. Civ. P. art. 2252.  A suspensive appeal must be filed within 30 days of "[t]he date of the mailing of notice of the court's refusal to grant a timely application for a new trial or judgment notwithstanding the verdict."  *Id.* art. 2123A(2).

Upon entering this Order & Reasons denying the parties' Rule 50 and Rule 59 motions, Besco is entitled to a 30-day stay of execution of judgment under Louisiana law.  *See, e.g., Cambridge Toxicology Grp., Inc. v. Exnicios*, 2005 WL 8173873, at *1 (E.D. La. Apr. 7, 2005). Plaintiffs repeatedly protest that permitting such a stay without a bond requirement unjustly allows Besco to challenge the verdict and judgment without the risk of security, but this ignores that federal and Louisiana law deem the judicial mortgage on Besco's immovable property to be adequate security.  Nor is there any language in Rule 62(f) or article 2252 indicating that the stay applies to execution on only immovable property, as would allow Plaintiffs to seize Besco's movable property, as Plaintiffs propose.[398]  Rather, these provisions work together to provide a stay of execution of judgment (without qualification), with the judicial mortgage, which attaches only to immovable property, providing an interim security.

Accordingly, the Court grants Besco's motion for a stay of execution of judgment, as

---

[398] *See* R. Doc. 327 at 7-8.

limited by law to 30 days from the denial of post-trial motions, absent the posting of the security specified in the judgment.[399]

### 8. Plaintiffs' Motion for Writ of Execution and/or Writ of Fieri Facias

Plaintiffs move for issuance of a writ of execution and/or writ of fieri facias,[400] which Besco opposes for the same reasons it moves for a stay of execution.[401]   Because Besco is entitled to a stay of execution, the Court denies Plaintiffs' motion.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Besco's motion for post-trial relief on Plaintiffs' patent-infringement claim (R. Doc. 314) is DENIED.

IT IS FURTHER ORDERED that Besco's motion for post-trial relief on fraud and LUTPA claims (R. Doc. 315) is DENIED.

IT IS FURTHER ORDERED that Besco's motion for post-trial relief on trade-secret misappropriation and breach-of-contract claims (R. Doc. 316) is DENIED.

IT IS FURTHER ORDERED that Besco's Rule 59 motion for new trial / alter / amend / for remittitur on damages award to Plaintiffs (R. Doc. 317) is GRANTED IN PART in that the final judgment (R. Doc. 312) is hereby amended to delete the phrase "for diverted rentals" from paragraph 5, and an Amended Final Judgment will be issued reflecting such amendment.   Besco's motion is DENIED in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' motion to alter the judgment with respect to the scope of injunction (R. Doc. 318) is DENIED.

---

[399] Plaintiffs also argue that Besco is not entitled to a stay of the injunction in the judgment.  *See* R. Doc. 327 at 10.  The Court does not understand Besco to be requesting such a stay.
[400] R. Doc. 320.
[401] R. Doc. 329.

IT IS FURTHER ORDERED that Besco's motion to stay execution of judgment (R. Doc. 319) is GRANTED.   Execution of judgment is stayed through 30 days from the entry of the Amended Final Judgment.

IT IS FURTHER ORDERED that Plaintiffs' motion for writ of execution and/or writ of fieri facias (R. Doc. 320) is DENIED.

New Orleans, Louisiana, this 15th day of June, 2020.


_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE